DECLARATION OF PATRICE P. JEAN, PH.D.

# EXHIBIT 1

**COPY**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MERIAL LIMITED,            )
                           )
         Plaintiff;        )
                           )
vs.                        )   CASE NO. 1:05-CV-3168
                           )
INTERVET, INC.,            )
                           )
         Defendant.        )


HEARING ON VARIOUS MOTIONS

MONDAY, APRIL 24, 2006

BEFORE HON. CHARLES A. PANNELL, JR.


APPEARANCES:

ON BEHALF OF PLAINTIFFS:    Ms. Judy Jarecki-Black
                            Mr. John Patrick Elsevier
                            Mr. Robert L. Lee
                            Mr. Thomas J. Kowalski
                            Ms. Elizabeth K. Haynes

ON BEHALF OF DEFENDANTS:    Mr. Richard L. DeLucia
                            Mr. Michael D. Loughnane
                            Mr. John R. Hutchins
                            Mr. William G. James
                            Mr. T. Hunter Jefferson


Martha J. Frutchey
U.S. District Reporter
Room 2314, U.S. Courthouse
75 Spring Street, SW.
Atlanta, Georgia 30303-3369
(404) 215-1573

             MR. ELSEVIER:  Your Honor, Mr. Kowalski will be handling
the plaintiff's preliminary injunction motion this morning.  We
also have three witnesses on behalf of Merial that we have
sequestered, and we would also ask that because of the nature of
the testimony today, that the defendant's witnesses be
sequestered.  The witnesses that we have today on behalf of
Merial are Mrs. Jean Mauldin, Merial's chief financial officer;
Dr. Frank Milward, Merial's Director of New Antigen Discovery
and Process Development; and Mr. Steve Parker, who is Merial's
Director of U.S. Large Animal Biologics Market.

             THE COURT:  Well, let's see.  Since they are
corporations, you all want to keep a corporate representative in
the courtroom?

             MR. DELUCIA:  In fact, Your Honor, we actually were not
planning -- we referred to them as potential witnesses.
Actually we don't intend for any of these folks to testify, so
that was simply a misstatement.  I apologize for that.  So we
shouldn't have to sequester them.

             MR. ELSEVIER:  In addition to the witness issue, Your
Honor --

             THE COURT:  It's going to be a long day if you can't
agree on who the witnesses are going to be.

             MR. DELUCIA:  Your Honor, there is another point that
could make it a shorter day.  My name is Rich DeLucia, outside
counsel for Intervet.  I'm here to counter block Mr. Kowalski

1  immune system?

2  A.   Presents one or several epitopes.

3  Q.   So the DNA that would encode the protein in the Intervet

4  vaccine encodes an epitope?

5  A.   Would encode one or several epitopes.

6  Q.   Of?

7  A.   Of PCV2.

8       MR. KOWALSKI:  Thank you.  I think I have no further

9  questions.  I then call Mr. Parker.

10      THE COURT:  Any further questions for this witness?

11      MR. DELUCIA:  Nothing further, Your Honor.  Thank you.

12      THE COURT:  Please step down.  Call your next witness.

13 (Witness sworn)

14      COURTROOM DEPUTY:  Sir, please raise your right hand.

15 (Witness sworn)

16      COURTROOM DEPUTY:  Please be seated.  State your full

17 name for the record.

18 A.   William Steven Parker.

19              **DIRECT EXAMINATION BY MR. KOWALSKI:**

20 Q.   Mr. Parker, would you please just detail for me your

21 background, professional educational experience say from college

22 forward, for everyone here?

23 A.   Yes, sir.  I received an animal science degree from the

24 University of Georgia in 1976, went to work for Merck and

25 Company in 1977.  Proceeded through the ranks of Merck and

1  Company from sales positions to marketing positions, sales op.
2  position. And at the time of the formation of Merial, was given
3  the opportunity to go back to New Jersey in another management
4  position, which was my second opportunity in marketing. And I'm
5  currently responsible for large animal biologicals in swine
6  pharmaceuticals for Merial for the U.S. region.
7  Q.    I put before you a document which we have marked as
8  plaintiff's exhibit 3. Do you recognize that document?
9  A.    Yes, I do.
10 Q.    And what is it?
11 A.    This is my current CV.
12 Q.    All right. And it accurately reflects in a summary
13 fashion your background, correct?
14 A.    Yes, sir. That is correct.
15 Q.    All right. And you previously have given a declaration in
16 this matter.
17 A.    Yes.
18       MR. KOWALSKI: All right. We are going to give you a
19 copy of a declaration. I presume you have a copy, Mr. DeLucia,
20 of Mr. Parker's deposition.
21       MR. DELUCIA: I do. Thank you.
22 A.    Thank you.
23 Q.    Now, Mr. Parker, at paragraphs 6 to 8, pages 3 to 4, there
24 is a brief discussion of the swine market. In your capacity and
25 through your experience, could you please elaborate for me on

1  A.  Yes. It is a vaccine for the sow, that once you give it
2  to the breeding unit, the sow who gives birth to the pigs, then
3  she is able to confer protection to the piglets. So you
4  eliminate the need for vaccinating the pig.
5  Q.  How long does this protection last?
6  A.  It would last all the way through slaughter, once those
7  pigs are grown out and taken into slaughter.
8  Q.  So we have talked about -- And I don't know if you have
9  heard this about the Intervet vaccine being for piglets, would
10 that then compete with the Circovac product?
11 A.  Yes, sir, very much so. If a producer is vaccinating
12 their pig herd, they would eliminate the need initially until
13 they prove that it's efficacious, they would probably not want
14 to spend the money to also then vaccinate the sows. Since they
15 operate on such low margins in terms of profitability, it would
16 not really make sense to double up on your protection.
17 Q.  So the discussion that I think we have heard today of the
18 Intervet and Merial products being complementary, is that
19 correct?
20 A.  I'm not sure if I understand the logic behind that.
21 Q.  So you would say they are not complementary then?
22 A.  Clarify your question again. Are you saying that in a
23 producer's mind, they would consider using both of them at the
24 same time?
25 Q.  Yes, that's exactly the question.

1  the infringement continues?
2  A.    All right.  You are talking about the words by the
3  picture.  Okay.
4  Q.    Yes.
5  A.    Yes.  I mean, if you take that in a very literal sense,
6  the swine industry will have one less choice out there if Merial
7  chooses not to go into that market segment and certainly I'll be
8  hurt by it.  I'm the one directly impacted by it when it comes
9  to marketing.  It would be research and development people,
10 manufacturing people, distribution, our relationship in that
11 industry, our credibility.  Our image with the swine industry
12 will be impacted.  I think the industry is very welcoming and
13 they are encouraging us to proceed with this.  They realize that
14 we have a limited position right now, but they also view Merial
15 as an innovative company that is out there working hard to bring
16 solutions.  So I see that there will be a lot of not only direct
17 impact, but goodwill lost, effort lost, a lot of time lost.
18         MR. KOWALSKI:  I think I'll thank you very much for your
19 testimony, Mr. Parker.  I'll stop here.
20         MR. DELUCIA:  Your Honor, I think my colleague, Mr.
21 Hutchins, is going to cross.
22         THE COURT:  All right, sir.
23              **CROSS EXAMINATION BY MR. HUTCHINS:**
24 Q.    Mr. Parker, you say the pork industry is certainly
25 encouraging of Merial's attempts to come out with a vaccine for

1   PMWS, is that correct?
2   A.    Yes, sir, that is correct.
3   Q.    Are they equally as encouraging of you in your attempts to
4   keep Intervet's vaccine from them?
5   A.    I don't know how to answer that.
6   Q.    Yes or no.
7   A.    I have never entered into a discussion with anybody about
8   that.
9   Q.    So you have never spoken to any pork producer concerning
10  the harm to them of the removal of Intervet's vaccine from the
11  market?
12  A.    No, I have not.
13  Q.    You are aware, though, that Intervet's vaccine is the only
14  vaccine on the market, correct, in the United States?
15  A.    It's the only licensed, conditional licensed product in
16  the United States at this point.
17  Q.    And therefore it is the only vaccine available to the pork
18  industry in the United States to protect against PMWS, yes?
19  A.    At this point in time.
20  Q.    At this point in time, at the time that you are seeking an
21  injunction, now.
22  A.    I believe there will be another solution within a month or
23  two, but at this point in time what you are saying is literally
24  true, but it may not continue to be true in a very short period
25  of time.

1  Q.    And that's because eventually the U.S.D.A. may allow your
2  product on the market, correct?
3  A.    That is correct.
4  Q.    And it could be as soon as a month or two, right?
5  A.    That's fair.
6  Q.    Could be as long as four months, right?
7  A.    I don't believe so.
8  Q.    Well, I know you don't believe so, but it could be, right?
9  A.    I don't believe so.
10 Q.    Has the U.S.D.A. told you that they definitely are going
11 to put you on the market sooner than four months from now?
12 A.    There is no assurance from the U.S.D.A.
13 Q.    So given that there is no assurance from the U.S.D.A.,
14 regardless of your personal belief, it is certainly possible at
15 least four months will go by before you have a product on the
16 market, right?
17 A.    I don't believe that.
18 Q.    How do you know, since the U.S.D.A. has given you no
19 assurance whatsoever?
20 A.    I just don't believe that.
21 Q.    Okay. Fair enough. At present how many pig vaccines does
22 Merial have on the market?
23 A.    None in the United States.
24 Q.    In the United States. And just for future reference, when
25 I talk about the market, I'll be referring to the U.S.

1  A.  Again, it is based on weight. It would be difficult to
2  estimate what that is. Depends on an individual herd situation.
3  Q.  And how much does Merial's vaccine cost per pig, per pig
4  protective. Let me take one step back, since it is administered
5  to sows. How much does it cost per dose to sow?
6  A.  Our published price in Canada is about five dollars
7  Canadian per sow.
8  Q.  And how much -- Have you even set a price for the U.S.
9  market?
10 A.  We are researching that.
11 Q.  So no?
12 A.  We are researching it. We have options.
13 Q.  We have options, but you mean we haven't yet set a price
14 though, right?
15 A.  Depends what part of the exercise I'm going through on
16 analysis. There are some plates I use for modeling. I'm not
17 sure what your question is getting at.
18 Q.  My question, I thought, was simple. Has Merial, Limited
19 set the price at which it will sell the Circovac vaccine in the
20 United States?
21 A.  No.
22 Q.  But in Canada it sells for about five dollars Canadian a
23 dose?
24 A.  Correct.
25 Q.  And how many piglets are covered by that dose?

1  witness. He wants to answer the question, but you want yes or
2  no. Can we let the witness give his full answer, please?
3       THE COURT: The question calls for opinion. I don't see
4  how it could call for --
5       MR. HUTCHINS: Your Honor, my understanding, and maybe
6  I'm wrong, is that the witness said he couldn't conceive of why
7  farmers hypothetically would use both products, because it
8  wouldn't make economic sense. So given that he offered that
9  opinion, it seems to me it very well may make very good economic
10 sense for these products to be used in a complementary fashion,
11 were Circovac ever granted permission to sell in the United
12 States. So I think it's fair for me to ask the witness yes or
13 no, is that a possibility.
14      THE COURT: All right. Ask your question again.
15 Q.   Certainly. Given that it might result in a savings of a
16 hundred dollars in preventing the death of the pig, isn't it
17 possible that farmers may choose to use both Merial's and
18 Intervet's vaccine if both were on the market as sort of a belt
19 and suspenders?
20 A.   It's possible.
21 Q.   Thank you. Now, if or when Merial goes on the market,
22 will it be able to immediately fulfill the entirety of the U.S.
23 pig market?
24 A.   I don't understand your question.
25 Q.   Sure. How many sows are there in the United States?

1  About 10 million?
2  A.    6 million.
3  Q.    Roughly 6 million sows.  Does Merial have 6 million doses
4  of its vaccine ready to ship to the United States right now?
5  A.    I would have to ask does the industry recognize 6 million
6  sows as being impacted.
7  Q.    Well, my question was simply does Merial have 6 million
8  doses of its vaccine ready to ship to the United States today?
9  A.    No.
10 Q.    Has Merial, Limited been stock piling vaccine to ship
11 immediately to the United States?
12 A.    Yes.
13 Q.    And how much has it stock piled?
14 A.    It depends.
15 Q.    On what?
16 A.    Any given point in time.
17 Q.    What's your estimate right now?
18 A.    Enough to make a reasonable market introduction.
19 Q.    And what percentage of the market is a reasonable market
20 introduction?
21 A.    Again, that would depend.
22 Q.    Sir, do you know or do you not know how many doses Merial
23 is capable of sending to the United States immediately upon its
24 launch?
25 A.    No.

# CERTIFICATE

I, Martha J. Frutchey, do hereby certify that I am a U.S. District Court Reporter for the Northern District of Georgia, Atlanta Division; that I reported the foregoing and the same is a true and accurate transcription of my shorthand notes as taken aforesaid.

_Martha J. Frutchey_
Martha J. Frutchey