# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MERIAL LIMITED

       *Plaintiff*,

   v.

INTERVET INC.

       *Defendant.*

Civil Action No. 1:05CV3168

## CONSOLIDATED BRIEF IN OPPOSITION TO MERIAL LTD.'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................... iii

SUMMARY OF THE ARGUMENT ..................................................... 1

NATURE AND STAGE OF THE PROCEEDING ................................... 7

STATEMENT OF FACTS ................................................................ 7

    I.   The Parties ....................................................................... 7

        A.  Intervet and Its Porcine Circovirus Vaccine ......................... 7

        B.  Merial and Its Planned Porcine Circovirus Vaccine .............. 9

        C.  The Market for Intervet's Vaccine ...................................... 10

ARGUMENT ............................................................................... 11

    I.  LEGAL STANDARDS FOR PRELIMINARY
       INJUNCTIVE RELIEF .............................................................. 11

    II.  MERIAL HAS FAILED TO PROVE THE FOUR FACTORS
        REQUIRED FOR A PRELIMINARY INJUNCTION ..................... 12

        A.  Merial Cannnot Prove That It Is Likely to
           Succeed at Trial ............................................................. 12

           1.  Intervet Does Not Infringe the '601 Patent ..................... 12

               a.  Claim Construction ................................................ 13

               b.  Applying the Properly-Construed Claims to
                   Intervet's Vaccine ................................................. 15

2. The '601 Patent Is Invalid and Unenforceable ..............................19

    a. The '601 Patent Is Invalid ........................................................19

    b. The '601 Patent Is Unenforceable ..........................................23

B. Merial Cannot Prove That It Is Being Irreparably Harmed ..........................................................................................25

C. The Balance of the Hardships Favor Intervet ......................................32

D. The Public Interest Strongly Favors Intervet .......................................33

CONCLUSION ......................................................................................................34

# TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*A.O. Smith Corp. v. Federal Trade Commission,*
530 F.2d 515 (3d Cir. 1976)...................................................................... 27

*Al-Site Corp. v. Cable Car Sunglasses,*
911 F. Supp. 410 (N.D. Cal. 1994)............................................................ 32

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) .............................................. 3, 12, 13,
19, 25, 32

*American Cyanamid Co. v. U.S. Surgical Corp.,*
833 F. Supp. 92 (D. Conn. 1992)............................................................... 29

*Business Objects, S.A. v. Microstrategy, Inc.,*
393 F.3d 1366 (Fed. Cir. 2005) ................................................................. 18

*Eli Lilly & Co. v. American Cyanamid Co.,*
82 F.3d 1568 (Fed. Cir. 1996)............................................................... 25, 31

*Enzo Biochem, Inc. v, Gen-Probe, Inc.,*
296 F.3d 1316 (Fed. Cir. 2002) ................................................................. 23

*Festo Corp. v. Shoketsu Kinozku Kogyo Kabushiki Co.,*
535 U.S. 722 (2002)..................................................................................... 18

*Fiers v. Revel,*
984 F.2d 1164 (Fed. Cir. 1993) ............................................................. 21, 22

*Gold Coast Publications, Inc. v. Corrigan,*
42 F.3d 1336 (11th Cir. 1994)..................................................................... 11

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.,*
906 F.2d 679 (Fed. Cir. 1990)..................................................................... 31

*Ingram v. Ault,*
    50 F.3d 898 (11th Cir. 1995)...................................................................... 1, 11

*Johnson & Johnston Associates Inc. v. R.E. Service Co.,*
    285 F.3d 1046 (Fed. Cir. 2002) ................................................................. 18

*Judin v. United States,*
    110 F.3d 780 (Fed. Cir. 1997)..................................................................... 16

*Lockwood v. American Airlines, Inc.,*
    107 F.3d 1565 (Fed. Cir. 1997) ................................................................. 20

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995),
    *aff'd*, 517 U.S. 370 (1996) ........................................................................ 13

*Monsanto Co. v. McFarling,*
    302 F.3d 1291 (Fed. Cir. 2002) ................................................................. 27

*Northeastern Florida Chapter of the Association of General Contractors of America v.*
*City of Jacksonville, Florida,*
    896 F.2d 1283 (11th Cir. 1990)............................................................... 1, 11

*Novo Nordisk Pharmaceuticals, Inc. v. Bio-Technology General Corp.,*
    424 F.3d 1347 (Fed. Cir. 2005) ................................................................. 23

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991).................................................................. 5, 25,
                                                                                                        29, 31

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 13

*Reebok International Ltd. v. J. Baker, Inc.,*
    32 F.3d 1552 (Fed. Cir. 1994).................................................................. 4, 27

*Regents of the University of California v. Eli Lilly and Co.,*

119 F.3d 1559 (Fed. Cir. 1997) ............................................................... 20, 21, 22

*Rohm & Haas Co. v. Mobil Oil Corp.*,
525 F. Supp. 1298 (D. Del. 1981).............................................................. 26, 33

*Roper Corp. v. Litton Systems, Inc.*,
757 F.2d 1266 (Fed. Cir. 1985) ................................................................ 25

*Southwall Technologies., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995).................................................................. 19

*Upjohn Co. v. Riahom Corp.*,
641 F.Supp. 1209 (D. Del. 1986).............................................................. 2, 16, 26

*View Engineering, Inc. v. Robotic Vision Systems, Inc.*,
208 F.3d 981 (Fed. Cir. 2000).................................................................. 15

*Zardui-Quintana v. Richard*,
768 F.2d 1213 (11th Cir. 1985).................................................................. 1, 11

*In re Ziegler*,
992 F.2d 1197 (Fed. Cir. 1993) ................................................................ 20

Defendant Intervet Inc. ("Intervet") hereby opposes the recent motions for a temporary restraining order and preliminary injunction filed by Merial Limited ("Merial"). Merial's motion for a TRO incorporated the arguments made in Merial's motion for a preliminary injunction. This brief addresses those arguments. Merial's motions do not justify the extraordinary, immediate injunctive relief Merial now seeks, either in the form of a preliminary injunction or a TRO. Because Merial has not shown it is entitled to a preliminary injunction (or a TRO) each of its motions should be denied.

## SUMMARY OF THE ARGUMENT

"The preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). In order to obtain a preliminary injunction or a TRO, a movant must demonstrate: a substantial likelihood of success, irreparable harm, and that both the balance of the hardships and the public interest favor an injunction. *See Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985). Here, Merial fails to prove any of these prerequisites, much less all four.

To begin with, Merial asserts that it is likely to prove that Intervet's vaccine for the Porcine Circovirus ("PCV") infringes the claims of United States Patent No. 6,368,601 ("the '601 patent"), yet Merial and its expert have not undertaken any evaluation or testing of the accused product whatsoever.  Rather, Merial admittedly bases its entire infringement "analysis" on the fact that the United States Department of Agriculture ("USDA"), in a letter granting a conditional license for Intervet's vaccine, referred to the vaccine as a "Porcine Circovirus Vaccine, Type 2, Killed Baculovirus Vector."  As explained in detail below, these seven words do not equate with the claims of the '601 patent, and do not provide any basis from which one could actually prove that Intervet's vaccine infringes the '601 patent.  As a result, Merial's motion fails on its face to provide the Court with a basis for finding a reasonable likelihood of success of proving infringement.  *See*, *e.g.*, *Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1220-21 (D. Del. 1986) (denying preliminary injunction in part because of lack of direct proof of infringement).

Indeed, Merial's own "expert" report does **not** definitively declare that the accused product actually infringes the asserted claims.  Instead, because he has not actually studied the accused product, Merial's expert is left only to speculate that Intervet's vaccine "can" (*i.e.*, might) include the claim limitations, or "should be"

an infringement.  He does not, because he cannot, opine that it actually is an

infringement.  Merial is not entitled to preliminary injunctive relief simply because

it is possible that Intervet's vaccine *might* infringe the '601 patent.  Here, however,

there is no doubt — as affirmatively explained by Intervet's expert — that

Intervet's vaccine does not, in fact, infringe the asserted claims of the '601 patent.

Not only will Merial be unable to prove infringement, but it also cannot

demonstrate a likelihood of success with respect to the validity and enforceability

of the '601 patent.  Motions for preliminary injunctive relief, such as Merial's,

should be denied whenever the defendant can raise any substantial question with

respect to the validity or enforceability of the patent-in-suit.  *Amazon.com, Inc. v.*

*Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51, 1358-59 (Fed. Cir. 2001)

(reversing grant of preliminary injunction because of substantial question of

invalidity).  As the movant, it is Merial's burden to prove that Intervet's defenses

"lack substantial merit."  *Id.*  Here, as explained below, not only is the '601 patent

invalid, but it is unenforceable because it was obtained by defrauding the Patent

Office.  These serious issues need not be finally determined at this time, but they

do raise a substantial question regarding Merial's likelihood of success and thus

mandate denial of the present motion.

Merial's motion also is devoid of the requisite proof of specific, *irreparable* harm that would allegedly occur between now and trial. Merial alleges nothing more than the harm that is potentially present in every patent case. Merial basically asserts that it will lose sales because it plans, eventually, to sell a porcine circovirus vaccine in the U.S. that will indirectly compete with Intervet. There is nothing irreparable about this type of harm; rather, such lost sales are the epitome of harm that is reparable after the fact with money damages. If the generic harm of which Merial complains (*i.e.*, possible lost sales and market share due to competition) constituted irreparable harm, then a TRO would be granted in virtually every patent case. Yet, TROs and preliminary injunctions are granted only exceedingly rarely, in exceptional circumstances, which plainly do not apply here. *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557-59 (Fed. Cir. 1994) (affirming denial of injunction because no specific proof of irreparable harm).

Merial's claim of harm is also substantially speculative. Merial does not have a vaccine on the U.S. market, and it is unclear when, if ever, it will. To sell a vaccine in the United States, Merial will need USDA approval, which it has not received. Also, the extent to which Intervet's vaccine and the vaccine Merial hopes to sell someday would theoretically compete is unclear, given that they

admittedly are administered to different animals (*i.e.*, piglets v. pregnant sows). It likewise is unclear why, in the unlikely event Merial won at trial and obtained an injunction, and further assuming that Merial will eventually obtain USDA approval, Merial would not be able to then recoup its market share, or be able to calculate its damages. Thus, Merial has not shown it will be irreparably harmed by the denial of its motions.

Merial's lack of immediate, irreparable harm is underscored by its delay in bringing the present motion. *See Nutrition 21 v. United States,* 930 F.2d 867, 872 (Fed. Cir. 1991) (vacating preliminary injunction in part because patentee's delay was evidence of no irreparable harm). Intervet's USDA license for its vaccine (which provides the sole basis for Merial's infringement analysis) was issued over six months ago, on October 13, 2005. Merial did not file this lawsuit until December 2005, and did not bother actually to serve the complaint until March 2006. If Intervet's presence in the market had the potential to devastate Merial, as it alleges, Merial would have acted more promptly in bringing this issue to the Court's attention.

As to the balance of the hardships, Merial's delay should preclude it from receiving the relief it requests. Since Merial has waited so long to file the present motion, Intervet has completed the launch of its vaccine and is now taking orders

for and selling its vaccine in the United States.  Intervet values its vaccine and its

relationship with its customers as much as Merial.  Intervet would be greatly

harmed if, after years of effort and planning, and after committing to producing a

vaccine desperately needed by its customers, it could not continue to sell its

vaccine.  If Merial had wanted to minimize the hardships on Intervet, it would have

sought relief months ago.

Finally, the public interest dictates that Merial's motion be denied.  Merial

admits that Intervet is the only company on the U.S. market licensed to sell a

vaccine for porcine circovirus.  There presently is a serious outbreak of porcine

circovirus in the United States and Canada.  The dire need for Intervet's vaccine

was one of the reasons the USDA granted Intervet a conditional license in the first

place.  Taking Intervet's vaccine off the market would cause severe hardship to

swine producers.  There is no other vaccine available.  Thus, even assuming that

Merial would be irreparably harmed here, any such harm is outweighed by the

public interest in having an efficacious vaccine for porcine circovirus on the

market at a time that it is desperately needed.

For all of these reasons Merial's motion should be denied.

## NATURE AND STAGE OF THE PROCEEDING

This is a patent infringement action brought by Merial against Intervet. Merial filed the complaint on December 15, 2005, but did not serve it until March 10, 2006. The complaint was not accompanied by a request for preliminary relief. It was not until March 31, 2006 that Merial moved for a preliminary injunction. The motion for preliminary injunction was not accompanied by a request for a TRO. Finally, on April 10, 2006, Merial moved for a TRO against Intervet.

Intervet has not yet answered the Complaint, but has filed a motion to dismiss, or in the alternative, to transfer to the United States District Court for the District of Columbia. This motion, which is predicated on Merial's lack of standing to sue under the '601 patent, and its failure to join indispensable parties to this litigation, is presently pending, and provides yet another set of alternative grounds for denying Merial's present requests for preliminary injunctive relief.

## STATEMENT OF FACTS

### I. The Parties

#### A. Intervet and Its Porcine Circovirus Vaccine

Intervet researches, develops, and manufactures animal health products, such as veterinary vaccines and pharmaceuticals. It has annual sales of approximately $1.3 billion. In contrast to Merial, which does not have a significant presence in

- 7 -

the U.S. swine industry, Intervet offers four different swine pharmaceutical products and 23 different types of swine vaccines for 28 separate swine diseases, including vaccines against porcine parvovirus, porcine rotavirus, porcine circovirus, swine influenza and transmissible gasteroenteritis virus.  (Schlueter Decl. ¶¶ 3, 10).[1]

Post-weaning Multisystemic Wasting Syndrome ("PMWS") is a disease of young pigs that is characterized by difficulty breathing, weight loss and death. (Osorio Decl. ¶ 9).  PMWS affects roughly 5% of U.S. herds and mortality rates in affected herds can be 40% or more.  (Schlueter Decl. ¶ 5; McKean Decl. ¶ 6). Intervet began working on its PCV vaccine in 1997 and first approached the USDA concerning a license on February 13, 2003.  (Hesse Decl. ¶ 12).  Intervet has invested substantial time, resources and facilities in researching and developing its vaccine, and scaling up production to bring it to market.  To date, Intervet has invested at least $8 million in this vaccine.  (Schlueter Decl. ¶ 11).

Intervet's PCV vaccine is labeled for use in pigs 3 weeks of age and older, the point at which the level of passive immunity (also called Maternally-Derived Antibodies ("MDA")) the piglet received from the sow (mother pig) has declined

---

[1]     The declarations and other materials upon which Intervet relies are attached as exhibits hereto.

and the piglet can respond to a vaccine and develop its own active immunity.  In

other words, Intervet's vaccine stimulates piglets' immune systems to develop

protection from the virus.  (Hesse Decl. ¶ 16).

Intervet has begun marketing its vaccine to the swine industry and the

industry expects that this product will be available to help control the current

serious PMWS outbreak being experienced by U.S. swine producers.  (Schlueter

Decl. ¶ 12).  Intervet has carefully fostered and nurtured its reputation as a leader

in the swine health industry.  Removing Intervet's vaccine from the market would

not only seriously undermine efforts to stem an ongoing swine health crisis, but

would damage Intervet's reputation and good will with its customers and the swine

industry as a whole.  *Id*.

**B.      Merial and Its Planned Porcine Circovirus Vaccine**

Merial is one of the largest companies in the world manufacturing animal

health products, yet sells virtually no swine products in the U.S.  (Schleuter Decl.

¶ 9).  In other words, the U.S. swine market provides only an infinitesimal

percentage of Merial's revenues.  Unlike Intervet, Merial does not possess a

license from the USDA to market a PCV vaccine in the U.S.  (Schlueter Decl. ¶ 6;

Hesse Decl. ¶ 13).  Merial does sell such a vaccine in Europe and Canada.

Merial's vaccine is intended for use in sows, and it is designed to produce high

concentrations of MDA that can be passed to the piglets through the colostrum (the first milk produced after birth) in order to provide protection from disease. (Hesse Decl. ¶ 15). Thus, the immunity provided to young pigs by Merial's product is passive: the antibodies are created by the mother and passed to the offspring where they circulate for a few weeks and then are cleared from the system. (Hesse Decl. ¶ 15).

### C. The Market for Intervet's Vaccine

Contrary to Merial's contention, the vaccines of Intervet and Merial are more complementary than competitive. (Hesse Decl. ¶ 17; McKean Decl. ¶ 10; Schlueter Decl. ¶ 8). The vaccines are intended for use in different animals. Whereas Intervet's vaccine is intended for use in young pigs after the passive immunity of MDA has waned, Merial's vaccine is intended for use in sows. (Hesse Decl. ¶ 17). The use of one does not preclude the use of the other. (Hesse Decl. ¶ 17). Thus, in that sense, the products do not compete.

Moreover, if Intervet's vaccine were to be taken off the market at the end of this litigation, customers would readily switch from the Intervet product to the Merial product (to the extent they were not using both), contrary to the position taken by Merial. (Schlueter Decl. ¶ 7). There is currently a very serious outbreak of PMWS spreading through the U.S. and a vaccine is the only current hope of

slowing or stopping it. (McKean Decl. ¶¶ 6, 9). Swine producers will use whatever vaccine product is available to combat this disease. (Schlueter Decl. ¶ 7). However, if Intervet's product is enjoined from the market during the pendency of this case, millions of at-risk young pigs will go unvaccinated and the chance to prevent disease in those animals will be lost.

## ARGUMENT

## I.  LEGAL STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

"The preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter*, 896 F.2d at 1285. In order to obtain a preliminary injunction, a movant must demonstrate "(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Zardui-Quintana*, 768 F.2d at 1216; *Gold Coast Publications, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir. 1994). The same standard applies to a request for a temporary restraining order. *Ingram*, 50 F.3d at 900.

Here, Merial has failed to meet this standard by failing to prove any, much less all, of the four factors.

## II. MERIAL HAS FAILED TO PROVE THE FOUR FACTORS REQUIRED FOR A PRELIMINARY INJUNCTION

### A. Merial Cannot Prove That It Is Likely to Succeed at Trial

In the context of a patent infringement lawsuit, proving a likelihood of success on the merits requires Merial to establish, in light of the presumptions and burdens that will inhere at trial, (1) it will likely prove that Intervet infringes, and (2) its infringement claim will likely withstand Intervet's challenges to the validity and enforceability of the '601 patent. *See Amazon.com*, 239 F.3d at 1350.

To defeat Merial's request, Intervet need not prove non-infringement or invalidity; it merely needs to "raise[] a substantial question concerning *either* infringement or invalidity, *i.e.*, assert[] an infringement or invalidity defense that [Plaintiff] cannot prove 'lacks substantial merit.'" *Amazon.com, Inc.*, 239 F.3d at 1350-51.

As explained below, Intervet possesses noninfringement and invalidity defenses that Merial cannot prove lack substantial merit.

#### 1. Intervet Does Not Infringe the '601 Patent

A patent infringement analysis is a two-step process — first the claims are construed, and second, the properly construed claims are applied to the accused

product.  *Id.* at 1351.  Infringement is found only when the accused product

possesses each and every element of the asserted claims.  *Id.*  As discussed below,

Merial has not performed either of these steps.

### a.    Claim Construction

First, Merial has not construed the claims of the '601 patent.  Rather, it

simply asserts that they require no construction.  However, there are various terms

in the asserted claims which have to be construed in order to properly evaluate

Merial's likelihood of success.  *See generally, Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc) aff'd 517 U.S. 370, 116 S.Ct. 1384

(1996).

Each of the claims of the '601 patent requires an isolated DNA molecule

from "porcine circovirus type II" or "PCV-2."[2]  Contrary to the assertion of

Merial's Dr. Fischer, these terms are not "unambiguous," nor did they have an

"ordinary meaning" at the time the patent application was filed.  At the time that

Merial filed its patent applications, the term "PCV-2" did not exist in the swine

industry.  (Osorio Decl. ¶ 16).  Accordingly, the term could not have had an

"ordinary meaning."  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir.

---

[2]     These two terms are used interchangeably in the '601 patent and will be
referred to here as "PCV-2."

2005) (en banc) (claim terms are to be given the interpretation that they would have

had at the time the patent application was filed).  The meaning of "PCV-2" must,

therefore, be derived from the '601 patent specification.

The '601 patent specification discloses 5 viral strains and provides the DNA

sequences for 4 of those strains.  (Osorio Decl. ¶ 11).  The '601 patent

characterizes "the invention" of the patent in terms of these "strains" and defines

"PCV-2" in terms of the DNA sequences of the isolated strains.  *Id*.  Thus, a person

of skill in the art reviewing the '601 patent specification would understand the

invention of the patent to be the five isolated strains and would understand the term

"PCV-2" to be limited to the sequences of those strains disclosed in the '601 patent

and used to define this claim term.  (Osorio Decl. ¶ 16).

Similarly, the Court must address the proper construction of the term "ORFs

1 to 13 of porcine circovirus type II."  Dr. Fischer asserts that this term should also

be given its ordinary meaning, but, again, he is wrong.  (Osorio Decl. ¶ 17).  Like

"PCV-2," the term "ORFs 1 to 13 of porcine circovirus type II" did not have an

ordinary meaning at the time the applications for the '601 patent were filed.  *Id*.

However, the '601 patent defines "ORFs 1 to 13" in Example 13 of the patent.

There, the patent defines ORFs 1 to 13 by the beginning and ending nucleotides in

the DNA sequences of the four circovirus DNA sequences disclosed in the '601

patent. *Id.* A person of skill in the art would understand "ORFs 1 to 13 of porcine circovirus type II" to mean those portions of the disclosed DNA sequences that are defined as ORFs 1 to 13 in Example 13 of the '601 patent. *Id.*

> **b.** **Applying the Properly-Construed Claims to Intervet's Vaccine**

In order to prevail in its request for a TRO or a preliminary injunction, Merial must adduce clear evidence of infringement showing it is likely to prevail. Merial has not done so. Merial has not even undertaken an analysis of Intervet's vaccine. Rather, Merial bases its entire infringement case on the name given to Intervet's vaccine by the USDA in the letter granting Intervet conditional approval to sell its vaccine in the United States. In that letter, the vaccine is referred to simply as a "Porcine Circovirus Vaccine, Type 2, Killed Baculovirus Vector." There is no other substantive description of the vaccine, or more importantly, the genomic sequence of the vector used to make the vaccine. Yet, specific genomic sequences are what are claimed in the '601 patent.

Not having obtained, sequenced or tested the Intervet vaccine, it is impossible for Merial, in good faith and consistent with Rule 11, even to have asserted infringement of the '601 patent in its complaint. *See*, *e.g.*, *View Engineering, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 984-86 (Fed. Cir.

2000); *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997). Merial,

likewise, has no basis to assert that it is likely to prevail on this issue.

As a necessary consequence of his failure to actually study or test the

accused product, Merial's infringement "expert"/employee, Dr. Fischer, could **not**

state definitively that the Intervet vaccine actually infringes the '601 patent.

Indeed, if he did make such a statement, based only on one sentence in one letter

from the USDA providing a general description of the vaccine, his declaration

would have to be rejected on its face.

Rather, Dr. Fischer surmises, based solely on the words "Porcine Circovirus

Vaccine, Type 2, Killed Baculovirus Vector," that such a vector "can be" the

vector claimed in the '601 patent. (*See* Fischer Decl. ¶ 14). Dr. Fischer is simply

declaring that Intervet's vaccine *could* or *might* infringe. Likewise, later in the

declaration, Dr. Fischer somewhat cryptically states that, based on his assumptions,

the Intervet vaccine "should" infringe certain claims of the '601 patent. While it is

unclear what Dr. Fischer means by "should," it appears that this is just another way

of stating that it could or might infringe. Dr. Fischer's declaration, even taken at

face value, does not provide a clear showing that Intervet's vaccine does infringe.

Thus, Merial has failed to adduce evidence of infringement that could support its

motion. *See Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1220-21 (D. Del.

1986) (denying preliminary injunction because patentee's reliance on

circumstantial statements about accused product was not clear evidence of

infringement; patentee needed actual testing of accused product to directly show

infringement).

While Intervet could properly rely on Merial's utter failure to meet its

burden of proof with respect to infringement, Intervet instead has provided the

declaration of Dr. Fernando Osorio, who, unlike Merial's "expert" actually is an

expert familiar with the accused vaccine.  Dr. Osorio has performed a substantive

review of the '601 patent, proffered an interpretation of the '601 patent claim terms

as those terms would be understood by persons having ordinary skill in the art, and

has reviewed details concerning Intervet's vaccine product.  (Osorio Decl. ¶¶ 19,

30-35).  Dr. Osorio concludes that Intervet's vaccine product does not infringe the

asserted claims of the '601 patent because it is produced from a different viral

strain having a different DNA sequence than those disclosed in the patent.  (Osorio

Decl. ¶¶ 19-21).

Although Merial does not mention infringement under the doctrine of

equivalents in its papers, Merial cannot rely on that doctrine to expand the scope of

the asserted claims to embrace materials that are not within the literal scope of the

asserted claims of the '601 patent.  First, in the '601 patent specification, Merial

describes alternatives to the claimed DNA sequences that, *e.g.*, would have "significant serological similarity with the strains of the invention," or that would exhibit "cross-hybridization with the strains of the invention." (Osorio Decl. ¶ 13). However, the claims of the '601 patent do not claim those alternatives, instead they relate only to the disclosed viral strains, only four of which were sequenced. (*Id.*). Where a patentee discloses subject matter in the patent specification, but does not claim it, that subject matter is dedicated to the public and cannot be embraced by the doctrine of equivalents. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc) (if "a patent drafter discloses but declines to claim subject matter, . . . this action dedicates that unclaimed subject matter to the public.").

In addition, during prosecution, Merial amended asserted claim 9 (then claim number 39) to add the term "of porcine circovirus type II." (Osorio Decl. Ex. I at 2 and 7). This amendment, which was made in response to the examiner's rejection of the claim, narrowed the claim and that narrowing amendment precludes Merial from resorting to the doctrine of equivalents for the "PCV-2" claim term. *See, e.g.*, *Business Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1374 (Fed. Cir. 2005) ("[A] narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel.") (quoting *Festo Corp.*

*v. Shoketsu Kinozku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002)).  Moreover, this amendment precludes Merial from asserting the doctrine of equivalents for any claim containing the "PCV-2" claim term.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1584 (Fed. Cir. 1995).

In sum, there is, at a minimum, a substantial question of non-infringement that precludes a finding of a likelihood of success on the merits.

### 2.    The '601 Patent Is Invalid and Unenforceable

On the issue of validity of the '601 patent, Merial's brief in support of its motion misstates the burden it presently bears.  Whereas Merial's brief suggests that it is somehow Intervet's burden to prove invalidity for purposes of this motion, that is not true.  Instead, it is Merial that bears the burden of proving that each and every one of Intervet's defenses lack substantial merit.  *Amazon.com*, 239 F.3d at 1350-51.  As explained below, Intervet possesses substantial defenses of invalidity and unenforceability that are in fact meritorious.

### a.    The '601 Patent Is Invalid.

The asserted claims of the '601 patent are invalid over the December 17, 1997 GenBank submission of Hamel ("Hamel").  (Osorio Decl. ¶ 30).  On September 26, 1997 Hamel and his colleagues submitted the sequence of an isolated PCV virus to the National Center for Biotechnology Information's

GenBank database in Bethesda, Maryland ("GenBank").  That sequence was published formally on December 17, 1997, which is prior to the May 21, 1998 U.S. filing date of the '601 patent and prior to the earliest patent application to which Merial can claim priority.  (Osorio Decl. ¶ 28).

While it is expected that Merial will claim priority to its October 3, 1997 French application ("1997 French application"), such a claim must fail because that application does not provide an adequate written description of the later-claimed invention of the '601 patent.  In order to claim priority to an earlier-filed foreign patent application under 35 U.S.C. § 119, the earlier application must provide a written description of the later-claimed invention under 35 U.S.C. § 112. *In re Ziegler*, 992 F.2d 1197, 1200 (Fed. Cir. 1993).  Thus, in order for Merial to claim priority to the 1997 French application, that application must describe the invention *claimed* in the '601 patent as required by § 112.  It does not.

To fulfill the written description requirement, a specification must describe the later claimed invention "with all of its claimed limitations." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997).  Whether a specification provides an adequate written description under § 112 is a question of fact. *Id.* (quoting *Lockwood v. American Airlines*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).  Here, the claims of the '601 patent are directed to "isolated DNA"

molecules, and the law is clear that an adequate description of DNA requires "a description of the DNA itself." *Regents*, 119 F.3d at 1566-67 (quoting *Fiers v. Revel*, 984 F.2d 1164, 1170-71 (Fed. Cir. 1993)). Merial's 1997 French application does not meet this standard.

More specifically, the claims of the '601 patent are directed to isolated DNA molecules that comprise "ORFs 1 to 13 of porcine circovirus type II" and nucleotide sequences specific to "PCV-2." The 1997 French application does not mention "porcine circovirus type II" or "PCV-2," and provides no description of "ORFs 1 to 13 of PCV type II" (Osorio Decl. ¶ 27). Moreover, the '601 patent defines "porcine circovirus type II" and "PCV-2" in terms of five deposited viral strains, four of which had been sequenced. (Osorio Decl. ¶ 11). But the 1997 French application discloses that only *three* strains were deposited at the ECACC and only *one* strain was sequenced, and that sequence contains errors. (Osorio Decl. ¶ 25). Thus, it is clear that the 1997 French application does not provide a description of an isolated DNA molecule from "PCV-2," as that term is defined in the '601 patent and thus cannot support the claims under 35 U.S.C. § 112.

Likewise, the 1997 French application provides no description of "ORFs 1 to 13 of porcine circovirus type II." Example 13 of the '601 patent, which defines ORFs 1 to 13, is not present in the 1997 French application, nor is it present in

Merial's subsequent January 1998 French filing. (Osorio Decl. ¶¶ 25-27). There is no mention of 13 ORFs in the 1997 French application. (Osorio Decl. ¶ 26). Indeed the only mention of ORFs at all is found in Example 10 of the 1997 French application where the inventors state that "open reading frames were analyzed," but they provide no results from those analyses, no information about how the ORFs were defined and no other description of the ORFs.[3] (Osorio Decl. ¶ 26). Thus, the 1997 French application fails to provide an adequate written description of "ORFs 1 to 13 of porcine circovirus type II."

The purpose of the written description requirement of § 112 is to "reasonably convey to the artisan that the inventor had possession" at the time the patent application was filed of the "claimed subject matter." *Fiers*, 984 F.2d 1164. Here, the inventors of the '601 patent did not have possession of the claimed invention in October 1997. (Osorio Decl. ¶ 27). Moreover, even assuming that the inventors possessed the later-claimed invention—which they did not—that still would not be enough to claim priority under § 112. A showing of "possession" is

---

[3]     The number and starting and ending points for the ORFs of a DNA sequence depends on the computer program used and the parameters set for the ORFs. Thus, the suggestion that an analysis was performed does not provide a description of the later defined ORFs. *See Regents*, 119 F.3d at 1568 ("The description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve is one made that invention.").

ancillary to the mandate of § 112 that the specification must contain a "written description" of the invention. *Enzo Biochem Inc. v. Gen-Probe Inc.*, 296 F.3d 1316, 1330 (Fed. Cir. 2002).

Because Merial cannot claim the benefit of the 1997 French application, Hamel is prior art to the '601 patent claims. As set forth in the Declaration of Dr. Osorio and his accompanying claim charts, Hamel, either anticipates or renders obvious each of the asserted claims of the '601 patent. (Osorio Decl. ¶¶ 30-35).

### b.     The '601 Patent Is Unenforceable

Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the United States Patent and Trademark Office ("PTO"). 37 C.F.R. § 1.56 (Sept. 8, 2000). Failure to meet that duty renders the patent unenforceable. *See e.g.*, *Novo-Nordisk Pharmaceuticals Inc. v. Biotechnology Gen. Corp.*, 424 F.3d 1347, 1359 (Fed. Cir. 2005). Here, the individuals prosecuting the '601 patent failed in their duty of candor and good faith before the PTO and committed inequitable conduct in the procurement of the '601 patent by misrepresenting that the '601 patent application is entitled to claim benefit of priority to the 1997 French application.

During prosecution of the '601 patent application the Patent Office rejected pending claims in the application as anticipated under 35 U.S.C. § 102(a) by

- 23 -

Hamel. (Osorio Decl. ¶ 29). Rather than distinguishing Hamel (which it cannot

do), Merial claimed the benefit of priority to the 1997 French application, stating

that "Hamel [i.e., Nayar] is not available as a section 102(a) reference in this

application because the publication date of Hamel, i.e [sic] December 17, 1997,

was after the October 3, 1997 priority date of this application." (Osorio Decl. Exh.

F). The applicants did not apprise the Patent Office of the inadequacy of the 1997

French application under § 112, nor is there any evidence that the Patent Examiner

reviewed the 1997 French application to determine whether it met the requirements

of § 112. *Id.* Moreover, the Patent Office would have found this information

material to the patentability of the '601 patent claims because it refutes and is

inconsistent with the applicants' position in, for example, opposing the rejection

over Hamel. 37 C.F.R. § 1.56(b)(2)(Sept. 8, 2000). Failure of the 1997 French

application to satisfy the requirements of § 112 precludes Merial from claiming the

benefit of the 1997 French application for the pending claims of the '601 patent

application, and, therefore, would have precluded them from removing Hamel as a

prior art reference on that basis.

The individuals associated with the filing and prosecution of the '601 patent

application were aware that the 1997 French application failed to satisfy the

requirements of 35 U.S.C. § 112, but they intentionally and inequitably concealed

this information from the Patent Office with an intent to deceive the Patent Office and obtain allowance of the '601 patent. These intentional acts constitute inequitable conduct before the Patent Office and render the '601 patent unenforceable.

For these reasons, Merial has not proven a likelihood of success on the merits, and its motion could be denied on this ground alone.

### B.    Merial Cannot Prove that It Is Being Irreparably Harmed

Because Merial has not made any showing, much less a "clear showing" that it will succeed on both infringement and validity, Merial is not entitled to a presumption of irreparable harm.[4]  *See Amazon.com*, 239 F.3d at 1350-51; *see also Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1271 (Fed. Cir. 1985) (cautioning that this showing must not merely be reasonable, but "a strong showing indeed"). Without the presumption, Merial has the burden of proving that it will suffer immediate irreparable harm of a magnitude that justifies imposition of the "extraordinary" relief of a TRO.  *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996).  It is impossible for Merial to carry this heavy burden.

---

[4]      Simply relying on the presumption of validity of a patent that has not been tested in litigation does **not** constitute a clear showing of validity sufficient to create a presumption of irreparable harm.  *Nutrition 21*, 930 F.2d at 871.

Merial relies solely upon the declaration of its marketer, Mr. Parker, to support its claim of irreparable harm. While Mr. Parker certainly *characterizes* the alleged potential harm as being irreparable (the words "irreparable" and "irreversible" appear in his declaration over a dozen times), the harm he actually posits is both overly speculative and fully reparable with a damage award after the fact. Merial's mere incantation of the word "irreparable" cannot hide that its alleged harm, even if it did come to pass, is, in fact, compensable with money.

At root, Mr. Parker fears that "Merial will be forced to compete with Intervet." Parker Decl. ¶ 13. As an initial matter, Intervet is fully entitled to compete with Merial, and such competition is beneficial. The Court should not aid Merial's attempt to create a broad monopoly on the entire porcine circovirus market, particularly when Intervet is the only company that can presently supply that market.

Most importantly, Intervet's presence in the marketplace does not pose competition for Merial for the simple reason that Merial has no USDA approval and cannot sell its vaccine in the United States. This fact, alone, precludes a finding of irreparable harm. *See Upjohn Co.*, 641 F. Supp. at 1221 (finding no irreparable harm because patentee did not yet have a product on the market, rendering any injury speculative); *Rohm and Haas Co. v. Mobil Oil Corp.*, 525 F.

Supp. 1298, 1306-07 (D. Del. 1981) (same).  Merial would have the Court rule that *no company* can sell any form of porcine circovirus vaccine, whether or not Merial eventually gets USDA approval to sell a product in the United States.  Not surprisingly, Merial cites no cases supporting the issuance of a TRO in such circumstances.

Any lost sales that Intervet's competition might allegedly cause Merial (even if it were selling a product) are, by definition, compensable with damages.  Lost profits and competition simply do not constitute irreparable harm:

> [W]e [have] rejected the patentee's argument that potential lost sales alone could demonstrate "manifest irreparable harm" because acceptance of that position would require a finding of irreparable harm to every patentee, regardless of circumstances.  Moreover, if the right to exclude during the litigation period alone established irreparable harm, the presumption of irreparable harm stemming from a finding of likely success could never be rebutted.

*Reebok,* 32 F.3d at 1558-59.  *See also Monsanto Co. v. McFarling,* 302 F.3d 1291, 1296-7 (Fed. Cir. 2002);  *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976) ("irreparable" harm must be of a "peculiar nature, so that compensation in money cannot atone for it").

Another fundamental problem with Mr. Parker's claim of harm is that Intervet's vaccine and Merial's vaccine are complementary products that may not compete.  They are administered to different animals at different times.  Merial's

vaccine is administered to pregnant sows, and, presumably, will provide passive immunization to the sow's piglets (when they suckle and ingest the sow's colostrum) for the brief period of a few weeks after birth.  (Hesse Decl. ¶ 15). Intervet's vaccine, in contrast, is given to piglets after they are at least three weeks old, and, also, after maternal antibodies have declined, to provide active immunization for a longer period, *i.e.*, up until the time they are slaughtered. (Hesse Decl. ¶ 16).  Even if a pregnant sow had, as a piglet, received Intervet's vaccine, it still could be given Merial's vaccine to provide passive immunization to its piglets immediately after birth.  (Hesse Decl. ¶ 17).  Thus, the products are different and complementary; swine producers could use both products.  *See id.* This fact severely undermines Mr. Parker's alarmist claims of potential harm.[5]

In addition to the aforementioned compensable lost sales, Mr. Parker speculates about lost market share as follows:  If Intervet were allowed to continue to sell its product in the United States and then be enjoined after this litigation, Merial *might* not be able to sell its vaccine to some previous purchasers of Intervet's vaccine, because such purchasers *may* mistakenly believe (1) that

---

[5]     Mr. Parker's claims of damages also must be viewed with skepticism because he bases them on some notion of harm to the entire North American market (including Canada) as opposed to the United States market.  Thus, his damages, while still all compensable after the fact, appear to be grossly overstated.

Intervet's vaccine was recalled for safety reasons and (2) that all porcine circovirus vaccines, including Merial's, are unsafe. This claim of harm is specious. To begin with, as explained above, a stoppage of Intervet's sales would not change the market for Merial's hypothetical sales in any event because the products are complementary. Moreover, this claim is factually preposterous. (Hesse Decl. ¶ 17; Schlueter Decl. ¶ 7). Mr. Parker would have the court believe: (1) that commercial farms are so wary of vaccines for their animals, they would mistakenly swear off all porcine circovirus vaccines out of misplaced safety concerns were Intervet held to infringe Merial's patents; and (2) that Mr. Parker, with all of his marketing expertise, would be ineffectual in overcoming this stigma. In short, Mr. Parker envisions that these commercial farms would rather have their pigs suffer and even die of PMWS, rather than purchase Merial's vaccine, which may be the only other porcine circovirus vaccine on the market at that time. This scenario is not credible and cannot justify the grant of a TRO.[6] *See Nutrition 21,* 930 F.2d at 871 ("[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."); *American Cyanamid Co. v.*

---

[6] Also, Merial has not proven that it would be unable to recover damages at trial for any lost market share, provided it could actually prove such damages were more than a figment of Mr. Parker's imagination.

*U.S. Surgical Corp.*, 833 F. Supp. 92, 95 (D. Conn. 1992) (denying PI because when infringer is permanently enjoined, patentee will be able to recover market share).

The other alleged types of irreparable harm listed by Mr. Parker, *i.e.*, ripple effects of lost sales such as loss of a return on research dollars or damaged business relationships or a loss of employees, are so vague and speculative that they, also, cannot justify a finding of irreparable harm.[7]  Indeed, without an approved vaccine, Merial should not be able to claim damaged business relationships or a loss of employees due to Intervet's presence on the market.  Moreover, if Merial is correct that, for example, reduced R&D funding flowing from reduced profits amounts to irreparable harm, then irreparable harm would exist in every patent infringement case.  Patentees could devise an endless series of ripple effects from reduced profits that would turn the "extraordinary" remedy of a pre-trial injunction into an entitlement:

---

[7]     Likewise, Merial's claim that it will lose reputation or goodwill is overstated, at best.  Merial is an enormous company that dominates the animal health product market, with sales of over $1.9 billion.  However, Merial is not actively involved in the swine vaccine market, and has no reputation as a leader in that market.  (Schlueter Decl. ¶ 9).  It is therefore difficult to see how its failure to be the first to market in the U.S. with a porcine circovirus vaccine will cause it a great loss of goodwill or reputation.

> Although [patentee] spills much ink speculating on the endless ripple
> effects a loss of profits might produce, the simple fact is that it, like all
> businesses, requires money to fund its operations.  Thus, if the simple
> recitation of potential economic injuries like the loss of sales, market
> share and profits could signify irreparable harm, it "would require a
> finding of irreparable harm to every manufacturer/patentee, regardless
> of circumstances."

*Eli Lilly & Co. v. American Cyanamid Co.,* 896 F. Supp. 851, 860 (S.D. Ind.

1995), *aff'd,* 82 F.3d 1568, 1578 (Fed. Cir. 1996) (quoting *Illinois Tool Works, Inc.*

*v. Grip Pak, Inc.,* 906 F.2d 679, 683 (Fed. Cir. 1990)).  This case simply is not one

of those rare circumstances in which the patentee will be irreparably harmed

during the pendency of the trial.

Perhaps most telling in this regard is the undeniable fact that Merial waited

six months from the time that Intervet received permission to sell its vaccine in the

United States to move for a temporary restraining order.  Since, astoundingly,

Merial's infringement case is based solely on the October 13, 2005 letter from the

USDA granting Intervet a conditional license, there is no reason that Merial could

not have brought this motion for a TRO six months ago.  Instead, Merial did not

even file this action until December 15, 2005, and did not bother to serve its

complaint for another three months after that.  If the threat Intervet posed was as

"irreparable," "imminent," and "disastrous" as Mr. Parker posits, then Merial no

doubt would have acted sooner.  *See Nutrition 21*, 930 F.2d at 872.

For all of these reasons, Merial cannot establish the requisite irreparable harm, and its motion should be denied.

## C.      The Balance of the Hardships Favor Intervet

Merial cannot prove either a likelihood of success on the merits, or irreparable harm.  Its motion could be denied on those grounds, alone. *Amazon.com*, 239 F.3d at 1350 ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm.")  However, it is worth noting that, given Merial's inexcusable delay in seeking the present relief, Intervet has recently begun offering for sale and selling its vaccine, and will be greatly damaged if Intervet is forced to renege.  (Schlueter Decl. ¶¶ 6, 12).

Indeed, Merial is seeking to change the status quo, and remove Intervet from the market after it has taken extensive steps to launch its vaccine.  (Hesse Decl. ¶ 11; Schlueter Dec. ¶ 11).  Under such circumstances, where Merial has sat by while Intervet committed itself to customers and began selling its vaccine, the balance of hardships weighs in favor of Intervet.  *See Al-Site Corp. v. Cable Car Sunglasses*, 911 F. Supp. 410, 418 (N.D. Cal. 1994) ("The equities, therefore, favor Defendant. Plaintiff allowed Defendant to make great expenditures to build up the

marketing system which it now challenges as infringing, without notifying

Defendant of its patent claims or potential claims of infringement.").

### D. The Public Interest Strongly Favors Intervet

Yet another decisive reason to deny the present motion is the public interest

in having Intervet supply its vaccine. At present, there is a serious outbreak in the

United States of PMWS and Intervet has the only approved vaccine on the U.S.

market.[8] (Hesse Decl. ¶¶ 6, 8, 19; McKean Decl. ¶ 6; Schlueter Decl. ¶ 5). Indeed,

one of the reasons that Intervet was granted a conditional license to sell its vaccine

from the USDA was the great need in the market for such a product. (Hesse Decl.

Exhibit D). In shocking disregard for the swine producers, Merial seeks a TRO,

knowing that it does not have an approved product to fill the void that will be left

by Intervet's departure. Merial cannot replace Intervet's vaccine because it has no

approved product to sell and also because Intervet's vaccine is administered to

different animals than Merial's planned product. (Hesse Decl. ¶ 13, 17, 18).

In these types of situations, the public interest favors the denial of a TRO.

*See*, *e.g.*, *Rohm and Haas*, 525 F. Supp. at 1308-09 (harm to farmers and public

---

[8] Merial disingenuously argues that there is no harm to the public were a TRO to issue because there are other swine vaccines on the market. It is of little solace to a farmer whose pigs have contracted PMWS that he vaccinated them against other diseases from which they did not die.

interest from removal of effective herbicide from market requires denial of preliminary injunction).  Merial's general appeal to the lofty principles of upholding the patent law does not outweigh the specific, immediate need among swine producers for a Porcine Circovirus vaccine.  *Id.*

## CONCLUSION

For the foregoing reasons, Intervet respectfully requests that the Court deny Merial's motion for a temporary restraining order and preliminary injunction.

Respectfully submitted,

April 20, 2006

/s/ T. Hunter Jefferson
T. Hunter Jefferson
Georgia Bar No. 389998
SMITH GAMBRELL & RU.S.SELL, LLP
Promenade II, Suite 3100
1230 Peachtree Street NE
Atlanta, Georgia  30309
404.815.3652 (telephone)
404.685.6852 (facsimile)
*Attorneys for Defendant Intervet Inc.*

OF COUNSEL
Michael D. Loughnane
William G. James
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200
(212) 425-5288 (facsimile)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MERIAL LIMITED

        *Plaintiff*,

    v.

INTERVET INC.

        *Defendant.*

Civil Action No. 1:05CV3168

## LR 7.1D CERTIFICATION

I hereby certify that the within and foregoing **CONSOLIDATED BRIEF IN OPPOSITION TO MERIAL LTD.'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** has been prepared with one of the font and point selections approved by the Court in LR 5.1C.

This 20th day of April, 2006.

/s/ T. Hunter Jefferson
T. Hunter Jefferson

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MERIAL LIMITED

      *Plaintiff*,

  v.

INTERVET INC.

      *Defendant.*

Civil Action No. 1:05CV3168

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and forego-
ing **CONSOLIDATED BRIEF IN OPPOSITION TO MERIAL LTD.'S
MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF
system which will send notification of such filing to the following:

> John Patrick Elsevier
> Alston & Bird LLP
> One Atlantic Center
> Atlanta, Georgia  30309

This 20th day of April, 2006.

                    /s/ T. Hunter Jefferson

                    T. Hunter Jefferson