# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MERIAL LIMITED, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 1:05-CV-3168-CAP |
| | ) | |
| v. | ) | |
| | ) | |
| INTERVET INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF FERNANDO A. OSORIO, M.V., Ph.D.

1.      I have been retained by Kenyon & Kenyon LLP ("Kenyon") to submit

this declaration on behalf of Intervet Inc. ("Intervet") in the above-captioned patent

litigation brought by Merial Limited ("Merial").  I have been asked to offer my

opinions concerning certain materials that have been provided to me, including,

among other things, U.S. Patent No. 6,368,601 ("the '601 patent"), its prosecution

history and prior art, and information relating to Intervet's "Porcine Circovirus

Vaccine, Type 2, Killed Baculovirus Vector" product (referred to here as

"Intervet's vaccine").

## I.    BACKGROUND

2.    I am currently a Professor in the University of Nebraska-Lincoln ("UNL") Department of Veterinary and Biomedical Sciences.  In addition, for the last 22 years I have been Head of Diagnostic Virology at the Veterinary Diagnostic Center at UNL.  I hold a degree in Veterinary Medicine (the equivalent of a Doctor of Veterinary Medicine degree) from Buenos Aires Nacional University in Argentina, as well as M.S. and Ph.D. degrees in Veterinary Microbiology from Iowa State University.  In addition, I am a board-certified Diplomate of the American College of Veterinary Microbiologists.  I have been studying viral diseases in animals for more than 30 years and I have significant experience in studying the creation and testing of vaccines and diagnostic tests for viral diseases in animals.  Much of my career I have spent studying diseases of swine.  I currently sit on the editorial board of the *Journal of Swine Health and Production*. I have authored 67 scientific articles in refereed publications.  A listing of my publications, honors and presentations is provided in my *curriculum vitae*.  (Ex. A).

## II.    SUMMARY OF OPINIONS

3.    I understand that Merial asserts that Intervet's vaccine infringes claims 9, 16, 32, 33 and 35 of the '601 patent.  It is my opinion that Intervet's product does not fall within the asserted claims as they would be understood by a

- 2 -

person of skill in the art and thus does not infringe those claims. I have also reviewed the declaration of Dr. Laurent Fischer, which was submitted in support of Merial's motion for a preliminary injunction. Dr. Fischer does not provide any interpretation of the terms of the claims of the '601 patent. Moreover, Dr. Fischer does not conclude that Intervet's vaccine infringes the claims of the '601 patent, but rather, he speculates that the product "can" or "should" infringe those claims.

4.  It is further my opinion that the claims asserted by Merial are invalid over the prior art publication by Hamel. The claims of the '601 patent are not supported by the French patent application filed by Merial in October 1997 because the application do not provide a description of the invention that is claimed in the '601 patent. Hamel published December 17, 1997, which is earlier than the first application filed by Merial that provides any mention of the invention later claimed in the '601 patent. The Hamel reference, either by itself, or in combination with the knowledge of people of skill in this field discloses the invention claimed in the asserted claims of the '601 patent. Thus, in my opinion, the claims asserted by Merial are not valid over the prior art.

## III. THE TECHNOLOGY

5.  The '601 patent relates to strains of a DNA virus that infects pigs. DNA refers to deoxyribonucleic acid; DNA contains the genetic information for essentially all cellular organisms and most viruses. DNA is a polymer made up of

four "nucleotides," which are designated with the letters A, T, C and G for adenine, thymine, cytosine and guanine, respectively. DNA can be "translated" into proteins, which are made up of amino acids. Three nucleotide "codons" encode each amino acid. A DNA "sequence" is the order in which the nucleotides A, T, C and G are connected. "Genome" refers to the whole of the information encoded by an organism's DNA. A viral "strain" is a genetic variant or subtype, which has a unique DNA sequence.

## IV.    THE '601 PATENT

### A.    The patent claims

6.    As stated above, Merial asserts that Intervet's product infringes claims 9, 16, 32, 33 and 35 of the '601 patent. Those claims read as follows:

> 9.    A vector comprising an isolated DNA molecule comprising a sequence selected from the group consisting of ORFs 1 to 13 of porcine circovirus type II.
>
> 16.    The vector of any one claims 1-6 and 9-13 wherein the vector is a virus.
>
> 32.    An isolated DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1.
>
> 33.    A vector comprising an isolated DNA molecule as claimed in claim 32.
>
> 35.    The vector according to claim 33, wherein the isolated DNA molecule is expressed in vitro.

('601 patent)(Ex. B col.27 l.9 – col.28 l.48).

7.     I understand that the terms in a patent claim are to be interpreted in light of the invention described in the patent specification and are to be given the meaning that they would have had to a person of skill in the field of interest at the time the patent application was filed.

B.     **The patent specification**

8.     The '601 patent relates to strains of a virus referred to in the patent alternatively as "porcine circovirus type II," "porcine circovirus group II" and "PCV-2."  These terms are used interchangeably in the patent and I will refer to them here as "PCV-2."  PCV-2 is a DNA virus, which has a single circular piece of DNA, thus leading to the name "circovirus."  Prior to the isolation of the PCV2 strains disclosed in the '601 patent, a related virus having circular DNA, called PCV1, had been isolated from PK/15 cell lines.  (Ex. B col.1 ll.25-26) (referring to PCV1 as "[t]he PCV derived from PK/15 cells").  PCV1 can be isolated from the tissues of both healthy and diseased pigs and is believed to be nonpathogenic (i.e., to not cause disease).

9.     Post-weaning Multisystemic Wasting Syndrome ("PMWS") is a disease syndrome of pigs characterized by, among other things, difficulty breathing, loss of weight and death.  Mortality rates associated with PMWS can be quite high and the syndrome is credited with causing significant economic loss in

swine production in the United States.  Although many pathogens are often

detected in pigs with PMWS, causation of the disease has been attributed, at least

in part, to strains of circovirus since 1997.

      10.     In June 1997, the group of Nayar and Hamel disclosed that they had

detected three strains of circovirus that were related to but different than PCV1 in

pigs suffering from PMWS.  (Ex. C).  In the June 1997 paper (referred to here as

"Nayar"), Nayar attributed the causation of the PMWS seen in those pigs, at least

in part, to the presence of these new strains of circoviruses.  (Ex. B col.1 ll.27-35).

Thus, prior to Merial's patent filings, the scientific literature disclosed that new

strains of PCV were causing PMWS.  This was the first disclosure that a new type

of PCV was causing PMWS, and after this disclosure researchers needed only to

sequence the newly-detected strains of circovirus.  While the findings of Nayar's

June 1997 paper are mentioned in the '601 patent, their significance is not

explained.  The disclosure of Nayar's June 1997 paper conditions and limits the

scope of the disclosure of the '601 patent because, through that paper, the scientific

community had already been informed that a second type of PCV virus was

responsible for PMWS, and thus the '601 patent provided only the incremental step

of disclosing the DNA sequence of the specific strains of virus that the inventors

had isolated.

11.     In fact, the '601 patent repeatedly defines the invention in terms of the
new strains that the inventors had isolated and purified.  The first sentence in the
patent states that "[t]he present invention relates to new porcine circovirus strains
responsible for PMWS."  (Ex. B col.1 ll.3-5).  Further, the patent provides "[t]he
subject of the present invention is more particularly purified preparations of five
strains, which were deposited at the ECACC . . ."  (Ex. B col.2 ll.4-6).
Importantly, the patent defines the terms "type II" and "group II porcine
circovirus" (i.e., "PCV-2") in terms of the sequences of four out of the five strains
that had been isolated and sequenced:

> The applicant has succeeded in isolating five new PCV strains
> from pulmonary or ganglionic samples obtained from farms situated
> in Canada, the United States (California) and France (Brittany),
> hereinafter called circoviruses according to the invention.  These
> viruses have been detected in pigs with the PMWS syndrome, but not
> in healthy pigs.
>
> The applicant has, in addition, sequenced the genome of four of
> these strains, namely the strains obtained from Canada and the United
> States as well as two French Strains.  The strains exhibit a very strong
> homology with each other at the nucleotide level, exceeding 96% and
> much weaker with the PK/15 strain, about 76%.  The new strains can
> thus be considered as being representative of a new type of porcine
> circovirus, called here type II, type I being represented by PK/15."[1]
>
> The subject of the present invention is therefore the group II
> porcine circovirus, as defined above, isolated or in the form of a
> purified preparation.

---

[1]     PK/15 is another designation of PCV1, the nonpathogenic circovirus found
in pigs.  (Ex. B col.1 ll.11-12).

(Ex. B col.1 ll.48-65) (emphasis added).  Thus, the '601 patent expressly defines the PCV-2 claim term with respect to the five strains the inventors had isolated and deposited, and, in particular, the DNA sequences of the four strains that they had sequenced.  In Figure Nos. 1 through 4 and 6 and Sequence Identification ("SEQ ID") Nos. 1 through 4 and 6 the '601 patent provides the sequences of the four PCV-2 strains.  (*See* Ex. B, figs.1-4, cols.16-28 and col.6 ll.66-col.7 l.26).

12.     An ORF is an "open reading frame," which is a length of DNA that is projected to encode a sequence of amino acids.  In other words, an ORF is a section of the DNA code that appears that it will produce a protein, although in some cases it does not.  ORFs are often projected by computer programs, but the number, size and beginning and ending nucleotides of the ORFs depends on the computer program used and how the ORFs are defined (for example, the number of amino acids required to be considered an ORF).  The '601 patent defines "ORFs 1 to13" in Example 13.  In that example, the '601 patent states that the inventors detected 13 ORFs of 20 or more amino acids and it defines the 13 ORFs for each of the four sequenced PCV-2 strains provided in the patent in terms of the beginning and ending nucleotide in the DNA sequence.[2]  (Ex. B col.13 ll.37-61).

---

[2]     I note that there are several errors in Example 13, including, for example varying numbers of encoded amino acids for the same number of nucleotides (compare ORF 13 at col.13 l.50 with col.14 l.9).  Thus, it is difficult to draw any generalities from this information.

Thus, "ORFs 1 to 13" of PCV-2 means the specific subsections of the DNA sequences provided in Figures 1-4 of the patent as defined in Example 13.

13.     The '601 patent also discusses alternatives to the precise sequences of the isolated strains.  For example, the patent states that the invention "aims to consider . . . circoviruses having a significant serological similarity with the strains of the invention and/or the circoviruses having cross-hybridization with the strains of the invention under stringency conditions such that there is no hybridization with the PCV PK/15 [i.e., PCV1] strain."  (Ex. B col.2 ll.20-26; *see also* col.4 ll.6-10).  The patent provides no explanation of what "serological similarity" means, nor does it explain the details of the "stringency conditions."  However, the patentees were attempting to characterize alternatives to the sequences used to define PCV-2 in terms of sequences that were "similar" in serological activity and in behavior under specific stringency conditions.  In another example, the patent states that the inventors obtained the genome of four of the isolates and that the "subject of the present invention is therefore a DNA fragment containing all or part of one of these sequences."  The patent the states that the invention also relates to "equivalent" sequences:

> It goes without saying that the invention automatically covers the equivalent sequences, that is to say the sequences which do not change the functionality or the strain-specificity of the sequence described or of the polypeptides encoded by this sequence.  There will of course be included the sequences differing by degeneracy of the code.

(Ex. B col.3 l.66-col.4 l.5).  However, it is important to note that the patentees did
not include any language relating to these alternatives in the language of the
asserted claims of the '601 patent.  The asserted claims do <u>not</u> claim sequences that
are "similar" or "equivalent" to the disclosed sequences, or sequences that
"hybridize" to the disclosed sequences, or which have "high homology" with the
disclosed strains.  Instead, the asserted claims of the '601 patent are limited to the
sequences of the isolated strains.

## V.     THE ASSERTED CLAIMS DO NOT EMBRACE INTERVET'S PRODUCT

14.    I understand that patent claims are interpreted from the point of view
of a person skilled in the relevant art in view of the description of the invention in
the patent specification.  In my opinion, the person of skill in the art of the '601
patent would have a Masters or Ph.D. degree in animal virology, pathology or a
similar field, or a Doctor of Veterinary Medicine degree, and have several years of
experience working in the area of animal virology, including viral vaccines, as well
as significant education and experience in molecular biology.

### A.     The interpretation of "porcine circovirus type II" and "PCV-2"

15.    As mentioned above, I understand the claim terms "porcine circovirus
type II" and "PCV-2" to be equivalent, and I refer to them here together as "PCV-
2".  These terms appear in each of the claims asserted by Merial against Intervet's

product.  In my opinion, a person of skill in the art would understand these claim terms to be limited to the five identified strains, four of which were sequenced.

16.     First, although the term "PCV-2" is used extensively in swine health today, that term did not exist when Merial filed the applications leading to the '601 patent.  In the June 1997 paper, Nayar disclosed that a new type of PCV was associated with PMWS in June 1997, but to the best of my understanding, the term PCV-2 was not used in the swine field until after Merial's March 1998 French patent application.  Thus, the PCV-2 term did not have an ordinary meaning in the field at the time the original applications were filed in 1997 and 1998.  The only definition comes from the '601 patent and the patent defines the PCV-2 term with regard to the five new PCV strains, four of which were sequenced, that the inventors set forth in the specification.[3]  Moreover, although the '601 patent discusses broader alternatives to the disclosed sequences, such as "serologically similar" sequences and sequences that "hybridize" to the disclosed sequences, those concepts are not claimed.  Thus, the term "PCV-2" should be interpreted as limited to the five strains, only four of which were sequenced, as disclosed in the '601 patent and which were used to define the term in the patent.

## B.     The interpretation of "ORFs 1 to 13"

---

[3]     As discussed below, the term "PCV-2" did not appear in Merial's patent applications until March 1998.

17.     Similarly, the term "ORFs 1 to 13" would be understood by a person of skill in the art to mean those portions of the DNA sequences provided in Figures 1-4 of the '601 patent that are defined by their starting and ending nucleotides as open reading frames in Example 13 of the patent.  Example 13 provides a clear definition of the 13 ORFs.  There is no description or teaching in the '601 patent that would support an interpretation of the ORFs claim term that would include alternative or equivalent sequences, nor do the asserted claims use any language that would include sequences beyond those disclosed in the '601 patent.  Accordingly, the claim term "ORFs 1-13" should be interpreted to mean those portions of the DNA sequences provided in Figures 1-4 of the patent that are defined as ORFs in Example 13 of the '601 patent.

18.     I note that Merial's Dr. Fischer appears to agree with this interpretation of the claim terms.  In his declaration, Dr. Fischer states that claim 9, among others, relates to a DNA sequence "selected from the group consisting of specific PCV2 sequences."  (Fischer Decl. ¶ 16).  For the reasons discussed above, I agree that the asserted claims of the '601 patent are limited to the specific PCV-2 sequences provided in the '601 patent.

## C.     Intervet's product does not infringe the asserted claims

19.     I have been shown details concerning Intervet's Type II vaccine.  In my opinion, Intervet's product does not meet the limitations of the asserted claims

- 12 -

of the '601 patent, as those claims would be understood by a person of skill in the art.

20.     Claims 9 and 16:  Claims 9 and 16 require an isolated DNA molecule comprising a sequence selected from the group consisting of "ORFs 1 to 13 of porcine circovirus type II."  Intervet's product does not provide a vector comprising a DNA sequence encoding any of "ORFs 1 to 13 of porcine circovirus type II."  As set forth above, these claim terms are properly understood to be limited to the DNA sequences of the four strains set forth in the patent.  The Patent Examiner who examined the '601 patent application agreed with this interpretation and demonstrated that agreement by rejecting only those claims having 100% homology with the sequence disclosed in National Center for Biotechnology Information's ("NCBI") GenBank submission number AF027217 ("Hamel").  (Ex. D).  By limiting his claim rejections to those instances where there was 100% homology with the prior art, the Examiner demonstrated his interpretation of the claims as limited to the precise sequences disclosed in the '601 patent, which supports my interpretation of the claim terms.  Because Intervet's product is produced from a different viral strain it does not fall within these claim terms.

21.     Claims 32, 33 and 35:  Claims 32, 33 and 35 require "an isolated DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2."  "Epitopes" are the portions of a molecule, such as a protein,

that are recognized by the immune system.  Often they are determined by the three-dimensional characteristics of a protein, but they can also be specific to the amino acid sequence.  I note that the patent does not define what "specific to PCV-2" means, nor how one should determine whether an epitope is specific or not.  However, as discussed above, the term "PCV-2" is properly interpreted to mean the specific DNA sequences provided in the '601 patent, and therefore, an "epitope which is specific to PCV-2" is properly understood to be limited to those epitopes found on the proteins encoded by the disclosed sequences.  Intervet's Type II vaccine is made from a different strain having a different sequence from those set forth in the '601 patent, and there is no evidence that it provides an "epitope which is specific to PCV-2" as that phrase would be understood in the context of the '601 patent.  In fact, because it is produced using a different DNA sequence it would have a different amino acid  sequence, and would be expected to provide different epitopes from those provided by the viral strains disclosed and claimed in the '601 patent.

> **D.     The Fischer declaration does not demonstrate infringement by Intervet's product**

22.     I have reviewed the Declaration of Dr. Laurent Fischer Supporting Plaintiff's Motion for a Preliminary Injunction.  In his declaration, Dr. Fischer states that the terms of the patent claims should be given their "ordinary meaning," and that the terms are "unambiguous," and based on this asserted interpretation of

the claim terms speculates that Intervet's Type II vaccine "can" and "should" fall within the claims. I disagree with these conclusions.

23. First, as discussed above, each of the asserted claims of the '601 patent defines the invention in terms of either "porcine circovirus type II," or "PCV-2." Neither of these terms existed in the area of swine virology prior to the time the applications leading to the '601 patent were filed, and thus they had no "ordinary meaning." The meaning of these claim terms as of the date the original patent applications were filed must be derived from the patent specification. Similarly, although people of skill in the field understood what ORFs were generally, there was no "ordinary meaning" of "ORFs 1 to 13 of porcine circovirus type II." I do agree with Dr. Fischer, however, that the meanings of these terms are unambiguous in that they can be determined from the specification of the '601 patent and they are limited to the DNA sequences disclosed in the patent.

24. Second, Dr. Fischer's conclusions regarding infringement are not based on any examination of Intervet's product. Dr. Fischer does not mention having access to Intervet's product or knowing any details about the product beyond those set forth in the USDA's October 13, 2005 Notice that the Animal and Plant Health Inspection Service had issued a conditional license. For that reason, Dr. Fischer offers no real conclusions regarding infringement, but, instead, merely states that Intervet's product "can" and "should" infringe the asserted claims. I

have reviewed details concerning Intervet's Type II vaccine product and I disagree with Dr. Fischer's speculation.

## VI. THE ASSERTED CLAIMS OF THE '601 PATENT ARE INVALID OVER THE PRIOR ART

### A. Merial's October 1997 French application does not support the asserted claims of the '601 patent

25. I have reviewed the prosecution history of the '601 patent, including the original French patent applications that Merial filed in 1997 and 1998. Merial filed its first application on October 3, 1997 ("1997 French application"). In that application, Merial's inventors disclosed that they had "succeeded in isolating three new PCV strains" from pigs experiencing PMWS. (Ex. E at 2). The 1997 French application explains that "the present invention is more particularly purified preparations of three strains." (Ex. E at 2). These circoviruses were deposited at the European Collection of Cell Cultures, Centre for Applied Microbiology and Research ("ECACC"). (Ex. E at 2). Moreover, the 1997 French application provides the DNA sequence for only one of the three deposited sequences, and it states that "the subject of the present invention is therefore a DNA fragment containing all or part of this sequence." (Ex. E at 5). The sequence is provided in Figure No. 1. However, the sequence provided in the 1997 French application contains numerous errors, such as unknown and misidentified nucleotides. (*See e.g.*, Ex. E, Fig. 1 at nucleotides 1132-38 (where unknown nucleotides are

- 16 -

indicated with "N").  Indeed, the inventors submitted in a later application the corrected sequence for this strain, which appears now as Figure 3, Seq. ID No. 3, of the '601 patent.  The original sequence for that strain is provided as Figure 6 of the '601 patent.

26.     The 1997 French application provides no description of ORFs 1 to 13, or any other ORFs for that matter.  In Example 10, the inventors indicate that "[t]he various open reading frames were analyzed," but the ORFs were not described in the patent, were not defined in terms of their starting and ending nucleotides, and were not otherwise defined elsewhere in the application.

27.     The 1997 French application does not describe the invention that is claimed in the asserted claims of the '601 patent.  Whereas the '601 patent claims require "PCV-2" and the '601 patent specification defines PCV-2 in terms of five strains, *four* of which had been sequenced, the 1997 French application does not provide five strains or four sequences, nor does it describe or even mention "PCV-2."  Instead, the 1997 French application provides *three* strains, only *one* of which was sequenced, and it has errors.  Likewise, the 1997 French application provides no description of ORFs 1 to 13 of PCV-2.  The '601 patent defines ORFs 1 to 13 in terms of the starting and ending nucleotides for each of the 13 ORFs in each of the four viral DNA sequences.  The 1997 French application, by contrast, says that the inventors analyzed the single provided sequence for open reading frames, but it

does not provide the results of that analysis or any other description of ORFs.  It does not appear that in October 1997 the inventors of the '601 patent possessed the same invention that was later claimed in the '601 patent; the inventors could not, therefore, describe the same invention.

### B.    Hamel renders the asserted patent claims invalid

28.    As discussed above, Nayar and his colleagues (including Hamel) disclosed in June 1997 that new PCV strains were pathogenic and associated with PMWS.  (Ex. C at 386).  On September 26, 1997, Hamel and Nayar sequenced the DNA of one of the new strains of PCV and submitted that sequence to the NCBI GenBank repository.  (Ex. F).  This submission, number AF027217 (referred to here as "Hamel"), defines the submission as "Porcine circovirus strain pmws PCV, complete genome."  It provides the complete DNA sequence for the PMWS-associated PCV strain, as well as the sequences of 11 ORFs.  Hamel's submission was published December 17, 1997.  (Ex. F).

29.    I understand that because the 1997 French application does not provide a description of the invention claimed in the asserted claims of the '601 patent, under the patent laws Merial cannot claim priority to that application for the asserted claims.  In that case, Hamel became public prior to Merial's earliest filed application and is, therefore, prior art to Merial's '601 patent claims.  I have reviewed the portion of the prosecution history of the '601 patent in which the

Examiner rejected the pending claims over Hamel. (Ex. D). In response, Merial asserted that it had priority to its 1997 French application without any elucidation whatsoever regarding the differences between the pending claims of the '601 application and the disclosure of the 1997 French application. In particular, Merial said nothing to the Examiner about the differences in the description of the invention in the 1997 French application and the terms of the claims pending at the time of the Examiner's rejection. Nor did Merial bring to the Examiner's attention the errors in the DNA sequence provided in the 1997 French application. (Ex. D).

30.     In my opinion, if the claims of the '601 patent were to be interpreted as Merial asserts—i.e., to cover Intervet's vaccine, which is based on a different strain than those strains identified in the '601 patent—then those claims would clearly not be novel as they would encompass the prior art publication of Hamel. Under such a claim interpretation, Hamel, either alone, or in combination with other prior art, describes each of the limitations of the asserted claims. Hamel describes a DNA sequence containing 11 ORFs. Claims 9, 16, 33 and 35 require "vectors." The text of the '601 patent appears to include "live viruses" within the meaning of "vector" ('601 Patent col. lines 44-46), and Dr. Fischer agreed, stating that "[a] more specific example of a vector is a virus." (Fischer Decl. ¶ 5).

31.     However, in the event that the term "vector" is interpreted to exclude a porcine circovirus like that disclosed by Hamel, it would have been obvious to

include isolated DNA from Hamel in a "vector." Many different vectors were known in the prior art. For example, Mankertz *et al.* "Mapping and Characterization of the Origin of DNA Replication of Porcine Circovirus," *J. Virol.* 71:3 pp. 2562-2566 (1997) ("Mankertz")(Ex. G), discloses placing PCV-1 fragments into a vector referred to as pUC19. I have been involved in the design and testing of many viral vaccines, and in my opinion any person of skill in the art reading Hamel and its disclosure of an isolated DNA molecule encoding for this circovirus would have been motivated to put some or all of the that DNA into a vector for use in, for example, an expression system. Thus, a person of skill in the art would have been motivated to combine Hamel with the disclosure of Mankertz and place Hamel's isolated DNA into a vector. Moreover, viral vectors were well known in the prior art. For example, U.S. Patent No. 4,745,051 ("the '051 patent")(Ex. H) discloses the use of baculovirus (insect virus) vectors. It would have likewise been obvious to combine the teachings of Hamel with a reference such as the '051 patent to create a viral vector including an isolated DNA molecule encoding one of ORFs 1 to 13 as claimed, for example, in claim 16 of the '601 patent.

32. Claims 9 and 16 require an isolated DNA molecule comprising a sequence selected from the group consisting of ORFs 1 to 13 of porcine circovirus type II. As set forth above, in my opinion the claims should be interpreted to

require a DNA sequence comprising one of the defined ORFs from the viral DNA

sequences disclosed in the patent.  Hamel provides ORF sequences that are

identical to the ORFs defined in the '601 patent.  The following table provides a

correlation between the ORFs defined by the '601 patent and the sequence

disclosed by Hamel:

| ORFs DEFINED IN THE '601 PATENT | MATCHING HAMEL SEQUENCES |
|---|---|
| **SEQ ID NO: 1** | |
| **ORF 6**  (Seq. 1254 – 1334) | Seq. 907- 987 |
| **SEQ ID NO: 2** | |
| **ORF 6** (Seq. 1254 – 1334) | Seq. 907- 987 |
| **SEQ ID NO: 3** | |
| **ORF 1** (Seq. 103 – 210) | **ORF 10** (Seq. 1524-1631) |

| ORFs DEFINED IN THE '601 PATENT | MATCHING HAMEL SEQUENCES |
|---|---|
| **ORF 2** (Seq. 1180 – 1317) | Seq. 833 -970 |
| **ORF 5** (Seq. 900 – 1079) | Seq. 553 -732 |
| **ORF 6** (Seq. 1254 – 1334) | Seq. 907 - 987 |
| **ORF 7** (Seq. 704 – 1018) | **ORF 3** (Seq. 357 – 671) |
| **ORF 8** (Seq. 311 – 439) | **ORF 9** (Seq. 1732 – 92) |
| **ORF 9** (Seq. 101 – 190) | **ORF 6** (Seq. 1522 – 1611) |
| **ORF 10** (Seq. 733 – 912) | **ORF 4** (Seq. 386 – 565) |
| **ORF 12**  (Seq. 1035 – 1100) | **ORF 8** (Seq. 688 – 753) |
| **SEQ ID NO: 4** | |
| **ORF 2** (Seq. 1180 – 1317) | Seq. 833 - 970 |
| **ORF 5** (Seq. 900 – 1079) | Seq. 553 - 732 |
| **ORF 6** (Seq. 1254 – 1334) | Seq. 907 - 987 |
| **ORF 7** (Seq. 704 – 1018) | **ORF 3** (Seq. 357 – 671) |
| **ORF 8** (Seq. 311 – 439) | **ORF 9** (Seq. 1732 – 92) |
| **ORF 10** (Seq. 733 – 912) | **ORF 4** (Seq. 386 – 565) |
| **ORF 12** (Seq. 1035 – 1100) | **ORF 8** (Seq. 688 – 753) |
| **SEQ ID NO: 6** | |
| **ORF 2** (Seq. 1180 – 1317) | Seq. 832 - 969 |
| **ORF 5** (Seq. 900 – 1079) | Seq. 552 - 731 |
| **ORF 6** (Seq. 1254 – 1334) | Seq. 906 - 986 |

| ORFs DEFINED IN THE '601 PATENT | MATCHING HAMEL SEQUENCES |
|---|---|
| **ORF 7** (Seq. 704 – 1018) | Seq. 356 - 670 |
| **ORF 8** (Seq. 311 – 439) | Seq. 1731 - 91 |
| **ORF 10** (Seq. 733 – 912) | Seq. 385 - 564 |
| **ORF 12** (Seq. 1035 -1100) | Seq. 687 – 752 |

33.     Claim 32 requires a DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1. Because Hamel provides ORFs that are 100% identical to the ORFs defined in the '601 patent, it necessarily provides DNA sequences that would express the same proteins—and therefore the same epitopes—as PCV-2 sequences disclosed in the '601 patent.

34.     Claim 35 requires that the isolated DNA molecule is expressed in vitro, that is, in the laboratory, as opposed to in a living organism.  It would have been obvious to a person of skill in the art to place the DNA sequence disclosed in Hamel, or a portion thereof, into a vector and express the DNA in vitro.  In vitro expression, as a laboratory tool in biotechnology was well understood and commonly used in the prior art.  For example, Mankertz discloses cloning PCV DNA into a vector and expressing the DNA in *E. coli* in the laboratory.  (*See* Ex. G).  It would have been obvious to a person of skill in the art to combine the

teaching of Hamel with a reference such as Mankertz and express the DNA disclosed by Hamel in vitro. Moreover, such procedures were commonly carried out and would reasonably have been expected to succeed.

35. Thus, in my opinion the prior art to the '601 patent discloses each limitation of the asserted claims of the '601 patent. The following table provides a correlation between the claim limitations and the prior art.

| '601 Patent Claim No. | Prior Art |
|---|---|
| 9. A vector comprising | Hamel discloses the complete DNA sequence of a Porcine Circovirus (PCV) associated with PMWS.<br><br>Mankertz *et al.* discloses cloning of Porcine Circovirus (PCV-1) genomic fragments into plasmid-based vectors. |
| an isolated DNA molecule comprising | Hamel provides the complete DNA sequence for the PCV strain. |
| a sequence selected from the group consisting of ORFs 1 to 13 of porcine circovirus type II. | Hamel discloses the DNA sequence of a PCV strain and includes sections of DNA that are 100% identical to the ORFs defined in the '601 patent. |
| 16. The vector of any one of claims 1-6 and 9-13 | Hamel discloses the complete DNA sequence of a Porcine Circovirus (PCV) associated with PMWS.<br><br>Mankertz *et al.* discloses cloning of Porcine Circovirus (PCV-1) genomic fragments into plasmid-based vectors. |
| wherein the vector is a virus. | U.S. Patent No. 4,745,051 discloses viral vectors. |

| 32. An isolated DNA molecule | Hamel discloses a PCV DNA sequence. |
| --- | --- |
| comprising a nucleotide sequence encoding an epitope which is specific to PCV-2 and not PCV-1. | Hamel provides DNA sequences that would express the same proteins—and therefore the same epitopes—as PCV-2 sequences disclosed in the '601 patent.  Moreover, if the claims are interpreted broadly enough to embrace Intervet's vaccine, Hamel's DNA sequence would fall within the "PCV-2" claim limitation. |
| 33. A vector comprising | Mankertz *et al*. discloses cloning of Porcine Circovirus (PCV-1) genomic fragments into plasmid-based vectors. |
| an isolated DNA molecule as claim in claim 32. | Hamel discloses the complete DNA sequence of a Porcine Circovirus (PCV) associated with PMWS. |
| 35. The vector according to claim 33, wherein the isolated DNA molecule | Hamel discloses the complete DNA sequence of a Porcine Circovirus (PCV) associated with PMWS.<br><br>Mankertz *et al*. discloses cloning of Porcine Circovirus (PCV-1) genomic fragments into plasmid-based vectors. |
| is expressed in vitro. | Mankertz *et al*. discloses cloning PCV DNA into a vector and expressing the DNA in *E. coli* in the laboratory, i.e., in vitro. |

36.    I declare under penalty of perjury that the foregoing is true and correct.

DATED: *April 20, 2006*

Dr. Fernando Osorio

F. A. OSORIO