## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

INTERVET INC.,

       *Plaintiff,*

   v.

MERIAL LIMITED and MERIAL SAS,

       *Defendants.*

Civil Action No. 1:06-cv-00658 (HHK/JMF)

## DECLARATION OF RAYMOND R. R. ROWLAND, PH.D.

1.     I am a Professor in the Department of Diagnostic Medicine/Pathobiology at the College of Veterinary Medicine at Kansas State University in Manhattan, Kansas. I have had more than 20 years of experience teaching and directing research related to the molecular biology and virology of microorganisms such as viruses. My own research is focused primarily on the investigation of emerging disease problems in swine, with an emphasis on viral infections, including detection, characterization, and investigation of porcine viruses and their genetics and pathogeneses.

2.     In particular, I have performed extensive research directed at elucidating molecular mechanisms of viral persistence and virulence caused by porcine circoviruses and Porcine Reproductive and Respiratory Syndrome Virus ("PRRSV"), both considered to be important infectious disease problems of swine. In that regard, members of my laboratory and I have sequenced the genome of these viruses and expressed their proteins to aid in understanding

the mechanisms of their pathogeneses. The results of my research are being applied to the development of control strategies, including novel vaccines and diagnostic tests.

3.     A copy of my *curriculum vitae* is attached hereto as Exhibit A, and a short summary follows in Section I below.

## I.    MY BACKGROUND

4.     I received a B.A. in Biology from Fresno State University in 1977, an M.A. in Microbiology from San Francisco State University in 1983 and a Ph.D. in Microbiology in 1989 from the University of New Mexico School of Medicine.

5.     Prior to my present professorship at Kansas State University, I held various positions in academia, including: Assistant and Associate Professor in the Department of Biology-Microbiology at South Dakota State University, Brookings, South Dakota, from 1994 to 1998 and 1998 to 2001, respectively; Postdoctoral Fellow in the Department of Microbiology at the University of Minnesota, Minneapolis, Minnesota, from 1990 to 1994; and Postdoctoral Fellow in the Department of Pharmacology at the University of Minnesota from 1989 to 1990.

6.     In addition to my teaching and collaborations with pharmaceutical/biological companies, I have been invited to present numerous scientific lectures and abstracts at companies, conferences and universities. These lectures, seminars and consultations have focused on helping develop and expand the understanding of diseases and the viruses associated with them.

7.     My research has contributed to authorship in approximately 50 refereed publications and three review articles. In addition to currently directing the research of one Ph.D. candidate and one Masters candidate, I have directed the research of three Ph.D. and six Masters recipients in research involving animal viruses and diseases.

## II.    FEES

8.    I have been retained by Kenyon & Kenyon LLP to provide my opinions as an expert witness on behalf of Intervet Inc. ("Intervet") regarding U.S. Patent No. 6,368,601 ("the '601 patent") (Exhibit B).  My fees for service as an expert witness in this litigation are $200 per hour plus expenses.  My compensation is not based on the opinions formed or the outcome of this litigation.

## III.    PRIOR EXPERT TESTIMONY

9.    In the last four years, I have not testified as an expert at trial or by deposition.

## IV.    MATERIALS CONSIDERED

10.    My opinions are based on the '601 patent, the materials identified in the Declaration, my knowledge, education and experience, and the materials listed in Exhibit C.

## V.    SUMMARY OF EXPECTED TESTIMONY

11.    I have been informed that Intervet filed the present lawsuit against Merial Limited and Merial SAS (hereinafter together "Merial") on the basis that Intervet's porcine circovirus vaccine product does not infringe the claims of the '601 patent and that the claims of the patent are not valid and are unenforceable.

12.    If called as a witness, I expect to testify on the following topics and to provide opinions and testimony on what is summarized in this Declaration.

a.    The state of the art of animal virology, pathology and molecular biology at times relevant to the subject matter set forth below;

b.    The level of ordinary skill in the art to which the '601 patent is directed;

c.    The '601 patent, its specification and claims, the science underlying what is disclosed in the '601 patent, the interpretation of the claims of the '601

patent by the person of ordinary skill in the art to which the claims of the

'601 patent are directed, and the correspondence between the patent

applicants and the United States Patent and Trademark Office ("Patent

Office") leading to the '601 patent;

    d.    My opinions about how certain terms and phrases in the claims of the '601

patent should be interpreted by a person of ordinary skill in the art.

## VI.   LEVEL OF ORDINARY SKILL IN THE ART

13.    I understand that patent claims are to be interpreted from the point of view of a person of ordinary skill in the relevant art in view of the description of the invention in the patent specification.

14.    I have reviewed the '601 patent, its specification and claims and also the correspondence between the patent applicants and the Patent Office leading to the '601 patent.

15.    I understand that the relevant time period for the person of ordinary skill in the art to interpret the claim terms is the filing date of the patent.  I also understand that the '601 patent was filed for in the U.S. on May 21, 1998 and that it purports to claim priority to three earlier filed French applications filed March 20, 1998, January 22, 1998 and October 3, 1997.

16.    Based on my experience, it is my opinion that a person of ordinary skill in the art of the '601 patent would have a Masters degree or Ph.D. in microbiology or a related field, and significant experience in animal virology, vaccines and diagnostics, as well as experience in molecular biology.  In my experience, this person of skill in the art would also have access to and consult with other scientists having related and/or complementary knowledge and experience in the areas of animal medicine, virology, diagnostics, pathology, microbiology and/or molecular biology.

## VII.   BACKGROUND MICROBIOLOGY/VIROLOGY PRIMER

17.     Deoxyribonucleic acid or DNA is the basic genetic material of life and it is made from simple building subunits known as nucleotides.  The four nucleotides found in DNA are adenine ("A"), guanine ("G"), cytosine ("C"), and Thymine ("T").  Combinations of these four nucleotides in varying lengths make up DNA sequences that encode for specific genetic information that creates and sustains life.   However, in order for this genetic information to perform its task it must ultimately be translated into its functional form, *i.e.*, the "protein" form.

18.     In order for the translation process to occur, every three nucleotides ("codon") in a DNA sequence are read and converted to a corresponding amino acid, of which there are in total 20.  More than one codon can code for the same amino acid. This is referred to as the "degeneracy" of the code. These 20 amino acids are the building subunits for polypeptides, also known as proteins, and once DNA sequences are translated—from a start codon (ATG) to a stop codon (*e.g.*, TAG)—proteins or polypeptides can be produced.

19.     Proteins and polypeptides have various functions in a living organism, but some proteins or polypeptides will interact with the immune system of the organism eliciting what is generally known as an "immunogenic response" to the protein or polypeptide.[1]  The immune system of that organism will then produce substances known as antibodies (as well as potentially other types of immune responses), which can react with these proteins or polypeptides (otherwise also known as antigens).  Antibodies are important to protect the host organism and can be used to identify the presence of infection or exposure to an organism.

20.     In fact, some vaccines work in the manner described above in that foreign polypeptides or proteins from a pathogen (such as a virus) can be introduced into a living host

---

[1]     Molecules that elicit an immune response in an organism (*e.g.*, swine) are commonly referred to as "antigens."

organism to elicit a protective immunogenic response. This protective immunogenic response results in the production of a sufficient quantity of antibodies or other types of immune responses to establish protection in the organism to later infection by the pathogen. Similarly, diagnostic tools such as those that distinguish between different types of pathogens can also be developed by harvesting antibodies, whether the antibodies are protective for the host organism or not.

## VIII.  CLAIM CONSTRUCTION

21.    In the paragraphs that follow, I set forth my opinion as to the proper interpretation of phrases or terms in the claims of the '601 patent by the person of ordinary skill in the art to which the claims of the patent are directed.

22.    I understand that Merial is asserting claims 9, 16, 32, 33 and 35 of the '601 patent against Intervet. Those claims read as follows:

> 9.    A **vector** comprising an isolated DNA molecule comprising a sequence selected from the group consisting of **ORFs 1 to 13** of **porcine circovirus type II**.

> 16.    The **vector** of any one claims [1-6 and 9-13] wherein the **vector** is a virus.

> 32.    *An isolated DNA molecule comprising a nucleotide sequence encoding an **epitope** which is specific to **PCV-2** and not specific to PCV-1*.

> 33.    A **vector** comprising an isolated DNA molecule as claimed in claim [32].

> 35.    The **vector** according to claim 33, wherein the isolated DNA molecule is expressed in vitro.

(Exhibit B, column 27, line 9 – column 28, line 48). The individual terms that I have been asked to define appear in bold above. In addition to these terms, I have also been asked to provide my opinion as to the meaning of claim 32.

### A.    "Vector"

23.    In my opinion, the term "vector" in claims 9, 16, 33 and 35 is specifically defined in the specification of the patent at column 4, lines 44-51 to mean live viruses and plasmid DNAs.  Specifically, the '601 patent states in the specification that "[a]s appropriate vectors, there may be used live viruses, ... Plasmid DNAs can also be used as vectors ..." (Exhibit B, column 4, lines 44-51).

### B.    "Porcine Circovirus Type II" or "PCV-2"

24.    The terms "porcine circovirus type II" or "PCV-2" in asserted claims 9, 16, 32, 33 and 35 are interchangeable terms and I will use the term "PCV-2" to refer to both terms.  While the term PCV-2 is frequently used in the swine health field today to refer to a virus that is endemic to pigs (and sometimes associated with PMWS),[2] this term did not exist and did not have an ordinary meaning to a person of skill in the art at the time that Merial filed its patent applications leading to the '601 patent.  Therefore, the only definition of "PCV-2" as used in the '601 patent comes from the '601 patent itself.

25.    The '601 patent defines PCV-2 only with regard to the "five new PCV strains", four of which were sequenced. In the '601 patent, the inventors repeatedly defined their invention in term of these five new porcine circovirus strains that were apparently deposited at the European Collection of Cell Cultures, Centre for Applied Microbiology and Research ("ECACC").  For instance, the patent states that "[t]he present invention relates to new porcine circovirus strains responsible for the PMWS syndrome." (Exhibit B, column 1, lines 3-5).  The patent further provides that "[t]he subject of the present invention is more particularly purified

---

[2]    In the '601 patent, the applicants never demonstrated that PCV-2 as defined in the '601 patent caused PMWS. In fact, we still do not fully understand the etiology of the pathogenesis of PMWS. The fact that an organism is isolated from a lesion does not establish it as the causal agent.

preparations of five strains, which were deposited at the ECACC ...." (Exhibit B, column 2, lines 4-6). The patent defines the term PCV-2 in terms of the five strains that had been isolated (of which four had been sequenced). With respect to the four sequenced strains, the '601 patent further notes that these four sequences exhibit greater than 96% homology with each other and about 76% homology with the PK/15 strain (otherwise known as PCV-1).

> The applicant has succeeded in isolating five new PCV strains from pulmonary or ganglionic samples obtained from farms situated in Canada, the United States (California) and France (Brittany), hereinafter called circoviruses according to the invention. These viruses have been detected in lesions in pigs with the PMWS syndrome, but not in healthy pigs.
> The applicant has, in addition, sequenced the genome of four of these strains, namely the strains obtained from Canada and the United States as well as two French strains. The strains exhibit a very strong homology with each other at the nucleotide level, exceeding 96% and much weaker with the PK/15 strain, about 76%. The new strains can thus be considered as being representative of a new type of porcine circovirus, called here type II, type I being represented by PK/15.
> The subject of the present invention is therefore the group II porcine circovirus, as defined above, isolated or in the form of a purified preparation.

(Exhibit B, column 1, lines 48-65). Thus, the term PCV-2 as used in the '601 patent is in my opinion understood by a person of skill in the art to mean those five specific circovirus strains that the inventors had isolated and identified in the '601 patent.

26.     Indeed, further support for limiting PCV-2 to the five strains is found in the '601 patent, which references a 1997 article authored by Dr. Gopi Nayar *et al.* entitled "Detection and characterization of porcine circoviruses associated with postweaning multisystemic wasting syndrome in pigs." (Exhibit D). In my opinion, this article describes a new and genomically distinct type of porcine circovirus that was characterized and associated with PMWS in pigs before the '601 patent was filed. Dr. Nayar had developed a test to recognize a new type of porcine circovirus that had a different DNA sequence than the previously known PK/15 circoviruses. Nayar had isolated DNA molecules comprising portions of the DNA sequence of

the virus he identified. Considering these facts, the only additional information provided in the '601 patent is the actual nucleotide sequence information of the specific strains isolated and identified in the patent. Therefore, the term PCV-2 as disclosed in the '601 patent should be limited to the five isolates.

C.    "PCV-1"

27.    The term "PCV-1" in claims 32, 33 and 35 is interchangeable with the term "porcine circovirus type I" and I will refer here to both terms as "PCV-1." The term PCV-1 did not exist and thus did not have an ordinary meaning to a person of skill in the art at the time that Merial filed its patent applications leading to the '601 patent. In my opinion, the term is understood by a person of ordinary skill in the art to mean those "nonpathogenic" porcine circovirus strains disclosed in the '601 patent. Two strains of PCV-1 are disclosed in the specification, which were originally detected as a contaminant in the pig kidney cell line, PK/15, bearing accession numbers YO9921 and U49186. (Exhibit B, column 12, lines 26-27).

D.    "ORFS 1 to 13"

28.    In my opinion, the term "ORFs 1 to 13" in claims 9 and 16 are understood by a person of skill in the art to mean those specific subsections of the DNA sequences defined as ORFs 1 to 13 in Example 13 of the '601 patent. An ORF is an "open reading frame," which is a length of DNA that could potentially encode a polypeptide or protein (*i.e.*, a sequence of amino acids). The term "ORFs 1-13" as used in the patent are those specific portions of the DNA sequences in Figures 1-4 of the '601 patent that are defined by their starting and ending nucleotides as open reading frames in Example 13 of the patent. In that example, the '601 patent states that the inventors identified 13 ORFs of 20 or more amino acids and it defines the 13 ORFs for each of the four sequenced PCV-2 strains provided in the patent in terms of their

respective starting and ending codons in the DNA sequence. The decision by the inventors to select a parameter of 20 amino acids as the smallest number of amino acids defined by a putative ORF is not a standard practice and it indicates the intention of the inventors to limit their ORFs to the exact ORFs delineated in Example 13. Thus, in my opinion, "ORFs 1 to 13" of PCV-2 is properly understood by one of skill in the art to be limited to the inventors' analysis of the DNA sequences of the four strains set forth in the patent, *i.e.*, the DNA sequences provided in Figures 1-4 of the patent and defined as ORFs in Example 13. The Patent Examiner who examined the '601 patent application agreed with this interpretation since she rejected only those claims having 100% homology with the sequence disclosed in National Center for Biotechnology Information's GenBank submission number AF027217, and allowed claims (*e.g.*, pending claim 48) that were not 100% identical at the nucleotide level. [3] (Office Action of June 2, 2000, pages 5-6) (Exhibit E). By limiting her claim rejections to only those instances where there was 100% homology with AF027217, the Patent Examiner demonstrated her interpretation of the claims as limited to the precise sequences disclosed in the '601 patent, which further supports my interpretation of this claim term.

    **E.**    **"Epitope"**

    29.    In my opinion, the term "epitope" in claims 32, 33 and 35 is specifically defined in the specification to mean immunodominant regions having at least 8-9 amino acids. Specifically, the '601 patent specification states that "[e]pitopes are immunodominant regions of proteins …" (Exhibit B, column 6, lines 44-45). The '601 patent further states "[a]t the very

---

[3]     For example, a comparison of the sequences identified in the '601 patent as ORF 13 (*i.e.*, the subject of allowed pending claim 48 of the '601 patent) with the most closely-corresponding portion of GenBank submission number AF027217 showed that these sequences shared approximately 98-99% homology. Comparison of the sequence of ORF 13 of strain 999 with the sequence of ORF 2 of the AF027217 GenBank submission shows greater than 99.7% identity.

least, an epitope is a peptide having from 8 to 9 amino acids." (Exhibit B, column 6, lines 51-52).

30.    Additionally, it is my opinion that the use of the phrase immunodominant region to describe "epitope" indicates that this term is used in a diagnostic context. In fact, the '601 patent itself discusses epitopes in the framework of their use as diagnostic tools. (Exhibit B, column 6, lines 45-50) ("[Epitopes] can therefore be recognized by antibodies and thus be particularly used in the field of diagnosis either for the preparation of antibodies for diagnostic purposes or for the production of corresponding peptides which can be used as diagnostic reagents."). Thus, in my opinion, as further discussed below in paragraph 37, those claims in the '601 patent that use the term epitope, use it in the context of a diagnostic tool or a vector comprising a diagnostic tool.

F.    "An isolated DNA molecule comprising a nucelotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1"

31.    In my opinion, the phrase "a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1" in asserted claims 32, 33 and 35 is not defined in the '601 patent and is not subject to a definite meaning. No guidance is provided in the patent as to how one of ordinary skill in the art would make the determination that a particular DNA sequence encoded epitopes specific for PCV-2 but none specific for PCV-1. An enormous amount of information that would be essential in making this determination is absent. For example, the specification of the '601 patent neither defines the term "specific" in relation to an epitope nor provides guidance to a person of ordinary skill as to how to interpret the term "specific" in relation to an epitope.

32.    Further, the specification of the '601 patent does not disclose how one should determine whether an epitope encoded by a DNA sequence of PCV-2 is specific for PCV-2 or

- 11 -

not. The patent specification does not identify any nucleotide sequences encoding "specific" or "non-specific" epitopes. It does not disclose which tests to perform to determine the existence and identity of specific epitopes. The only described application of so-called PCV-2 generated antibodies (Example 19) does not provide the controls or conditions used in the testing.[4] The example would not pass the "peer review" process.

33.    Moreover, the '601 patent has also defined an epitope to be an "immunodominant region" and yet fails to disclose how to find such an "epitope". Notably, nowhere in the patent have the inventors identified such an "epitope"; nor do they teach how to determine if one exists. A person of ordinary skill in the art reading the '601 patent has insufficient information to be able to determine or confirm the existence of such an "epitope." The patent does not provide any information whatsoever about the techniques that should be used to determine an immunodominant region specific for PCV-2 and not specific for PCV-1.

34.    For example, the patent does not describe the degree of cross-reactivity or cross-hybridization that would distinguish a product having a specific epitope from a product not having such an epitope.

35.    Moreover, a great deal of time, effort, and money would be required to design and develop any experiment to answer the open questions presented above. The patent is of no help since it does not identify an example of a DNA sequence that encodes for a particular epitope or immunodominant region that would be "specific to PCV-2 and not specific to PCV-1." Nor does the patent describe how one would test and/or confirm whether or not a DNA sequence encodes

---

[4]    For instance, Example 19, does not provide any information about the experimental controls, if any were even used by the inventors, such as the incorporation of negative sera or non-specific antibodies to determine background levels of immunoreactivity. Likewise, Example 19 does not provide to one of ordinary skill in the art adequate information to reproduce this experiment (*e.g.*, no information is given about how the antibodies used in Example 19 were made or what animal they were derived from). Example 19 also provides no information regarding how the experimental reagents were treated or even if the different segments of the experiment were performed at the same time in the same way.

an epitope or immunodominant region that is "specific to PCV-2 and not specific to PCV-1."

For these reasons, it is my opinion that a person of skill in the art would not recognize what is

meant by the phrase (or understand how to determine) "a nucleotide sequence encoding an

epitope which is specific to PCV-2 and not specific to PCV-1."

36.     If claim 32 is amenable to any interpretation, it is my opinion that it should be

interpreted to mean "an isolated DNA molecule which codes for at least one epitope found on

PCV-2, but not for an epitope found on PCV-1." Support for this construction is found in the

terms of the claim.

37.     As discussed in paragraphs 29 and 30, the '601 patent uses the term "epitope" in

the context of diagnostics and states that they can be "recognized by antibodies and thus be

particularly used in the field of diagnosis either for the preparation of antibodies for diagnostic

purposes or for the production of corresponding peptides which can be used as diagnostic

reagents." (Exhibit B, column 6, lines 46-50.)

38.     Furthermore, in my opinion, the word "specific" in the claim phrase also indicates

that the claim relates to diagnostics because "specific" would generally have been understood at

the time the '601 patent application was filed to refer to the special affinity of an antigen for a

corresponding antibody.  Furthermore, the correspondence between the patent applicants and the

Patent Office supports my opinion.  Specifically, as support for adding the language "and not

specific for PCV-1" to what became claim 32 of the '601 patent, the applicants directed the

Patent Examiner to, for example, page 9 of the specification of the application, where it is stated

that "[p]ersons skilled in the art will also be able to select fragments of the sequences

corresponding to regions exhibiting little or no homology with the corresponding PK/15

circovirus sequence in order to carry out a specific diagnosis." (Response to Office Action of

October 19, 2001, fax page 4.) (Exhibit F); ('601 patent application, page 9, lines 1-5) (Exhibit G); *see also*, Exhibit G, pages 11-12.

39.     Read in the proper context, epitopes "specific to PCV-2 and not specific to PCV-1" would have been understood by a person of ordinary skill in the art at the time the '601 patent was filed to be epitopes that are found on PCV-2 but not found on PCV-1. Likewise, in order for a nucleotide sequence to encode a product that is "specific to" PCV-2, the sequence cannot encode any epitopes that are found on PCV-1. In my opinion, this is also consistent with the Patent Examiner's view. When she examined the prior iteration of claim 32, which was drawn to "[a]n isolated DNA molecule comprising a nucleotide sequence encoding a PCV-2 epitope", she rejected it over the 1982 Tischer *et al.* reference (Exhibit H). The Examiner stated "Tischer et al. isolates PCV DNA expressed from PK-15 cells and characterizes the DNA by isolating and characterizing it by transfection experiments." (Office Action of July 5, 2001, page 3) (Exhibit I). In response, the applicants changed the claim to read "An isolated DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2", and argued that it distinguished the claim from PCV-1. (Amendment With Request For Interview of September 26, 2007, pages 2 and 7) (Exhibit J ).

40.     In the context of this patent, the proper construction of claim 32 is one that gives life to it in the context of a diagnostic tool—a tool that would be used to identify only PCV-2 and PCV-2 infections. The presence of epitopes common to both PCV-1 and PCV-2 would make an encoded protein or peptide product "non-specific for PCV-2" and not useful diagnostically. Therefore, it is my opinion that claim 32 should be interpreted to mean "an isolated DNA molecule which codes for at least one epitope found on PCV-2, but not for an epitope found on PCV-1."

I declare under penalty of perjury that the foregoing is true and correct.


DATED: May 2, 2007

Dr. Raymond R. R. Rowland