**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERVET, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:06-cv-00658 (HHK-JMF) |
| MERIAL LIMITED AND MERIAL SAS, | |
| Defendants. | |

**MERIAL'S PRINCIPAL BRIEF
<u>CONCERNING CLAIM CONSTRUCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

OTHER AUTHORITIES ..................................................................................................... v

GLOSSARY OF TERMS AND ABBREVIATIONS ..................................................... vi

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................... 1

I.      Procedural Background. ............................................................................................ 1

II.     Scientific Background. ............................................................................................... 3

        A.      The DNA code determines the amino acid sequence of proteins. ........... 3

        B.      Homology and mutations. ........................................................................ 5

        C.      Viruses, vaccines and epitopes. ............................................................... 6

        D.      Use of DNA technology to create vaccines. ........................................... 7

III.    Factual Background. ................................................................................................. 8

        A.      Post-Weaning Multisystemic Wasting Syndrome ("PMWS"). ............... 8

        B.      PK/15 (PCV) virus (a/k/a PCV-1). ......................................................... 9

        C.      PCV-2 and the '601 patent. ..................................................................... 9

        D.      Merial's PCV-2 vaccine. ........................................................................ 12

        E.      Intervet's infringing PCV-2 vaccine. ...................................................... 12

ARGUMENT ....................................................................................................................... 13

I.      General Principles of Claim Construction. .......................................................... 13

        A.      Intrinsic evidence is the central focus in claim construction. ............... 14

             1.      The claim language is of primary importance. ............................ 14

             2.      Although the claims are interpreted in view of the
                    specification, limitations from the specification should not
                    be imported into the claims. ...................................................... 15

           30351282_7.DOC

3. The prosecution history does not narrow claim scope unless the patentee's prosecution statements clearly and unmistakably surrender claimed subject matter. ........................................ 16

B. Extrinsic evidence, if considered, must be consistent with the intrinsic evidence ................................................................................ 16

II. Merial's Claim Constructions Adhere to the Principles Articulated by the Federal Circuit, and Intervet's Do Not. ......................................................... 18

A. Merial proposes the proper construction for the term "Vector" in Claims 9, 16, 33, and 35. ........................................................................ 18

B. Merial proposes the proper construction for the term "PCV-1 [Porcine Circovirus Type-1]" in Claims 32-33 and 35. ......................... 22

C. Merial proposes the proper construction for the term "Porcine Circovirus Type 2 [PCV-II]" in Claims 9, 16, 32-33, and 35. ............................ 23

D. Merial proposes the proper construction for the phrase "ORFs 1 to 13" in Claims 9 and 16. ........................................................................ 27

E. Merial proposes the proper construction for the term "Epitope" in Claims 32-33 and 35. ........................................................................ 30

F. Merial proposes the proper construction for the phrase "A nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1" in Claims 32-33 and 35. ......................... 31

CONCLUSION .......................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Andrx Pharms., Inc.*,
        473 F.3d 1196, Fed. Cir. 2007) ................................................................. 14, 21

*AK Steel Corp. v. Sollac & Ugine*,
        344 F.3d 1234, 1242 (Fed. Cir. 2003) ....................................................... 14, 21

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004) ............. 32

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
        388 F.3d 858 (Fed. Cir. 2004) .......................................................................... 17

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) ..................... 32

*Ekchian v. Home Depot, Inc.*,
        104 F.3d 1299 (Fed. Cir. 1997) ................................................................... 27, 29

*Housey Pharms., Inc. v. AstraZeneca UK Ltd.*,
        366 F.3d 1348 (Fed. Cir. 2004) ........................................................................ 14

*In re Dossel*,
        115 F.3d 942 (Fed. Cir. 1997) .......................................................................... 13

*In re Wallach*,
        378 F.3d 1330, 1333 (Fed. Cir. 2004) ............................................................. 27

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
        381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal quotations omitted) ................ 14

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
        256 F.3d 1323 (Fed. Cir. 2001) ........................................................................ 14

*Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) ................... 32, 35

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
        302 F.3d 1352 (Fed. Cir. 2002) ........................................................................ 16

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
        358 F.3d 898,10 (Fed. Cir. 2004) ..................................................................... 14

*Markman v. Westview Instruments., Inc.*,
        52 F.3d 967 (Fed. Cir. 1995) (en banc),
        *aff'd*, 517 U.S. 370 (1996) ............................................................. 13, 14, 15, 16

*Microsoft Corp. v. Multi-Tech. Sys., Inc.*,
        357 F.3d 1340 (Fed. Cir. 2004) ........................................................................ 15

30351282_7.DOC

*Middleton, Inc. v. Minn. Mining & Mfg. Co.*,
    311 F.3d 1384 (Fed. Cir. 2002) ................................................................. 16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006) .......... 13, 15, 16, 17

*Smith v. Snow*,
    294 U.S. 1 (1935) ......................................................................................... 15

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ................................................................... 17

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ................................................................. 16

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ................................................................. 17

*Transmatic, Inc. v. Gulton Indus., Inc.*,
    53 F.3d 1270 (Fed. Cir. 1995) ................................................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................... 13, 14, 16

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ............................................................. 15, 29

*Wiener v. NEC Elecs., Inc.*,
    102 F.3d 534 (Fed. Cir. 1996) ................................................................... 13

*Yoon Ja Kim v. Conagra Foods, Inc.*,
    465 F.3d 1312, 1319 (Fed. Cir. 2006) ..................................................... 14, 21

**Statutes**

35 U.S.C. § 112 .............................................................................................. 13

35 U.S.C. § 112, ¶ 2 ....................................................................................... 31

35 U.S.C. § 282 .............................................................................................. 35

30351282_7.DOC

## OTHER AUTHORITIES

*Molecular Biology*:    Molecular Biology of the Cell (Alberts, B et. al. ed. 1994)

*Encyclopedia*:    The Encyclopedia of Molecular Biology (Kendrew, Sir John ed. 1994)

Meehan (1997):    Meehan et al., *Sequence of porcine circovirus DNA: affinities with plant circoviruses*, J. Gen. Virol. (78) 221-227 (1997)

Meehan (1998):    Meehan et al., *Characterization of novel circovirus DNAs associated with wasting syndromes in pigs,* J. Gen. Virol. (79) 2171-79 (1998)

Allan (1998):    Allan ,et. al., *Novel porcine circoviruses from pigs with wasting disease syndromes*, (letter) The Veterinary Record, April 25, 1998 at 467-68

# GLOSSARY OF TERMS AND ABBREVIATIONS*

*Except as otherwise indicated, definitions in the glossary terms are based on the online encyclopedia Wikipedia, available at http://www.wikipedia.org, the U.S. Dept. of Health and Human Services "Inside the Cell", and/or U.S. Patent No. 6,368,601.

AMINO ACID:  Amino acids are the building blocks of proteins. There are twenty standard amino acids used to make proteins.  Amino acids are joined together by peptide bonds to form chains that are known as polypeptides or proteins.  Each different protein has a unique sequence of amino acid residues; this sequence is the primary structure of the protein. The specific sequence of amino acids that make up a particular protein is specified by the general genetic code.  (Franks Decl. Ex. 12; Decl. Ex. 32 at 23-26 & 74)

ANTIBODY:  A protein that binds specifically to a particular substance-its antigen.  Each antibody molecule has a unique structure that enables it to bind specifically to its corresponding antigen, but all antibodies have the same overall structure and are known collectively as immunoglobulins or lgs.  Antibodies are produced by plasma cells in response to infection or immunization, and bind to and neutralize pathogens or prepare them for uptake and destruction by phagocytes.  (Franks Decl. Ex. 13)

CAPSID:  A capsid is the outer shell or protective coat of a virus. Capsids are made of proteins. Among other functions, the capsid protects the virus's genome (DNA or RNA). (Franks Decl. Ex. 14)

CELL: Cells are the structural and functional unit of all living organisms, and are often referred to as the "building block of life."  A cell is some what self-contained and self-maintaining: it contains "organelles" which carry out different cellular functions, and allow the cell to take in nutrients, convert these nutrients into energy, carry out specialized functions, and reproduce as necessary.  Each cell stores its own set of instructions for carrying out each of these activities. (Franks Decl. Ex. 15; Decl. Ex. 32 at 7-9, generally, & 74)

CODON:  A codon is a set of three nucleotides which are linked together (usually in a nucleotide chain such as DNA or RNA).  The specific sequence of each codon specifies or "encodes" (or "codes for") one of twenty common amino acids.  (Franks Decl. Ex. 16, Decl. Ex. 32 at 23)

DNA: DNA refers to deoxyribonucleic acid.  DNA is a long, double-stranded molecule.  Each strand of a DNA is made up of simple units called nucleotides that are joined together to form a chain.  DNA contains the genetic instructions for the development and functioning of living organisms and most viruses.  (Franks Decl. Ex. 17, Decl. Ex. 32 at 7, 22-24, & 76)

ELISA or Enzyme-Linked ImmunoSorbent Assay:  A biochemical technique used to detect the presence of an antibody or an antigen in a sample.  Performing an ELISA involves at least one antibody with specificity for a particular antigen. A sample with an unknown amount of antigen is immobilized on a solid support (usually a polystyrene microtiter plate). After the antigen is immobilized the detection antibody is added, forming a complex with any antigen that is

recognized by the antibody. Between each step the plate is typically washed with a mild detergent solution to remove any proteins or antibodies that are not specifically bound. After the final wash step, one can visualize whether, and the degree to which, the detection antibody recognized (i.e., bound to) the immobilized antigen. This is commonly done by adding a reagent that reacts with any detection antibody to produce a visible (measurable) signal, which indicates the quantity of antigen in the sample. (Franks Decl. Ex. 18)

GENE: A gene is a segment of DNA OR RNA that contains the information necessary to produce a functional product, usually a polypeptide or a protein. Genes correspond to units of inheritance. They contain regulatory regions dictating under what conditions the product is produced, transcribed regions dictating the structure of the product, and/or other functional sequence regions. (Franks Decl. Ex. 19; Decl. Ex. 32 at 7, 22, & 76)

GENOME: A genome is an organism's entire DNA (OR RNA in the case of some viruses), including genes and non-coding portions of the organism's DNA. A genome is often compared to a set of blueprints, since it contains the instructions to construct other components of the cell, such as proteins. (Franks Decl. Ex. 20; Decl. Ex. 32 at 76)

GENETIC CODE: The genetic code is the set of rules by which information encoded in genetic material (DNA or RNA sequences) is translated into proteins (amino acid sequences) by living cells. Specifically, the code defines a mapping between tri-nucleotide sequences called codons and amino acids; every triplet of nucleotides in a nucleic acid sequence specifies a single amino acid. (Franks Decl. Ex. 21; Decl. Ex. 32 at 22)

HOMOLOGY or Homologous: In genetics, "homology" refers to the degree to which genetic materials are related and is measured by comparing protein or DNA sequences. Homologous genes share a high sequence identity or similarity. (Franks Decl. Ex. 22)

*IN VITRO: In vitro* refers to the technique of performing a given experiment in a test tube, or, generally, in a controlled environment outside a living organism. (Franks Decl. Ex. 23)

*IN VIVO: In vivo* means that which takes place inside an organism and refers to experimentation done in or on the living tissue of a whole, living organism. (Franks Decl. Ex. 24)

NUCLEOTIDE: Nucleotides are small chemical compounds that are the structural units of DNA and RNA. The four nucleotides which make up DNA are adenine, thymine, cytosine, and guanine, which are designated with the letters A, T, C, and G respectively. RNA contains the ribonucleotide uracil (U) instead of thymine (T). (Franks Decl. Ex. 25; Decl. Ex. 32 at 23)

ORF / OPEN READING FRAME: An open reading frame (ORF) is the length of DNA (or copied RNA) that may be transcribed and translated into a polypeptide, i.e., protein. An ORF is bounded by special codons that signify the beginning (start codons) and end (stop codons) of the DNA chain to be translated. By looking for the start and stop codons in a genetic sequence, scientists can identify the ORFs. (Franks Decl. Ex. at 26)

PEPSCAN: A procedure for mapping and characterizing epitopes involving the synthesis of overlapping peptides and analysis of the peptides in enzyme-linked immunosorbent assays (ELISAs). (Franks Decl. Ex. 3 & Ex. 39)

PEPTIDE: Short chains of amino acids joined together by a chemical bond, known as a peptide bond. Long chains of amino acids or peptides are known as polypeptides. (Franks Decl. Ex. 27)

POLYPEPTIDE: Polypeptides are long chains of amino acids joined together by a chemical bond, known as a peptide bond, which make up proteins. Proteins consist of one or more polypeptides. (Franks Decl. Ex. 28)

PROTEIN: Proteins are macromolecules made of one or more polypeptides, which are amino acids arranged in a chain and joined together by peptide bonds. The sequence of amino acids in a protein is defined by a gene and encoded in the genetic code. Proteins are essential parts of all living organisms and participate in every process within cells. Proteins may adopt folded conformation. Proteins may have biological, structural or mechanical functions - for example, they may serve as a scaffolding to maintain cell shape or they may catalyze, or initiate, biological reactions vital to metabolism or other essential biological processes. (Franks Decl. Ex. 29; Decl. Ex. 32 at 8-9, 21-25, & 79)

RNA: RNA refers to a ribonucleic acid. RNA is similar to DNA in that it is a chain of nucleotides, though there are some differences. For example, in an RNA molecule the ribonucleotide uracil, designated U, is used in place of the nucleotide thymine (T) in the DNA molecule. RNA acts as a messenger between DNA and the machinery in cells that makes proteins out of amino acids. (Franks Decl. Ex. 30; Decl. Ex. 32 at 22-23 & 79)

SEROLOGY or SEROLOGICALLY SIMILAR: Serology refers to the identification of antibodies that recognize a particular agent, such as a virus. If agents are serologically similar it means that they are generally recognized by the same antibodies, thereby implying, in certain instances, that they have similar three-dimensional structures. (Franks Decl. Ex. 31)

TRANSCRIPTION: Transcription is the first step in protein production whereby DNA is copied or "transcribed" into ribonucleic acid or RNA, preserving the order in which the nucleotides are connected. (Franks Decl. Ex. 32; Decl. Ex. 32 at 22-23 & 80)

TRANSLATION: Translation is the second step of protein production, whereby an RNA molecule is converted or "translated" into a chain of amino acids that form a protein, using the genetic code. (Franks Decl. Ex. 33; Decl. Ex. 32 at 23-24 & 80)

VACCINE: A vaccine is a preparation designed to stimulate a specific immune response in a body so as to establish a degree of protective immunity against a disease-causing agent so that there is a degree of protection against a subsequent infection of that body by the disease causing agent, such as a virus. A vaccine works by causing the subject's immune system to generate protective antibodies and immune system cells that recognize the disease causing agent, marking it for destruction by the subject's immune system. (Franks Decl. Ex. 34)

VECTOR: A vector is an agent (such as a virus or plasmid) used to transmit foreign genetic material to a cell or organism. It can also be used for the *in vitro* or *in vivo* expression of polypeptides. Vectors are a tool commonly used by molecular biologists to introduce or deliver

genetic material into cells.  Often, this genetic material is foreign, or does not naturally occur within the host cell.  By inserting the DNA sequence of viral ORFs or parts of ORFs, such as epitopes, into an appropriate vector, recombinant vaccines can be produced.  (Franks Decl. Ex. 35)

VIRUS: A virus is a microscopic particle that can infect living organisms, and depends on its ability to infect living cells to replicate itself.  Generally, viruses consist of genetic material contained within a protective protein coat generally called a capsid.  Additionally, viruses lack the means for self-replication outside a host cell. (Franks Decl. Ex. 36;  Decl. Ex. 32 at 70-71 & 80)

# INTRODUCTION

A patent's claims set the boundaries of the patentee's right to exclude. Courts construe patent claims to determine their meaning and scope, thus establishing bounds on the right to exclude. Absent a manifest or explicit restriction, courts should assign claim language its ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006).

Merial properly relies on the patent specification to show the conventional meaning of disputed claim language. Intervet relies on the specification as well, but Intervet improperly tries to limit the meaning of the claim terms and phrases to the patent's preferred embodiments and examples. The Federal Circuit has repeatedly rejected efforts to limit claim scope to a patent's preferred embodiments and examples. This Court should likewise reject Intervet's attempt to do so. Neither the patent in suit nor its prosecution history provides any grounds for narrowing the disputed claim language as Intervet proposes.

# BACKGROUND

## I.    Procedural Background.

U.S. Patent Application No. 09/082,558 was filed on May 21, 1998, claiming priority to, *inter alia*, a French application which was filed on October 3, 1997. This U.S. patent application issued as U.S. Patent No. 6,368,601 ("the '601 patent"), entitled "Porcine Circovirus Vaccine and Diagnostics Reagents," on April 9, 2002. In December 2005, Merial Ltd. asserted the '601 patent against Intervet in the District Court for the Northern District of Georgia. In the Spring of 2006, Merial Ltd. moved for a temporary restraining order and preliminary injunction in the Georgia case. In opposing those motions, Intervet proffered several claim constructions. The district court dismissed the Georgia case in April 2006 because, under the contractual provisions then in place, it believed that Merial Ltd., and its wholly-owned subsidiary Merial SAS

(collectively "Merial"), lacked standing to assert the '601 patent on their own. Nevertheless, Merial and Intervet continue to dispute whether Intervet infringes the '601 patent.

Prior to dismissal of the Georgia case, on April 11, 2006, Intervet filed this declaratory judgment action against Merial Ltd. and Merial SAS, as well as two additional defendants, the Queen's University of Belfast and the University of Saskatchewan. The University of Belfast and the University of Saskatchewan were dismissed from the suit for lack of subject matter jurisdiction in March 2007. As in the Georgia case, Merial maintains that Intervet infringes the '601 patent. Intervet denies infringement and contends that the '601 patent is invalid and unenforceable.

On August 4, 2006, this Court entered a Scheduling Order which required the parties to submit a "Joint Claim Construction Statement" by February 23, 2007. The parties timely complied with this requirement. Additionally, Merial has produced the '601 patent's inventors' documents, and Intervet has questioned the inventors it wanted to depose before claim-construction briefing, namely Lori Hassard, John Ellis, Gordon Allan, and Francis McNeilly.

Certain reference materials, including the '601 patent, a chart providing the sections of the '601 patent's specification cited as support in Merial's claim-construction brief, and scientific background references are attached as exhibits to the Declaration of Vicki Franks in Support of Merial's Principal Claim Construction Brief ("Franks Decl.") which is submitted herewith.

30351282_7.DOC

II.    **Scientific Background.**

   A.    **The DNA code determines the amino acid sequence of proteins.**

   "DNA" refers to deoxyribonucleic acid.  (Franks Decl. Ex. 11 at 76.)  DNA contains the

genetic instructions for the development and functioning of living organisms and most viruses.[1]

The term "genome" refers to an organism's entire DNA.  (*Id.*)  A genome is often compared to a

set of blueprints, since it contains the instructions to construct other components of the cell, such

as proteins. The segments of DNA that carry this genetic information are called genes.  (*Id.*)

DNA is a long chain of simple units called nucleotides.  Nucleotides are chemical compounds

that are the building blocks for DNA, and they link together to form DNA chains.  (*Id.* at 22.)

The four nucleotides that make up DNA are adenine, thymine, cytosine, and guanine, which are

designated with the letters A, T, C, and G respectively.  (*Id.* at 22, Bottom figure showing a DNA

subunit and location of DNA "A, T, G, or C".)  A DNA "sequence" is the order in which the

nucleotides A, T, C, and G are connected in a particular DNA chain.  The major function of

DNA is to code for the sequence of amino acids which form chains that make up proteins.  (*Id.* at

22-25.)

   DNA is read to make proteins in a multi-step process.  In the first step, known as

transcription, DNA is copied or "transcribed" into ribonucleic acid or RNA, preserving the order

in which the nucleotides are connected.  (*Id.* at 22.)  RNA is similar to DNA in that it is a chain

of nucleotides, though there are some differences, such as, in an RNA molecule, the

ribonucleotide uracil, designated U, is used in place of T in the DNA molecule.  (*Id.*, Bottom

---

[1] Many terms in this brief, such as "virus" and "DNA" are included in a glossary of this brief.  Though these terms may also be defined in the text of the brief, they are compiled in the glossary for ease of reference.

30351282_7.DOC

figure comparing DNA and RNA subunit with caption "The units that make up DNA and RNA differ only slightly.")

In the second step of protein production, known as translation, the copied RNA molecule is converted or "translated" into a chain of amino acids that form a protein. (*Id.* at 23-24.) "Amino acids" are molecules that are joined together in a specific sequence, similar to beads on a necklace, to make a particular protein. (*See* Decl. Ex. 11 at 74 and 24, Top left figure showing bead-like amino acids as a growing protein chain.) Because the amino acids are joined together in this process by a chemical bond known as a peptide bond, these chains of amino acids that make up proteins are sometimes referred to as polypeptides.

There are twenty common amino acids that are encoded by the standard genetic code. These amino acids are also represented by single letters. For example, the amino acid arginine is represented by the letter "A" whereas the amino acid phenylalanine is represented by the letter "F".

During the translation, machinery in a cell "reads" the RNA molecule three nucleotides at a time. A nucleotide triplet is called a codon. The specific sequence of each codon specifies or "encodes" (or codes for) one of twenty common amino acids. (Decl. Ex. 38.) [2] In this way, the DNA sequence (or "gene") ultimately dictates the corresponding amino acid sequence that makes up a particular polypeptide, i.e., protein.

There is redundancy in the genetic code, but no ambiguity. This means that more than one codon can code for a particular amino acid, but no one codon can code for more than one amino acid. For example, although codons GAA and GAG both specify the amino acid glutamic

---

[2] Not all codons encode amino acids. As discussed below, some codons specify where the translational machinery should begin reading, i.e., translating the RNA molecule, and where it should stop. These codons are known as "start" and "stop" codons.

acid (redundancy), neither code specifies any other amino acid (no ambiguity). A table identifying which codons code for particular amino acids and which are stop and start codons has been provided. (Franks Decl. Ex. 38)

A "reading frame" or "open reading frame" ("ORF") is the length of DNA (or copied RNA) that is transcribed and translated into a polypeptide, i.e., protein. An ORF is bounded by special codons that signify the beginning and end of the DNA chain to be translated. The "start" codon is ATG (or AUG) and the "stop" codons are TAA, TGA or TAG (or UAA, UGA or UAG). By looking for the start and stop codons in a genetic sequence, scientists can identify the ORFs. This process can be done manually or through the use of computer programs, as described in the '601 patent. (Franks Decl. Ex. 1, col. 13, lns. 26-55.)

Although the amino acid chains that make up proteins can be thought of as linear molecules, in reality most proteins fold into unique three-dimensional structures. This process can be analogized to a beaded necklace, representing the amino acid chain, being balled-up in one's hand to form a specific three-dimensional structure. (Franks Decl. Ex. 11 at 24; Bottom caption "Protein Origami" describing how "proteins come in virtually every imaginable shape, each containing a sophisticated array of bends and folds that allow them to do their jobs…") The specific three-dimensional structure of a protein, however, is not random, but rather is dictated by the sequence of the amino acids that make up the amino acid chain.

**B.    Homology and mutations.**

In genetics, "homology" refers to the degree to which genetic materials are related and is measured by comparing protein or DNA sequences. Homologous genes share a high sequence identity or similarity.

Mutations are changes or alterations to a genetic sequence. (Franks Decl. Ex. 11 at 51 & 78.) Mutations can be caused by several mechanisms, such as copying errors in the genetic

material during cell division, or through exposure to radiation or chemicals.  Mutations can

accumulate in a species over time and create variation in the gene pool.  Accordingly, even

members of the same species will have genetic variation among them.  For example, although

the genome of two humans will be homologous, i.e., exhibit a high sequence identity or

similarity as compared to the genome of another species, no two humans will have the exact

same genome (except perhaps certain identical twins).  Just as humans get mutations in their

DNA, so do viruses.  Thus, one can expect that viruses of the same type, although homologous,

will have some mutations, i.e. differences, in their genomes.

One method by which scientists distinguish species or types of organisms from one

another is by the degree of homology of their genomes.  Organisms of the same type or species

have a greater degree of homology with one another than they do with another type or species.

**C.     Viruses, vaccines and epitopes.**

A virus is a microscopic particle that can infect the cells of a biological organism.

(Franks Decl. Ex. 11 at 70-71 & 80.)  At the most basic level, viruses consist of genetic material

(either DNA or RNA) contained within a protective protein coat generally called a capsid.

Viruses cause several serious diseases in humans and animals.  Of particular relevance here,

viruses can cause diseases in pigs.  Therapy is difficult for viral diseases as antibiotics have no

effect on viruses and few antiviral drugs are known. The best way to prevent viral diseases is

with a vaccine, which produces immunity.

A vaccine is a preparation designed to stimulate a specific immune response in a body so

as to establish a degree of protective immunity against a disease-causing agent so that there is a

degree of protection against a subsequent infection of that body by the disease-causing agent,

such as a virus.  A vaccine works by causing the subject's immune system to generate protective

antibodies and immune system cells that recognize the disease-causing agent, marking it for

30351282_7.DOC

destruction by the subject's immune system.  (*See* Franks Decl. Ex. 11 at 74; definition of antibody)

The antibodies and immune cells that are part of a body's immune system work by recognizing regions of proteins encoded by the genetic sequence of the disease causing agent. The protein sequences that are capable of being recognized by the immune system, specifically by antibodies, are known as epitopes.  Epitopes are "immunodominant regions of proteins and are as such regions exposed at the surface of the proteins."  (Franks Decl. Ex. 1 at col. 6, lns. 44-45.)  In the practice of the invention, it is advantageous that an epitope be an immunodominant region of a protein, i.e., regions that may be recognized by antibodies. (*Id.*)  Because epitopes may be recognized by antibodies, they are particularly useful in the field of diagnosis of disease and for the production of vaccines. (*Id.* col. 6, lns. 45-50.)

From the DNA sequence of a genome, persons skilled in the art are in a position to determine epitopes, for example using an appropriate computer program or PEPSCAN.  (Franks Decl. Ex. 1 col. 6, lns. 36-43, Decl. Ex. 3)  A PEPSCAN is a procedure for mapping and characterizing epitopes involving the synthesis of overlapping peptides and analysis of the peptides in enzyme-linked immunosorbent assays (ELISAs).  (Franks Decl. Ex. 3.)

**D.    Use of DNA technology to create vaccines.**

In their studies of viral diseases, scientists attempt to isolate and propagate (i.e., multiply) viruses that cause diseases.  If they are able to do so, it is possible to develop diagnostic tests to determine whether a particular virus has infected an organism.  In addition, it is possible to create vaccines against the disease causing virus using conventional techniques, i.e., through the use of an inactivated or attenuated (i.e., structurally compromised or weakened) whole viruses.

On the basis of the DNA sequence of a virus, persons skilled in the art are able to determine ORFs that encode viral proteins.  Persons skilled in the art are also able to determine

30351282_7.DOC

the DNA sequences of the virus that encode epitopes of interest. DNA sequences encoding whole ORFs and/or epitopes of interest can be isolated and inserted or recombined into a vector using DNA technology.

A vector is an agent (such as a virus or plasmid) used to transmit genetic material (usually DNA or RNA) to a cell or organism. It can also be used for the *in vitro* or *in vivo* expression (i.e. production) of polypeptides. Vectors are a tool commonly used by scientists to introduce or deliver genetic material into host cells. Often, this genetic material is foreign, that is, it does not naturally occur within the host cell. By inserting genetic material—such as the DNA sequence of viral ORFs or parts of ORFs, such as epitopes—into an appropriate vector, vaccines can be produced. These vaccines, once introduced into a subject human or animal, will allow for the transcription and translation of the genetic material of interest into proteins that are capable of generating an immune response in the human or animal to be vaccinated.

## III.    Factual Background

### A.    Post-Weaning Multisystemic Wasting Syndrome ("PMWS").

Swine producers monitor the health of their livestock so that they can bring as many healthy pigs to market as possible. But pigs—like people—can get sick.

Around the mid to late 1990s, pigs began suffering from a devastating disease now known as Post-Weaning Multisystemic Wasting Syndrome ("PMWS"). PMWS is an infection of young pigs (usually 8-16 weeks old). PMWS tends to be a slow and progressive disease with high mortality in affected pigs. Symptoms of the disease include: jaundice, weight loss, and abnormally rapid breathing rates. Mortality in acutely infected herds varies from 5 to 50%, and chronically infected herds may sustain losses of 15% (on average) from weaning to slaughter.

Swine producers can face tremendous financial losses due to PMWS. Pigs are considered "production animals"; they are raised and sold by swine producers as food sources. PMWS can

cause herd size to plummet, resulting in lost income and other hardships for swine producers. Consumers also feel the effects as well because when supply drops, prices increase.

### B.     PK/15 (PCV) virus (a/k/a PCV-1).

During the 1980s, scientists identified a virus contaminant in a pig kidney ("PK") cell line known as the PK/15 cell line. This virus, which became known as the PK/15 virus, is a small nonenveloped[3] virus whose common characteristic is to contain a genome in the form of a circular single-stranded DNA of 176 to 231 kilobases ("kb"), meaning that the DNA strand is 176,000 to 231,000 nucleotides long. As discussed earlier, a "genome" refers to an organism's entire DNA, or in the case of some viruses, by its RNA. Because the PK/15 virus was found in a pig (i.e. porcine) cell line and because of the circular nature of its genome, the PK/15 virus was also called porcine circovirus, abbreviated PCV.

It was determined, however, that PK/15 (PCV) virus is non-pathogenic. "Non-pathogenic" means that the virus does not cause pigs to get sick or negatively affect their health. Thus, PK/15 (PCV) virus was determined not to be the cause of PMWS.

### C.     PCV-2 and the '601 patent.

The inventors of the '601 patent—which is entitled Porcine circovirus vaccine and diagnostics reagents—sought to address PMWS. Through their efforts, the inventors isolated, sequenced, and characterized a new type of porcine circovirus from the tissues of pigs that have PMWS.

---

[3] Many viruses (e.g. influenza and many animal viruses) have membranes made up of phospholipids and proteins that cover the viruses' protein coats, or capsids. These membranes that surround viruses' capsids are called viral envelopes, and viruses that have such viral envelopes are called enveloped viruses. Viruses, such as the PK/15 (PCV) virus, that lack a viral envelope are called nonenveloped viruses.

30351282_7.DOC

Like the previously characterized PK/15 (PCV) virus, the new type of virus isolated by the inventors of the '601 patent has a circular DNA genome. However, the DNA sequence of the new type of circovirus identified by the inventors is only about 76% the same as, or homologous to," the previously identified PK/15 (PCV) virus. The inventors of the '601 patent decided to call this new circovirus, which is found in PMWS infected pigs, "porcine circovirus type II" or "PCV-2" and decided to call the non-pathogenic virus, which was previously isolated from the PK/15 cell line, "type I" or "PCV-1."

The inventors of the '601 patent isolated PCV-2 from pigs having PMWS syndrome on farms situated in Canada, the United States, and France. The inventors also deposited several of these PCV-2 isolates at the ECACC (European Collection of Cell Cultures, Centre for Applied Microbiology & Research, Porton Down, Salisbury, Wiltshire SP4 0JG, United Kingdom), thereby making samples of the virus available to the scientific community. (Franks Decl. Ex. 1 col. 2, lns. 4-19)

As would be expected due to natural differences or mutations, each of the PCV-2 samples isolated by the inventors from PMWS infected pigs has a unique DNA sequence. The DNA sequences of the isolated samples, however, exhibit a high degree of homology with each other at the nucleotide level, and each is considered representative of the PCV-2 type porcine circovirus that is the subject of the invention of the '601 patent. Indeed, the '601 patent makes clear that the invention is not limited to the exact sequences listed in the figures of the patent. For instance, the '601 patent states "the new strains can thus be considered as being *representative* of a new type of porcine circovirus, called here type II, type I being represented by PK/15." (Franks Decl. Ex. 1 col. 1, lns. 59-62 (emphasis added).)

30351282_7.DOC

The term PCV-2 as defined by the patent encompasses (i) porcine circoviruses having a significant serological[4] similarity with the strains listed in the patent; (ii) porcine circoviruses whose DNA cross-hybridizes[5] with the DNA of the strains listed in the patent under stringency conditions such that there is no hybridization with the PK/15 (i.e., PCV-1) strain; (iii) porcine circoviruses having equivalent sequences, that is to say the sequences which do not change the functionality or the strain-specificity of the sequences described or of the polypeptides encoded by the sequences in the patent; (iv) porcine circoviruses whose sequences differ from the strains listed in the patent by degeneracy of the genetic code; and (v) porcine circoviruses having a high homology with the sequences of the strains listed in the patent.  (Franks Decl. Ex. 1, col. 1, lns. 4-6, lns. 48-61, col. 1, ln. 66- col. 2, ln. 3, col. 2, lns. 20-29, col. 3, ln. 62- col. 4, ln. 30, col. 13, lns. 24-34, col. 13, lns. 62-66.)

It is generally accepted in the scientific community that the PCV-2 virus type that is the subject of the '601 patent is a causative agent of PMWS.  Accordingly, apart from teaching how to isolate, culture, detect, identify, obtain the genetic sequence of, and characterize PCV-2, the '601 patent teaches those of skill in the art how to create vaccines using PCV-2 to save pigs' lives.  The patent also teaches those of skill in the art how to develop diagnostic tests for PCV-2 so that swine producers can determine if their pigs are infected by this virus and can take steps to stop its spread among any herd.

---

[4] Serology refers to the identification of antibodies that recognize a particular agent, such as a virus.  If agents are serologically similar it means that they are generally recognized by the same antibodies, thereby implying, in certain instances, that they have similar three-dimensional structures.

[5] A DNA molecule is typically comprised of two complementary chains of nucleotides bound together in a single double-stranded molecule.  Hybridization is the process of combining complementary, single-stranded nucleic acids to form a double-stranded DNA molecule. Two perfectly complementary single strands of DNA will bind to each other readily. Genetic differences between two single strands of DNA will make binding between them less likely to occur.  Accordingly, measuring the ability of DNA strands to bind to one another can provide information as to the

### D.    Merial's PCV-2 vaccine.

Merial is a leader in the manufacture, research, and development of veterinary products.

Merial makes and sells a PCV vaccine, CIRCOVAC®, which is based on the invention

described in the '601 patent.  To date, Merial has spent at least approximately $20 million in

research and development and in bringing CIRCOVAC® to market.  Merial currently sells

CIRCOVAC® in Europe and Canada and has applied for a license to sell CIRCOVAC® in the

United States.  Merial's CIRCOVAC® vaccine has been established to be effective in preventing

PMWS disease and over 350,000 doses have been sold to date.  Accordingly, Merial's and the

inventors' time, effort, and labor are reflected not only in the '601 patent, but in the thousands of

pigs whose lives will not succumb to this devastating disease.

### E.    Intervet's infringing PCV-2 vaccine.

Following, and despite, the issuance of the '601 patent, Intervet began making and selling

a PCV-2 vaccine in the United States.  In December 2005, Merial contacted Intervet, requesting

that Intervet cease and desist all activities that infringe the '601 patent.  Intervet, however, has

refused to cease and desist its infringing acts.

Intervet admits through its own product label that its vaccine is a "Porcine Circovirus

Vaccine, Type 2, Killed Baculovirus Vector."  Thus, there can be no serious dispute that

Intervet's vaccine is a PCV-2 vaccine.  Intervet's position is that, contrary to the explicit

language in the '601 patent, the terms Porcine Circovirus Type II and PCV-2 as used in the '601

patent should be limited only to the five viral strains identified in the '601 patent, and that,

---

similarity in the nucleotide sequences between the two strands, i.e., information about the degree of homology
between the two strands.

30351282_7.DOC

presumably, because the PCV-2 strain on which its vaccine is based does not have the identical DNA sequence to any of those five strains that its vaccine does not infringe the '601 patent.

For the reasons set forth below, Intervet's proposed constructions are contrary to both well-settled case law and the express language of the patent.

## ARGUMENT

### I.    General Principles of Claim Construction.

Because patent claims define the invention and set the boundaries of the patentee's right to exclude, a district court construes patent claims as a matter of law to determine their meaning and scope.  *See Markman v. Westview Instruments., Inc.*, 52 F.3d 967, 976, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

Broadly speaking, guidance as to the meaning of claim language comes from two sources: intrinsic evidence and extrinsic evidence.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-83 (Fed. Cir. 1996).  The intrinsic evidence consists of two components: the patent itself and its prosecution history.  *Id.* at 1582.  A patent contains two parts: first, the drawings (if any) and the text forming the patent's body, called the written description; second, the claims.  Although a patent's specification includes both the written description and the claims, the word "specification" often—used colloquially—refers to the patent's body other than the claims.  *See In re Dossel*, 115 F.3d 942, 944-45 (Fed. Cir. 1997); 35 U.S.C. § 112, ¶¶ 1-2.  The prosecution history—the rest of the intrinsic evidence—contains the record of the proceedings before the Patent Office.  *Vitronics*, 90 F.3d at 1582.  Extrinsic evidence consists of all evidence external to the patent and its prosecution history.  *Markman*, 52 F.3d at 980.

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006) , the Federal Circuit, sitting *en banc*, discussed claim-construction principles in detail and provided guidance for district courts to follow when construing claims.  Among other things, the

Federal Circuit indicated that it adheres to the approach to claim construction that it outlined in *Markman* and *Vitronics*. The principles of claim construction are detailed below.

### A.    Intrinsic evidence is the central focus in claim construction.

### 1.    The claim language is of primary importance.

The "'bedrock principle' of patent law is that 'the claims of a patent define the invention … .'" *Phillips,* 415 F.3d at 1312. In construing claims, the analytical focus must center on the claim language. Accordingly, "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal quotations omitted); *see also Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Phillips,* 415 F.3d at 1314.

In addition, a court should consider the other claims in the same patent, whether or not the patentee asserts them. *Vitronics*, 90 F.3d at 1582. Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003); *see also Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1209 (Fed. Cir. 2007); *Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006). The presence of a dependent claim that adds a particular limitation to an independent claim raises a presumption that the independent claim does not include the dependent claim's particular limitation. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

A court should assign claim language its ordinary and customary meaning unless sufficient evidence rebuts the "heavy presumption" favoring ordinary meaning. *See, e.g., Housey Pharms., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). The

ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art … at the time of the invention." *Phillips,* 415 F.3d at 1313.  In order to discern what a person of skill in the art would have understood disputed claim language to mean, courts look first to those sources available to the public, i.e., the claims themselves, the specification, and the file history.  *Id*.

      **2.**      **Although the claims are interpreted in view of the specification, limitations from the specification should not be imported into the claims.**

The words of the claim are interpreted "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  Although the patent's written description should be considered, "it is improper to read limitations from the written description into a claim." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1237 (Fed. Cir 2001).  This has long been the law.  Years ago, the Supreme Court held that "the claims of the patent, not its specifications, measure the invention." *Smith v. Snow*, 294 U.S. 1, 11 (1935) (reversing the improper use of language from a patent's written description to limit the patent's claims).  More recently, the Federal Circuit reiterated that the language in the claims, not the written description, defines the limits of the patentee's right to exclude.  *Markman*, 52 F.3d at 980.  For this reason, the Federal Circuit in *Phillips* again warned against importing limitations from the written description into the claims.  *Phillips*, 415 F.3d at 1312, 1323.

Only where the written description makes clear that the invention excludes a particular feature should a court deem that feature outside the scope of the claims.  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004).  Thus, a court should exercise caution when reviewing the written description because the written description's preferred embodiments or examples usually do not limit claim scope.  *See, e.g.*, *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277-78 (Fed. Cir. 1995).  In *Phillips*, the Federal Circuit repeated its

                                                  30351282_7.DOC

admonition against restricting claim scope to a patent's preferred embodiments or examples. *Phillips*, 415 F.3d at 1323. Focusing on a very narrow disclosure to exemplify this principle, the court said, "[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* at 1323.

Additionally, a patentee may act as its own lexicographer by clearly setting forth in the written description an explicit definition for a claim term. *See, e.g.*, *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002). But in those cases, the patentee must demonstrate an intent to deviate from a term's ordinary and customary meaning by expressing a different meaning in the written description "with reasonable clarity, deliberateness, and precision." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

> **3.    The prosecution history does not narrow claim scope unless the patentee's prosecution statements clearly and unmistakably surrender claimed subject matter.**

Claim construction requires consideration of the patent's prosecution history, if placed in evidence. *Markman*, 52 F.3d at 980. A narrowing of claim scope during prosecution occurs if the patentee characterizes the invention using words or expressions of manifest exclusion or restriction. *Teleflex*, 299 F.3d at 1326. But a court should not narrow claim scope unless the patentee's prosecution statements clearly and unmistakably surrender claimed subject matter. *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

> **B.    Extrinsic evidence, if considered, must be consistent with the intrinsic evidence.**

A court should not use extrinsic evidence to vary or contradict the meaning of claim language where the intrinsic evidence determines the meaning. *Vitronics*, 90 F.3d at 1583, 1584-85.

30351282_7.DOC

Because dictionaries and treatises—although categorized as extrinsic evidence—provide insight into the ordinary and customary meaning of claim language, the Federal Circuit noted that they are "often useful" in claim interpretation. *Phillips*, 415 F.3d at 1322. But a district court may not employ a definition from a dictionary to contradict the meaning derived from the intrinsic evidence. *Id.* at 1322-23.

Expert reports and testimony are considered extrinsic evidence. The Federal Circuit has cautioned that expert reports and testimony generated at the time of and for purposes of litigation "can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. Indeed, the Federal Circuit has gone so far to state that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id*.

In summary, the Federal Circuit in *Phillips* identified a hierarchy for using intrinsic and extrinsic evidence to discern the meaning of claim language, starting with the intrinsic evidence, i.e., the claims themselves, the patent's written description, and the patent's prosecution history. *Id.* at 1311-19. The Federal Circuit explained that extrinsic evidence is "'less significant than the intrinsic record in determining "the legally operative meaning of the claim language."'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). The Federal Circuit also cautioned against excessive reliance on extrinsic evidence due to "the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Id.* at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

II.    **Merial's Claim Constructions Adhere to the Principles Articulated by
the Federal Circuit, and Intervet's Do Not.**

A.    **Merial proposes the proper construction for the term "Vector" in Claims 9,
16, 33, and 35.**

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| Vector | 9, 16, 33, 35 | An agent (virus or plasmid) used to transmit foreign genetic material to a cell or organism; used for the in vitro or in vivo expression of polypeptides. | A live virus or plasmid DNA. |

Merial contends that the term "vector" has its ordinary meaning, which is consistent with
the patent's specification, and that the proper construction of this term is "an agent (virus or
plasmid) used to transmit foreign genetic material to a cell or organism; used for the *in vitro* or *in
vivo* expression of polypeptides." The '601 patent's written description makes clear that the term
"vector" means an agent used to transmit foreign genetic material and that it can be used for the
*in vitro* or *in vivo* expression of polypeptides. (Franks Decl. Ex. 1 at col. 4, lns. 11-13, lns. 22-
31, & lns. 40-53.) More particularly, the written description explains that "sequences and their
fragments can be advantageously used for the *in vitro* or *in vivo* expression of polypeptides with
the aid of appropriate vectors." (*Id.* at col. 4, lns. 11-17.) The patent's written description
teaches that a vector can be, for example, a plasmid or virus. (*Id.* at col. 4, ln. 44 & ln. 51.) As
an example, the '601 patent teaches that the foreign coding sequence of PCV-II or its fragment
for *in vitro* expression may be "integrated into the baculovirus genome . . . and the latter is then
propagated on insect cells." (*Id.* at col. 4, lns. 22-28.) Moreover, a vector can transfer DNA to
another vector. (*Id.* at col. 4, lns. 11-58.) For example, one can use a plasmid and a baculovirus
to transfect a cell and deliver foreign DNA in the plasmid to the baculovirus.

In addition, contemporaneous reference materials are consistent with Merial's construction.  For instance, *Molecular Biology of the Cell* (Bruce Alberts et al., Garland Publishing, Inc., 3d ed., 1994) ("*Molecular Biology*") defines "vector" as "[i]n cell biology, an agent (virus or plasmid) used to transmit genetic material to a cell or organism." (Decl. Ex. 2 at G-23.)

Intervet, on the other hand, seeks to limit the scope of the term "vector" by improperly importing a preferred embodiment from the specification into the claim language.  Federal Circuit case law admonishes importing limitations into claims from the written description's examples or embodiments.  *Wenger*, 239 F.3d at 1237.

Intervet contends that "vector" means "a *live* virus or plasmid DNA."  (Franks Decl. Ex. 9 (emphasis added).)  Intervet's construction unduly narrows the ordinary meaning of the term "vector" to a "live" virus or plasmid.  Although the specification suggests that "[f]or the expression *in vivo* for the purpose of producing recombinant live vaccines … [a]s appropriate vectors, there *may* be used live viruses, preferably capable of multiplying in pigs, nonpathogenic for pigs (naturally nonpathogenic or rendered as such), according to techniques well known to persons skilled in the art", the specification does not limit the term "vector" to "live" viruses or plasmids in all instances.  (Franks Decl. Ex. 1 col. 4, lns. 40-47 (emphasis added).)  As an initial matter, the specification only suggests that live viruses "may" be used as an appropriate vector for *in vivo* expression.  It does not teach that live viruses are the only appropriate vectors for *in vivo* expression.

In addition, the specification teaches that appropriate vectors may include live viruses that are rendered nonpathogenic via techniques well known to persons skilled in the art.  (Franks Decl. Ex. 1 col. 4, lns. 22-58 & col. 15, ln. 4-6.)  Under Intervet's proposed construction, there

would be a question as to whether a live virus that has been rendered nonpathogenic by conventional techniques, such as chemical treatment, would still be considered a "live" virus and thus outside of the scope of the term "vector." Thus, even though the specification teaches that such viruses rendered nonpathogenic by such techniques are appropriate vectors for purposes of the invention described in the patent, Intervet's proposed construction would improperly exclude such viruses from the scope of the claims.

Moreover, in addition to describing vectors for use in *in vivo* expression, the patent specification teaches that vectors may also be used for *in vitro* expression. Nowhere does the specification limit the vectors useful for *in vitro* expression to "live" viruses or plasmids. Rather the patent specification speaks in general terms of "appropriate vectors." (Franks Decl. Ex. 1 col. 4, lns. 22-58; Abstract) By way of example, the specification explains "[f]or the expression of subunits *in vitro*, as a means of expression, E. coli or a baculovirus will be preferably used (U.S. Pat. No. 4,745,051)" without setting forth any requirement that these example vectors be "live." (*Id.* at col. 4, lns. 22-24.)

Intervet's construction is ambiguous. In particular, it is unclear in Intervet's proposed construction whether the adjective "live" is intended to modify both "virus" and "plasmid" or "virus" alone. In either case, Intervet's proposed construction is objectionable. With respect to viruses, although the patent specification makes a general reference to live viruses, this phrase is used only in the context of a non-limiting example, and it has been extensively debated in science whether viruses are living organisms, with virologists generally considering them as non-living, because they do not meet all the criteria generally accepted for the definition of life. Thus, importing the "live" limitation into the claim language with respect to the use of viruses as vectors, in addition to being improper, would introduce an unnecessary ambiguity into the

claims. With respect to plasmids, it is universally accepted that "plasmids" are non-living things. Thus, to the extent Intervet intends the adjective "live" to modify plasmids, it would effectively eliminate plasmids as possible vectors, which is entirely inconsistent with the '601 patent's specification. Thus, while it is unclear what Intervet hopes to accomplish by importing the limitation "live" into the construction of the term vector, what is clear is that the importation of such a limitation into the claim language would improperly limit the claims' scope and introduce unnecessary ambiguity.

The doctrine of claim differentiation also supports Merial's construction. Claim 16 reads, "[t]he vector of any one claims 1-6 and 9-13 wherein the vector is a virus." Because Claim 16 is not limited to a "live virus," Claim 1 cannot be limited to a "live virus" because by definition, as a claim that depends from Claim 1, Claim 16 cannot be broader than Claim 1. Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003); *see also Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1209 (Fed. Cir. 2007); *Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006)

Because Merial's construction is consistent with (i) the ordinary meaning of the term "vector," (ii) the patent's written description, and (iii) the other claims of the patent, e.g., under the doctrine of claim differentiation, and because Intervet's construction improperly seeks to import a limitation into the claim, unnecessarily creates ambiguity, and conflicts with the doctrine of claim differentiation, Merial's construction should be adopted by the Court, and Intervet's rejected.

### B.    Merial proposes the proper construction for the term "PCV-1 [Porcine Circovirus Type-1]" in Claims 32-33 and 35.

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| PCV-1 [Porcine Circovirus Type-1] | 32, 33, 35 | A non-pathogenic porcine circovirus that can be derived from PK/15 cells. | The nonpathogenic porcine circovirus strains disclosed in the '601 patent. |

Merial's construction of the term "PCV-1 [Porcine Circovirus Type-1]," which means "a non-pathogenic porcine circovirus that can be derived from PK/15 cells" is supported by the written description of the '601 patent.  (Franks Decl. Ex. 1 '601 patent Abstract, col. 1, lns. 10-13, lns. 25-27, col. 5, lns. 10-17, col. 5, lns. 20-27, col. 5, ln. 64 -col. 6, ln. 2, col. 6, lns. 36-50, col. 6, lns. 54-57, col. 12, lns. 22-35, col. 12, lns. 46-67, col. 13, lns. 5-17, col. 14, lns. 21-29, col. 14, lns. 37-42, & col. 14, lns. 59-64.)  The written description distinguishes the newly discovered porcine circovirus, i.e. PCV-2, from PCV-1, stating, "[t]he new strains can thus be considered as being representative of a new type of porcine circovirus, called here type II, *type I being represented by PK/15*." (*Id.* at col. 1, lns. 59-62 (emphasis added).)  The patent's written description also notes that "the PCV derived from the PK/15 cells is considered not to be pathogenic." (*Id.* at col. 1, lns. 25-26.)

Additionally, two articles by Meehan et al. (which includes as authors several of the '601 patent's inventors)—one a 1997 reference cited in the '601 patent itself and the second a 1998 contemporaneous article—further support Merial's construction of PCV-1.  (Franks Decl. Ex. 4; Decl. Ex. 5.)  Meehan's 1997 article provides, among other things, a nucleotide sequence of porcine circovirus [type-I] in comparing porcine and plant circoviruses.  (Franks Decl. Ex. 4 at 224-25.)  And Meehan's 1998 article distinguishes PCV-2 from PCV-1 and describes PCV-1 as

– 22 –

a "PK-15 cell culture isolate" that does "not produce clinical disease" in experimentally infected pigs. (Franks Decl. Ex. 5 at 2178 & 2171, respectively.)

Intervet asserts that "PCV-1 [Porcine Circovirus Type-1]" should mean "the nonpathogenic porcine circovirus strains disclosed in the '601 patent."  With that assertion, Intervet improperly tries to limit the construction of this term to the embodiments or examples in the written description.  As previously explained, Intervet's proposed construction must fail in light of Federal Circuit case law and the language of the patent's written description that manifests breadth by indicating that particular embodiments are merely *representative* and that equivalent sequences should also be included.  *Phillips*, 415 F.3d at 1323; (E.g., Franks Decl. Ex. 1 at col. 1, lns. 59-62.)

### C.    Merial proposes the proper construction for the term "Porcine Circovirus Type 2 [PCV-II]" in Claims 9, 16, 32-33, and 35.

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| Porcine Circovirus Type 2; PCV-II | 9, 16, 32, 33, 35 | A porcine circovirus of type II that is pathogenic to pigs and a causative agent of Post Weaning Multisystemic Wasting Syndrome [PMWS]. | The five viral strains identified in the '601 patent. |

Merial's construction of the term "Porcine Circovirus Type 2 [PCV II]" as "a porcine circovirus of type II that is pathogenic to pigs and a causative agent of Post Weaning Multisystemic Wasting Syndrome [PMWS]" is supported by the written description of the '601 patent.  (Franks Decl. Ex. 1, col. 1, lns. 4-6, lns. 48-61, col. 1, ln. 66- col. 2, ln. 3, col. 2, lns. 20-29, col. 3, ln. 62- col. 4, ln. 30, col. 13, lns. 24-34, col. 13, lns. 62-66; *see also* Decl. Ex. 5.)  The patent teaches that "the present invention relates to new porcine circovirus (PCV for Porcine CircoVirus) strains responsible for the PMWS syndrome (Porcine Multisystemic Wasting

Syndrome also called Post-Weaning Multisystemic Wasting Syndrome) ….” (*Id.* at col. 1 ln., 4-7.) The patent further teaches that the “invention relates to any porcine circovirus capable of being isolated from a physiological sample or from a tissue sample, especially lesions, from a diseased pig having the PMWS . . . in particular type II circovirus.” (*Id.* at col. 1, ln. 66- col. 2, ln. 3.) Moreover, the written description explains that the invention includes at least, “each of the open reading frames present on the genome of *all the circovirus isolates associated with the multisystemic wasting syndrome.*” (*Id.* at col. 13, lns. 64-66 (emphasis added).)

Meehan’s 1998 article further supports this definition. It discloses the “nucleotide sequences of circoviruses associated with wasting syndromes in pigs.” (Franks Decl. Ex. 5 at 2172.) It concludes by explaining that “the circoviruses associated with cases of wasting syndromes in pigs in North America and Europe represent a new type of PCV. We propose that these new circoviruses should be referred to as PCV2 as opposed to the original PK-15 cell culture isolate which should be referred to as PCV1.” (*Id.* at 2178.)

And in an April 1998 letter to the editor—prior to the May 1998 U.S. filing date of the application from which the ’601 patent stems—inventor Allan and his colleagues further described PCV-2. (Franks Decl. Ex. 10, 4/1998 Ltr. to The Veterinary Record.) The letter states, “We have isolated and characterised [sic] novel porcine circoviruses from pigs with wasting disease syndromes in Canada, the USA, France, Spain, Denmark and Northern Ireland . . . . Genomic analysis of the Canadian, US and French isolates of PCV have shown that these porcine circoviruses form a closely related group…Given the antigenic and nucleotide sequence differences, we propose that these novel PCVs represent a different type of PCV, and should be designated Type II porcine circoviruses. The original PCV contaminant…should be designated

Type I porcine circovirus." (*Id.*)  Thus, Merial proposes the correct definition of PCV-2, which is consistent with the recognized definition in the relevant literature.

Intervet again improperly seeks to limit a claim term to the specific examples in the patent.  Intervet's proposed construction for "Porcine Circovirus Type 2 [PCV II]" as "the five viral strains identified in the '601 patent" ignores the '601 patent's express disclosure.  The patent expressly states that the term "Porcine Circovirus Type 2 [PCV II]" is not limited to the examples listed in the patent, but rather, "[t]he new strains can thus be considered as being *representative* of a new type of porcine circovirus, called here type II, type I being represented by PK/15." (Franks Decl. Ex. 1 at col. 1, lns. 59-61 (emphasis added).)  By way of example, the patent teaches that "[t]he nucleotide sequence of the Imp. 1010 isolate was considered to be *representative* of the other circovirus strains associated with the multi-systemic wasting syndrome." (*Id.* at col. 13, lns. 24-26 (emphasis added).)  It further teaches that, "The positions of the start and end of each ORF refer to the sequence presented in Fig. No. 4…, of the genome of strain 1010.  The limits of ORFs 1 to 13 are identical for strain 999.  They are also identical for strains 1011-48121 and 1011-48285, except for the ORFs 3 and 13." (*Id.* at col. 13, lns. 52-58.)

Moreover, the patent states, in part, that:

> The subject of the present invention is therefore
> a DNA fragment containing all or part of one of
> these sequences.  It goes without saying that the
> invention automatically *covers the equivalent sequences*…
> There will of course be *included the sequences differing by*
> *degeneracy of the code*.  The invention *also*
> *covers the equivalent sequences in the sense that they*
> *are capable of hybridizing with the above sequence*
> *under high stringency and/or have a high homology*
> *with the strains of the invention*. . . .

(*Id.* at patent, col. 3, ln. 64- col. 4, ln. 9 (emphasis added).)

In addition, no claims in the '601 patent are limited by any specific strain designation, or any specific sequence. Notably, during prosecution of the '601 patent, the United States Patent Office ("USPTO") did not require that the '601 patent's claims be limited to particular sequences or viral strains. (Franks Decl. Ex. 6.) Thus, the Court should not read such limitations into the '601 patent from the written description.

The prosecution history of the '601 patent further supports Merial's construction in another way. In January 2001, the USPTO issued an Office action stating: "The claims are drawn to DNA and vectors that comprise 'ORFs 1-13.' The ORFs are assumed to be derived from porcine circovirus, but as written, the claims could encompass ORFs from any organism." (Franks Decl. Ex. 6, 1/26/2001 Office Action at 2.) In response, Merial added the phrase "of porcine circovirus type 2" to the claim that issued as claim 9. Thus, Merial clarified that the claim covered a vector containing DNA of ORFs 1 to 13 of any PCV-2, only so as to distinguish this from other organisms, but, not to limit the claim to only the particular isolates, strains, or sequences disclosed in the patent. (Franks Decl. Ex. 6, 4/23/2001 Amendment) Indeed, the PTO allowed the amended claim and did not require it to recite the particular PCV-2 strains disclosed in the application, or particular sequences. Accepting Intervet's construction would introduce a claim limitation that is not present in the clear language of claim 9 and was not required by the PTO for allowance.

Intervet wrongly attempts to limit the meaning of PCV-2 to the '601 patent's examples and preferred embodiments. The written description does not warrant the restrictions that Intervet seeks to impose. The written description contains no language limiting the invention to only the five example strains provided in the patent. In fact, the written description contains language precisely to the contrary. And the Federal Circuit has repeatedly held that a patent's examples

– 26 –

should not generally limit claim scope. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997); *see also In re Wallach*, 378 F.3d 1330, 1333 (Fed. Cir. 2004) (explaining that disclosure of an amino acid sequence provides sufficient information that an applicant is in possession of the full genus of nucleic acids encoding a given amino acid sequence). Thus, the Court should adopt Merial's construction of PCV-2 and should not, as Intervet proposes, limit the term to the particular examples listed in the patent.

### D.    Merial proposes the proper construction for the phrase "ORFs 1 to 13" in Claims 9 and 16.

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| ORFs 1 to 13 | 9, 16 | A length of DNA sequence (or corresponding RNA sequence) from the genome of a PCV-2 circovirus between an ATG (or AUG) translation start signal (initiation codon) and a termination codon which can be potentially translated into a polypeptide sequence.<br><br>The specific DNA sequences identified in Example 13 are only representative examples. | The specific DNA sequences defined as ORFs 1-13 in Example 13. |

Merial contends that the phrase "ORFs 1 to 13" has its ordinary meaning of "a length of DNA sequence (or corresponding RNA sequence) from the genome of a PCV-2 circovirus between an ATG (or AUG) translation start signal (initiation codon) and a termination codon which can be potentially translated into a polypeptide sequence." This construction is supported by the specification. (Franks Decl. Ex. 1 at col. 13, lns. 20-52, col. 14, lns. 52-67, col. 11, lns. 60-65, & col. 12, lns. 22-35.)

Likewise, Merial's construction is consistent with *The Encyclopedia of Molecular Biology* (Sir John Kendrew ed., Blackwell Science Ltd., 1994) ("*Encyclopedia*"). (Franks Decl. Ex. 8 at 772.) It defines an "open reading frame" i.e., ORF, as "a length of DNA or RNA

30351282_7.DOC

sequence between an ATG (or AUG) translation start signal (initiation codon) and a termination codon, which can be potentially translated into a polypeptide sequence." (*Id.*)  Because it was clear during prosecution that the '601 patent provides a pioneer invention the language of the claims is not limited to particular strains or particular sequences.  Instead, as the patent teaches, example 13 provides examples.

Intervet improperly tries to limit the claim phrase "ORFs 1 to 13" by arguing that this phrase means "the specific DNA sequences defined as ORFs 1-13 in Example 13.**"**  Intervet's proposed construction is inconsistent with the '601 patent's written description.  (Franks Decl. Ex. 1 at col. 13, lns. 20-52, col. 14, lns. 52-67, col. 11, lns. 60-65, & col. 12, lns. 22-35.)  For instance, example 13 provides an analysis of the proteins encoded by the genome of the PCV-2 strains. (*Id.* at col. 13, ln. 20- col. 14, ln. 67.)  The written description clearly teaches that the ORFs in Example 13 are exemplary, specifically stating that "The nucleotide sequence of the Imp. 1010 isolate was considered *representative* of the other circovirus strains associated with the multi-systemic wasting syndrome." (*Id.* at col. 13, lns. 24-26 (emphasis added).).

The written description teaches that "[i]t was possible to detect 13 open reading frames (or ORF's) of a size greater than 20 amino acids on this sequence (circular genome).  These ORFs are the following: [table inserted in the '601 patent at col. 13, lns. 36-52 describes representative ORFS]].  The positions of the start and end of each ORF refer to the sequence presented in FIG. No. 4 (SEQ ID No. 4), of the genome of strain 1010.  The limits of ORFs 1 to 13 are identical for strain 999." (*Id.* at col. 13, lns. 31-57.)  It additionally teaches that "[a]mong these 13 ORFs, 4 have significant homology with analogous ORFs situated on the genome of the cloned virus PCV PK-15.  Each of the open reading frames present on the genome of all the circovirus isolates associated with the multisystemic wasting syndrome was analyzed." (*Id.* at

30351282_7.DOC

col. 13, lns. 61-66). And the written description further instructs that "any open reading frame (ORF1 to ORF 13) as described in the table above can represent all or part of an antigenic protein encoded by the type II porcine circovirus . . . ." (*Id.* at col. 14, lns. 53-62.)

Moreover, the specific DNA sequences identified in Example 13 are only representative examples. (*Id.* at col. 3, ln. 62- col. 4, ln. 10, col. 4, lns. 14-21, col. 13, lns. 24-28, & col. 13, lns. 62-67.) As explained above, the '601 patent states that "[i]t goes without saying that the invention automatically covers the equivalent sequences. . . ." (*Id.* at col. 3, ln. 66- col. 4, ln. 1.) The patent further teaches that "[t]he invention also covers the equivalent sequences in the sense that they are capable of hybridizing with the above sequence in high stringency conditions and/or have a high homology with the strains of the invention and belong to group II defined above." (*Id.* at col. 4, lns. 6-10.)

By defining "ORFs 1 to 13" as "the specific DNA sequences defined as ORFs 1-13 in Example 13," Intervet again seeks to read unnecessary and inappropriate limitations into the claim language. Intervet appears to rely on the written description's discussion of preferred embodiments. (*Id.* at col. 13, ln. 20- col. 14, ln. 67.) But "it is improper to read limitations from the written description into a claim." *Wenger*, 239 F.3d at 1237. The written description's illustrative example 13 does not warrant the restrictions Intervet seeks to impose on "ORFs 1 to 13." A patent's examples should not generally limit claim scope. *Ekchian*, 104 F.3d at 1303.

Indeed, the language of the claims is not limited to particular strains or particular sequences because it was clear during prosecution that the '601 patent provides a pioneer invention. The '601 patent's disclosed strains and ORFs are only representative. (Franks Decl. Ex. 1 at col. 3, ln. 62- col. 4, ln. 10, col. 4, lns. 14-21, col. 11, lns. 60-65, & col. 12, lns. 22-35, col. 13, lns. 20-52, col. 13, lns. 62-67, and col. 14, lns. 52-67.) From the '601 patent's

– 29 –

disclosure, persons of skill in the art can identify additional PCV-2 strains, and hence sequences

and ORFs[6] of additional PCV-2 strains.  Therefore, the '601 patent's claims are not—and should

not be construed to be—so limited, as Intervet suggests.

### E. Merial proposes the proper construction for the term "Epitope" in Claims 32-33 and 35.

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| Epitope | 32, 33, 35 | An imnmunodominant region of a protein. | An immunodominant region having at least 8-9 amino acids of a protein or peptide. |

Merial contends that the term "epitope" has its ordinary meaning.  An epitope is "an

imnmunodominant region of a protein."  The '601 patent's written description supports this

definition.  (Franks Decl. Ex. 1 '601 patent Abstract, col. 5, lns. 10-17, col. 5, lns. 20-27, col. 5,

ln. 64- col. 6. ln. 2, col. 6, lns. 36-50, col. 6, lns. 54-57, col. 14, lns. 21-29, col. 14, lns. 37-42, &

col. 14, lns. 59-64.)  The written description teaches that epitopes are "immunodominant regions

of proteins and are as such regions exposed at the surface of the proteins."  (*Id.* at col. 6, lns. 44-

45.)  In the practice of the invention, it is advantageous that an epitope be an immunodominant

region of a protein, i.e., regions that may be recognized by antibodies. (Franks Decl. Ex. 1 col. 6,

lns. 44-45.)  Because epitopes may be recognized by antibodies, they are particularly useful in the

field of diagnosis of disease and for the production of vaccines. (Franks Decl. Ex. 1 col. 6, lns. 45-

50.)

---

[6] Again, an ORF is a length of DNA bounded by special codons—a start codon and a stop codon.  Thus, disclosure of a DNA sequence is also a disclosure of the ORFs therein, as the skilled person readily recognizes ORFs within a sequence.

30351282_7.DOC

On its face, Intervet's construction does not appear contrary to Merial's construction.

But Intervet's construction does attempt to insert a limitation of a certain number of amino acids

into the claim term "epitope." Although a non-limiting example in the specification does state

that epitopes can be "at the very least, … a peptide having from 8 to 9 amino acids" this

limitation is not found in the claim language and was not required by the USPTO.  (*Id.* at col. 6,

lns. 51-53).  It is unclear what Intervet seeks to gain by inserting this limitation into the claims.

However,  because Merial has provided a clearer construction of the term "epitope" that properly

conforms to both the intrinsic and extrinsic evidence, Merial's construction should be adopted.

F.    **Merial proposes the proper construction for the phrase "A nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1" in Claims 32-33 and 35.**

| Disputed Term or Phrase | Found In Claims | Merial's Proposed Construction | Intervet's Proposed Construction |
|---|---|---|---|
| A nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1 | 32, 33, 35 | A DNA sequence which codes for an immunodominant region of a protein, wherein the sequence is from the genome of a PCV-2 circovirus and not from the genome of a PCV-1 circovirus. | At present, this term appears to be indefinite as the '601 patent does not provide a definition of "specific to PCV-2 and not specific to PCV-1." |

Intervet contends that the claim language "a nucleotide sequence encoding an epitope

which is specific to PCV-2 and not specific to PCV-1" is indefinite under 35 U.S.C. § 112, ¶ 2.[7]

---

[7] Despite the fact that the Court's Scheduling Order (D.I. 35) required the parties to exchange their lists of disputed claim terms and proposed constructions by November 13, 2006 and that the parties complete and file the Joint Claim Construction Statement by February 23, 2007, Intervet did not provide a proposed construction for this claim phrase by either of those dates.  Instead, Intervet took the dubious position that the phrase could not be understood by a person of skill in the art and, therefore, was indefinite. (*See* Franks Decl. Ex. 37).  On the evening of Monday, April 30, 2007, only two days before the parties' opening claim construction briefs were due, Intervet waffled and sent a letter to Merial's counsel asserting:  "Intervet will propose to the Court that, if the terms of claim 32 are to be construed, they should be given the following construction … 'an isolated DNA molecule which codes for at least one epitope found on PCV-2, but not for an epitope found on PCV-1." (*See* Franks Decl. Ex. 37).  Obviously, the fact that Intervet was able to provide a construction for this phrase torpedoes Intervet's previous assertion that this phrase is indefinite.  Because Intervet sandbagged Merial with its belated construction of this phrase in violation of

But vagueness, undue breadth, and triviality are matters that go to claim validity under 35 U.S.C. § 112, ¶¶ 1-2, not claim construction. *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989). A claim is not indefinite merely because it poses a difficult issue of claim construction. *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). The Federal Circuit has held that if the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, the claim has sufficient clarity and should be construed. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Holding claims indefinite only if reasonable efforts at claim construction prove futile, respects the statutory presumption of validity and protects an inventor's technical contribution. *Id.* at 1347-48..

In any event, the Court should reject Intervet's indefiniteness contention. The test for patent definiteness is whether person experienced in the field of invention would understand the scope of the claim when read in light of specification. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005). The claim language at issue satisfies this standard.

---

the Court's Scheduling Order, Merial did not have the opportunity to fully analyze and respond in this brief to Intervet's proposed construction. However, at first blush, it appears that Intervet's proposed construction is improper because it would exclude from the claim scope any DNA molecule that includes a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1 if the DNA molecule also includes nucleotide sequence encoding epitopes that are found in both PCV-2 and PCV-1. Given that, as taught in the '601 patent specification, the DNA sequences of PCV-2 viruses and PCV-1 viruses are about 76% homologous, Intervet's proposed construction would prevent Claims 32, 33, and 35 from covering isolated PCV-2 molecules, since all PCV-2 molecules, in addition to coding for epitopes specific for PCV-2, will include epitopes that are common to both PCV-2 and PCV-1. In fact, the claim uses the terminology "comprising." Comprising does not require that all epitopes are different between PCV1 and PCV2. *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("transitional term 'comprising' ... is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.") (citation omitted). Rather, the term "comprising" means that while PCV1 and PCV2 may have some epitopes in common, there must be at least one epitope wherein the sequence is from the genome of a PCV-2 circovirus and not from the genome of a PCV-1 circovirus. Merial intends to address Intervet's untimely proposed construction more fully in its responsive claim construction brief, but, it is clear that there is no basis for reading the restrictive limitation as proposed by Intervet into the language of the claims.

30351282_7.DOC

Because, as set forth above, Intervet proposes a construction for the phrase "epitope," it is apparently Intervet's contention that it is the remainder of the claim language in this phrase—"a nucleotide sequence … which is specific to PCV-2 and not specific to PCV-1"—that is not understandable by a person of skill in the art from a review of the specification.

Contrary to Intervet's contention, the written description provides a clear meaning for the complete phrase "a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1."  Upon a review of the specification, one of ordinary skill in the art would understand this phrase to mean "a DNA sequence which codes for an immunodominant region of a protein, wherein the sequence is from the genome of a PCV-2 circovirus and not from the genome of a PCV-1 circovirus." (Franks Decl. Ex. 1 '601 patent Abstract, col. 3, ln. 62- col. 4, ln. 10, col. 5, lns. 10-18, col. 5, lns. 38-39, col. 5, lns. 20-27, col. 5, ln. 64- col. 6, ln. 2, col. 6, lns. 36-53, col. 6, lns. 54-57, col. 11, lns. 8-14, col. 12, lns. 22- 35, col. 12, lns. 46-67, col. 13, lns. 5-17, col. 14, lns. 21-29, col. 14, lns. 37-42, & col. 14, lns. 59-64.)  Indeed, one of the primary teachings of the patent is the distinction between the nucleotide sequence of the PCV-2 virus versus a PCV-1 (i.e., PK/15) virus.  The written description of the '601 patent states, "[t]he [PCV-2] strains exhibit a very strong homology with each other at the nucleotide level, exceeding 96% and much weaker with the PK/15 strain, about 76%. The new strains can thus be considered as being representative of a new type of porcine circovirus, called here type II, type I being represented by PK/15."  (Franks Decl. Ex. 1, col. 1, lns. 57-62.)

Additionally, the patent teaches that "The invention aims to consider the porcine circoviruses isolated from a diseased pig and/or the circoviruses having a significant serological similarity with the strains of the invention and/or the circoviruses having cross-hybridization with the strains of the invention under stringency conditions such that there is no hybridization

with the PCV PK/115 strain." (Ex. 1 at col. 2, lns. 20-51)  And it further teaches that PCV2 encompasses:  (i) porcine circoviruses having a significant serological similarity with the strains listed in the patent; (ii) porcine circoviruses whose DNA cross-hybridizes with the DNA of the strains listed in the patent under stringency conditions such that there is no hybridization with the PK/15 (i.e., PCV-1) strain; (iii) porcine circoviruses having equivalent sequences, that is to say the sequences which do not change the functionality or the strain-specificity of the sequences described or of the polypeptides encoded by the sequences in the patent; (iv) porcine circoviruses whose sequences differ from the strains listed in the patent by degeneracy of the genetic code; and (v) porcine circoviruses having a high homology with the sequences of the strains listed in the patent.  (Franks Decl. Ex. 1, col. 1, lns. 4-6, lns. 48-61, col. 1, ln. 66- col. 2, ln. 3, col. 2, lns. 20-29, col. 3, ln. 62- col. 4, ln. 30, col. 13, lns. 24-34, col. 13, lns. 62-66.)

The written description further explains: "Persons skilled in the art will also be able to select fragments of the sequences [of PCV-2] corresponding to regions exhibiting little or no homology with the corresponding PK/15 circovirus sequence in order to carry out a specific diagnosis." (Ex. 1, col.5, lns. 14-17.)  The patent further teaches that "[s]equence alignments make it possible for persons skilled in the art to select a reagent in accordance with their wishes." (Ex. 1, col. 5, lns.18-19.)  Figure 5 of the '601 patent then provides a DNA sequence alignment of four PCV-2 sequences with the sequence of a PCV-1 (PK/15) virus such that a person of ordinary skill in the art could identify those regions of nucleotide sequences that are specific to PCV-2 and not specific to PCV-1.

Finally, the written description teaches that epitopes of interest can be determined especially on the basis of PCV-II DNA sequences, whether such epitopes are:

> epitopes of vaccinal interest or epitopes
> of interest in diagnosis. . . . From the. . .

– 34 –

> genome of the circovirus according to the
> invention [PCV-2], persons skilled in the
> art are in a position to determine epitopes
> according to known methods, for example
> an appropriate computer program or PEPSCAN.

(*Id.* at col. 6, lns. 36-43.)

Therefore, the written description explicitly teaches epitopes specific to PCV-2 and not specific to PCV-1 and explains how such epitopes can be identified by persons of skill in the art. Moreover, a presumption of validity attaches to an issued patent. 35 U.S.C. § 282. This presumption of validity carries with it a presumption that the examiner fulfilled her duty and understood the scope and content of the claims considered patentable. *See Intervet Am. Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989).

Thus, Intervet's contention that this phrase is indefinite has no basis and should be rejected and Merial's proposed construction should be adopted by the Court.

## CONCLUSION

Accordingly, Merial respectfully request that the Court adopt their proposed constructions for the claim terms and phrases of the '601 patent, and reject Intervet's attempts to improperly narrow the scope of the claims.

Respectfully submitted, this 2nd day of May 2007.

/s/ Tim Ngau
ALSTON & BIRD, LLP
Timothy Ngau
DC Bar No. 339333
950 F Street, NW
Washington, DC 20004
Phone: 202-756-3300
Fax: 202-756-3333

Judy Jarecki-Black, Ph.D.
Merial Limited
3239 Satellite Blvd.
Duluth, GA 30096-4640

– 35 –

Tel.: (678) 638-3805
Fax: (678) 638-3350

Thomas J. Kowalski
Steven M. Amundson
DC Bar No. 412196
Vicki Franks
Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, New York 10151
Tel.: (212) 588-0800
Fax: (212) 588-0500

Frank G. Smith, III
J. Patrick Elsevier, Ph.D.
Elizabeth K. Haynes
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Merial Limited and Merial SAS*

30351282_7.DOC