# Exhibit T

LEXSEE 2006 U.S. DIST. LEXIS 54366

E-WATCH, INC., a Nevada Corporation, and E-WATCH CORPORATION, a Texas Corporation, Plaintiffs, v. MARCH NETWORKS CORPORATION, Defendant.

Civil Action No. 9:06-CV-25

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, LUFKIN DIVISION

2006 U.S. Dist. LEXIS 54366

August 4, 2006, Decided
August 4, 2006, Filed

**COUNSEL:** [*1] For E-Watch, Inc, a Nevada Corporation, e-WATCH CORPORATION, a Texas Corporation, Plaintiffs: Anthony Field Constant, Constant & Vela - Corpus Christi, Corpus Christ, TX;Christopher A Bandas, Bandas Law Firm P C, Corpus Christi, TX; Christopher Todd Coco, Provost Umphrey - Beaumont, Beaumont, TX; Clayton Edward Dark, Jr, Attorney at Law, Lufkin, TX; Eric William Cernyar, Gunn & Lee, San Antonio, TX; Filemon B Vela, Jr, Constant & Vela, Corpus Christi, TX; Jesse Thomas Rhodes, III, Lyons, Rhodes and Vela LLP, San Antonio, TX.

For March Networks Corporation, Defendant: John E Giust, John E Gartman, Joseph P Reid, Michael M Rosen, Fish & Richardson - San Diego, San Diego, CA; James Stephen Roper, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, TX.

For March Networks Corporation, Counter Claimant: James Stephen Roper, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, TX.

**JUDGES:** Ron Clark, United States District Judge.

**OPINION BY:** Ron Clark

**OPINION:**

MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 6,970,183 AND NO. 6,392,692

JUDGE RON CLARK

Plaintiffs E-Watch, Inc. and e-Watch Corporation (collectively "E-Watch") filed suit against Defendant March [*2] Networks Corporation ("March Networks") claiming infringement of *United States Patent No. 6,970,183* ("the ' *183* patent") and *United States Patent No. 6,392,692* ("the ' *692 patent*"). The court conducted a *Markman* hearing to assist the court in interpreting the meaning of the claim terms in dispute. Having carefully considered the patent, the prosecution history, the parties' briefs, and the arguments of counsel, the court now makes the following findings and construes the disputed claim terms. n1

> n1 The record of the hearing sets out various agreements and statements of the parties concerning various claim terms, as well as the Court's analysis of some of the terms. While this order governs in the event of any conflict between the order and the Court's preliminary analysis at the hearing, the record provides additional reasons for the conclusions set out herein.

**I. Claim Construction Standard of Review**

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)* [*3] ("*Markman II*"). "The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995)* (citations omitted).

"'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)*

(*en banc*) (citation omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips, 415 F.3d at 1312* (quoting *White v. Dunbar, 119 U.S. 47, 52, 7 S. Ct. 72, 30 L. Ed. 303, 1886 Dec. Comm'r Pat. 494 (1886))*.

The words of a claim are generally given their ordinary and customary meaning. *Phillips 415 F.3d at 1312*. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." n2 *Id. at 1313*. Analyzing "how a person of ordinary skill in the art understands [*4] a claim term" is the starting point of a proper claim construction. *Id.*

> n2 Based on the patents and the representations of the parties at the hearing, the court finds that in this case such a person would have a background in computer and data transmission technology and in security. This would require a Bachelor's degree, with courses in computer operation, software engineering, and data transmission. Depending on the university, the degree might be designated by a title such as electrical engineering, computer engineering, or computer science. Sufficient work experience might substitute for such education. The person would also have a minimum of two to three years experience in the field of security of transportation facilities and carriers, and two to three years in the field of computer operation and data transmission.

A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire [*5] patent, including the specification." *Phillips, 415 F.3d at 1313*. Where a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean. *Id. at 1414*. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (citation omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips, 415 F.3d at 1314*. In these instances, a general purpose dictionary may be helpful. *Id.*

However, the Court emphasized the importance of the specification. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the [*6] meaning of a disputed term.'" *Phillips, 415 F.3d at 1315* (quoting *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996))*. A court is authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treaties. *Phillips, 415 F.3d at 1317*. But their use should be limited to edification purposes. *Id. at 1319*.

The intrinsic evidence, that is, the patent specification, and, if in evidence, the prosecution history, may clarify whether the patentee clearly intended a meaning different from the ordinary meaning, or clearly disavowed the ordinary meaning in favor of some special meaning. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979-80 (Fed. Cir. 1995)*. Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification. *Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999)*.

The "'ordinary meaning' of a claim term is its meaning to the ordinary [*7] artisan after reading the entire patent." *Phillips, 415 F.3d at 1321*. However, the patentee may deviate from the plain and ordinary meaning by characterizing the invention in the prosecution history using words or expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)*. It is clear that if the patentee clearly intended to be its own lexicographer, the "inventor's lexicography governs." *Phillips, 415 F.3d at 1316*.

## II. Claim Construction - The '183 patent

David Monroe is the inventor of *United States Patent No. 6,970,183*. The assignee is E-Watch, Inc. The '183 patent describes a comprehensive, wireless multimedia surveillance and monitoring system which can combine various sensors and detectors, including megapixel digital camera capability and full motion video surveillance in a network, with network components and appliances such as a server. The system is described as being capable of a wide range of monitoring techniques utilizing digital network architecture and is adapted for transmitting event data, [*8] video, and/or image monitoring information, audio signals and other sensor and detector data. The data can be transmitted

using both wired and wireless Local Area Network and Wide Area Network connections over long distances.

The first five disputed terms are contained in Claim 1. As indicated below, some of these terms are also found in dependent claims 18 and 25. The claim language is set out below with the disputed terms in bold and agreed terms in italics.

> A comprehensive, *IP network compatible, multimedia surveillance and security system* comprising a plurality of **sensor appliances** *adapted to connected* n3 to *a network based server for monitoring, logging, and transmitting data to the server* in order to permit **comprehensive surveillance of a predetermined area**, the system comprising:
>
> **a. a conventional security sensor** which is activated by the occurrence of an activating event and upon activation generates a signal;
>
> b. a *convertor for converting* the conventional sensor signal into a *network compatible signal* and adapted for sending the converted signal via the network to the server;
>
> **c. a surveillance sensor appliance** [*9] **controlled by the server** for monitoring an area and generating a signal indicating a condition in the monitored area in a **programmed response mode** controlled by the server, whereby the server receives and logs data transmitted by both the conventional sensor and sensor appliance.

n3 The parties agreed that "adapted to connected" means "are connected." For clarity, the court will use the agreed definition when discussing this term.

**1. "Sensor appliance."** Used in Claims 1, 18, and 25.

E-Watch proposes "a server-controlled network device that contains a sensor for monitoring an area and which generates and transmits an IP signal indicating a condition in the monitored area." March Networks suggests "a device which detects occurrence of an event and generates an output indicating that the event has occurred."

The specification teaches that a "sensor appliance" is different than just a sensor. See *183 patent*, col. 5, l. 7 ("multiple sensors and appliances. . . ."). The two are also listed [*10] separately in col. 5, ll. 39-43.

The parties agree that a "sensor appliance" is a "network device," which means that it generates an output or signal that is internet protocol compliant. This distinguishes the sensor appliance from a conventional sensor which generates a signal or an output that must be modified or processed before it can be transmitted over the internet. Examples of a conventional sensor would be a household fire alarm with a siren, or a pressure monitor with an analog dial gauge.

March Networks limits its definition to detecting an event. However, an IP camera, an audio monitor, or a thermostat might monitor both static, unchanging conditions in an area, as well as discrete events in the same area. E-watch limits its definition to a device that indicates a condition. There is no support in the specification for limiting the device in either way. The sensor appliance may monitor conditions, such as temperature and/or events, such as an intrusion into an area. See *183 patent*, col. 5, ll. 39-50 (specifications describe detection for temperature and smoke conditions); *see also 183 patent*, col. 7, ll. 50-55 (specifications describe "event detection such as by [*11] motion detection, contact closure. . . ."). At the *Markman* hearing, the parties seemed to agree that a sensor appliance may monitor a condition or event. Transcript from July, 12, 2006 Markman Hearing ("Tr.") pp. 17-24.

Contrary to the E-watch proposal, the claim is not limited to a device which is server controlled. There are sensor appliances which monitor continuously and/or automatically and which may be unresponsive to any "control" from a server. See *183 patent*, col 42, ll. 17-19. E-Watch is not opposed to deletion of the term "server-controlled." See Tr. p.15. The court therefore defines the term as follows:

> **"Sensor appliance"** means: "a network device which contains one or more sensors for monitoring an area and which generates and transmits an IP signal indicating a condition or event in the monitored area."

**2. "Comprehensive surveillance of a predetermined area."** Used in Claims 1, 18, and 25.

E-Watch argues that no construction is needed because the term is plain and ordinary on its face. In the alternative, E-Watch suggests "careful, close, continuous, thorough, or extensive watching of a predetermined area." March Networks argues [*12] that the definition should be: "the area under surveillance has sensors with some sensors having overlapping zones of detection."

This claim language is in the preamble of Claim 1 and could be interpreted to merely state an intended use or a desired result. It might be said that the phrase does not "breathe life and meaning" into the claim or any part of it, and is not a required antecedent of any of the actual paragraphs (a)-(c). However, both parties believe the phrase is important enough to argue over, see Tr. pp. 34-35, so the court will construe it.

Defendant's construction is too limited. The "predetermined area" is not specifically defined in the claims or specifications. In the context of the patent, it is the entire area of the facility to be protected. Nothing in the drawings or specifications requires overlap of sensors or sensor appliances, so long as all of the area is covered or monitored by at least one sensor appliance or conventional sensor. See ' 183 patent, col. 6, ll. 9-18. In other words, there could be one sensor appliance with video coverage of a court room, another with coverage of the judge's chambers, a third with coverage of the hall, and a heat [*13] and smoke detecting unit covering the crawl space above these rooms. There is no overlap, but the entire area is monitored or protected.

E-Watch argues that "comprehensive surveillance" includes the storing of data. The specifications indicate that storage, and other uses of data occurs in the server or in the sensor appliance. ' 183 patent, col. 7, ll. 38-40. The term being defined is "surveillance" of an area. The other functions are accomplished by the total system, but that does not make them part of the surveillance function.

The claim itself requires a plurality of sensor appliances,' 183 patent, col.45 ll.49-50, so there must be more than one. n4 The appliances may, but do not have to, overlap in their coverage of parts of the "predetermined area." n5

  n4 For the reasons stated in *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1122 (Fed. Cir. 2004), the court concludes that "plurality," as used in this patent, means "two or more."

  n5 Counsel for both sides agreed to this. See Tr. pp. 39-41.

[*14]

The court will define this term as follows:

> **"Comprehensive surveillance of a predetermined area"** means: "Using at least two sensor appliances, and in some cases one or more conventional security sensors, to monitor or observe the area protected by the system, so that all parts of the area are monitored or observed, although some or all parts of the area may be monitored or observed by only one sensor appliance or sensor."

3. **"Conventional security sensor."** Used in Claim 1(a).

E-Watch initially proposed "a sensor which outputs information in a format other than the Internet Protocol." March Networks suggested "a sensor that detects a predetermined event and which outputs data in a protocol other than an IP network protocol."

At the hearing the parties agreed to the following definition which, for the reasons stated on the record, is adopted by the court:

> **"A conventional security sensor"** means: "a sensor that outputs a signal or information in a format other than an Internet Protocol."

4. **"Surveillance sensor appliance controlled by the server."** Used in Claims 1 and 25.

E-Watch proposes "a server-controlled network device that [*15] contains a sensor for monitoring an area and which generates and transmits an IP signal indicating a condition in the monitored area." This is the same construction as "sensor appliance." Defendant does not offer a definition, but suggests that the phrase "surveillance sensor appliance . . . for monitoring . . . and generating . . ." is a means plus function term.

The claim does not include the word "means," which invokes a presumption that *35 U.S.C. § 112 (6)* does not apply. See *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). "This presumption can be overcome if it is demonstrated that 'the claim term failed to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function.'" *Id. at 1358* (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)).

In the briefing, and at the hearing, March Networks failed to demonstrate that "surveillance sensor appliance"

does not recite sufficient structure, or recites function without reciting sufficient structure. March Networks agrees that [*16] the term "sensor appliance" is not subject to § 112, P 6. The addition of the term "surveillance" does not suddenly make the term subject to § 112, P 6. The court concludes that this is not a means plus function term.

The court has already defined "sensor appliance." Some such appliances may send signals to the server but receive no return signal or command. But others, "controlled by the server," may react in response to commands. The specification describes steerable cameras. ' 183 patent col. 5, ll. 65-66. Upon detection of an event some devices may be activated. ' 183 patent, col. 6, ll. 59-61.

March Networks argues that a "surveillance sensor appliance" must be different from a "sensor appliance." Normally each word in a claim should have some meaning, and if the patentee uses "surveillance sensor appliance" that should be different than a "sensor appliance." *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317 (Fed. Cir. 2000)*("in absence of any evidence to the contrary, we must presume that the use of different terms in the claims connotes different meanings."). But the court should also presume the patent is valid and strive [*17] to construe the claim in light of the specifications.

When asked at the hearing, March Networks could provide no example in the specifications, nor from the point of view of one skilled in the art, of a sensor appliance that did not perform some type of surveillance of a condition, area, or event. Tr. pp. 29-31. One might not think of a temperature or fluid level sensor as performing "surveillance" but the ordinary definitions of "surveillance" do not exclude that definition. And, the claim itself states that the "surveillance sensor appliance" in question is for "monitoring an area and generating a signal indicating a condition. . . ." This is among the functions described for "senor appliances" in the specifications. *See* ' 183 patent, col. 35, ll. 29-36.

While it may have been less than perfect drafting, the court concludes that "surveillance sensor appliance" has the same meaning as "sensor appliance," as defined above. The court therefore defines the term as follows:

> **"Surveillance sensor appliance controlled by the server"** means "a sensor appliance (as defined previously) which monitors one or more conditions or events in an area, and which can receive and respond [*18] to signals from a server."

**5. "Programmed response mode."** Used in Claim 1(c).

E-Watch now argues that this term means "the server receives and logs the surveillance sensor appliance data in a pre-programmed response to a condition, situation, or event." March Networks suggests "the sensor appliance responds to the event in a mode of operation established by the server."

E-Watch's construction has the phrase modifying what the server does. But what is claimed is "a surveillance sensor appliance," not a server. The parties have previously agreed that the claim is for a system "comprising a plurality of sensor appliances [which are connected] to a network based server. . . ." There is no basis in the specification to adopt a grammatically strained construction of Claim 1(c), in which "programmed response mode" does modify "server" rather than "surveillance sensor appliance."

The plain language of the claim states that the appliance monitors an area, and generates a signal indicating a condition in the area. This monitoring and generation of a signal is described as being in a "programmed response mode controlled by the server." The appliance may respond automatically [*19] to certain conditions or events, if programmed or instructed to do so by the server. *See* ' 183 patent, col. 4, ll. 21-22 (a server may provide "auto response generation.").

The appliance, such as a wireless camera, can send data to the monitoring station, "continuously, periodically as programmed, or upon event detection. . . ." ' 183 patent col. 17, ll.14-17. Again, it is the appliance responding either automatically in accordance with prior instructions from the server, or reacting as an event occurs, in compliance with instructions from the server. *See* ' 183 patent, col. 30, ll. 58-61;' 183 patent, col. 37, ll. 22-27.

March Network's argument was in accord with this interpretation. Tr. p. 53, p. 54, ll. 14-16. E-Watch agreed that this was one way to interpret the claim. Tr. p. 46, ll. 21-23. E-Watch wanted to emphasize that the server was controlling the programmed response mode, but that is already in other language of the claim. The court therefore defines the term as follows:

> **"Programmed response mode"** means "the surveillance sensor appliance responds to the condition in accordance with predetermined instructions which are, or previously have been, received [*20] from the server."

**6. "Multi-function image sensor appliance."** Used in Claim 18(a).

Claim 18(a), with the disputed term in bold, and agreed terms in italics, states:

> **a multi-function image sensor appliance adapted for generating** an image signal representing the visual condition of a monitored zone of operation, *the image signal comprising both still frame image data and motion video image data.* . . .

The court has previously defined the term "sensor appliance." The claim language simply provides a further limitation that the appliance must be able to generate more than one kind of image. n6 Accordingly, the court provided the following construction of the language in question, to which the parties agreed. *See* Tr. p. 70, ll. 23-25, p. 71, ll. 1-14.

> **"Multi-function image sensor appliance"** means "a sensor appliance, as defined above, that can generate more than one type of image signal."

---

n6 Other language at the end of the claim specifies both static frame image data and motion video image data, which the parties agree are produced by different algorithms. Tr. p. 68, ll. 11-19.

---

[*21]

**7. "Mining the image data stored in the sensor memory."** Used in Claim 22.

Claim 22, with the disputed term in bold, states:

> The system of claim 18, the server is adapted for **mining the image data stored in the sensor memory**.

March Networks suggests that the term is indefinite and impossible to construe. If the term is construed, March Networks states that the term means "performing an analysis of the image data to determine historical patterns of behavior."

Data mining is described at col. 13, ll. 55-66, referring to Figs. 46a-46h and 47a-47i (which are described at col. 33, ll.24-67 and at col. 34, ll. 1-67) which describe "mining" a database. Both parties agreed that "mining" means "searching." Tr. p. 75, ll. 19-25; p. 76, ll. 1-7. March Network argues that the claim must be limited to data stored in the sensor memory, and is therefore indefinite because no sensors are disclosed - only sensor appliances.

*35 U.S.C. § 112* P 2 requires that the claims of a patent particularly point out and distinctly claim the subject matter which the applicant regards as his invention. "In ruling on a claim of patent indefiniteness, a court must [*22] determine whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp Servs., LLC v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004).* "The claims as filed are part of the specification, and may provide or contribute to compliance with *Section 112.*" *Hyatt v. Boone, 146 F.3d 1348, 1352 (Fed. Cir. 1998).* "If the claim is subject to interpretation, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Bancorp Servs., 359 F.3d at 1371.*

Here, the specification refers to the server and sensor appliances as having memory. *See* '183 patent, col. 7, ll. 38-40. Claim 18, on which Claim 22 depends, refers to sensor appliances. In light of the specification, including the claims, the court concludes that the claim term is not indefinite, even though it refers to sensor memory, and the rest of the claim uses "sensor appliance." n7

---

n7 The court notes that since the original claims included "sensor memory," there is disclosure of sensor memory in the '183 patent and the patentee could have amended the written description in the body of the specification to include it.

---

[*23]

The court construes this claim term as follows:

> **"Mining the image data stored in the sensor memory"** means: "searching the still frame images and the motion video images stored in those sensor appliances which retain such images."

The parties have agreed to the definition of some claim terms in Claim 25. For convenience Claim 25 is set out below, with the agreed terms in italics and the disputed terms in bold. n8

> A comprehensive, *IP network compatible, multimedia surveillance and security system* comprising a plurality of **sensor appliances** *adapted to connected to a network based server for monitoring, log-*

*ging, and transmitting data to the server* in order to permit **comprehensive surveillance of a predetermined area**, the system comprising:

**a. a plurality of surveillance sensor appliance controlled by the server** for monitoring an area and generating a data signal indicating a condition in the monitored area controlled by the server, whereby the server receives and logs signal data. . . .

n8 The terms in the preamble are the same as those in the preamble of Claim 1, and have already been construed.

[*24]

8. **"A plurality surveillance sensor appliances controlled by the server."** Used in Claim 25.

E-Watch suggests that the term means "two or more network devices that adapt the signals generated by associated surveillance sensors in a manner prescribed by the initial server." March Networks argues that this is a means plus function term. For the reasons stated in the discussion of disputed term 4 above, this term it is not a means plus function term.

When a harmless error in a patent is not subject to reasonable debate, and the prosecution history does not support a different interpretation, the error can be corrected by the court. *Hoffer v. Microsoft Corp., 405 F.3d 1326, 1332 (Fed. Cir. 2005) citing Novo Industries, L.P. v. Micro Molds Corp., 350 F.3d 1348, 1357 (Fed. Cir. 2003)*. It seems clear that the omission of the word "of" in front of "surveillance" is a typographical error. Based on previous constructions the court will define this term as follows:

> **"A plurality surveillance sensor appliances controlled by the server"** means: "two or more sensor appliances (as defined above) which monitors one or more conditions or events [*25] in an area, and which can receive and respond to signals from a server."

9. **"The server."** Used in Claims 26, 28, and 29.

Claim 26, with the disputed terms in bold, states:

> The system of claim 25, wherein the data from each of the various sensor appliances is transmitted to **the server** as it is created, wherein there is further included a monitor associated with the server for displaying data, the server adapted for showing image data in a step video format.

Claim 28, with the disputed terms in bold, states:

> The system of claim 25, wherein the data generated by each of the sensor appliances is stored in the memory at each appliance and is transmitted to **the server** upon occurrence of an event within the zone of operation of each sensor.

Claim 29, with the disputed terms in bold, states:

> The system of claim 25, wherein **the event is created by the server**.

Defendant March Networks argues that the term "the server" is indefinite, or in the alternative that it should be construed as "the initial server." E-Watch contends that the term is not indefinite and that it should be interpreted to mean "the initial network-based server."

If [*26] a claim is subject to interpretation, i.e., it is not insolubly ambiguous, then the claim term is not indefinite. *See Bancorp Servs., 359 F.3d at 1371*. "[T]he definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005)*. In determining whether a claim is insolubly ambiguous, the court should construe the terms according to the general principles of claim construction. *Id.*

Construing a term in accordance with the principles of claim construction, however, is different than correcting terms because of a typographical or clerical error. The court can correct such an error only if: (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims. *Novo Industries, L.P., 350 F.3d at 1357*.

The parties agreed that Claim 25 identifies two servers. The one they have agreed to call the "initial server," is mentioned several times in Claim 25: "a plurality of sensor appliances [*27] [which are connected] to a **network based server** for monitoring, logging, and transmitting data to **the server**. . . ." Part (a) of the claim then

describes "a plurality surveillance sensor appliances controlled by **the server**. . . ." And "a data signal indicating a condition in the monitored area controlled by **the server**, whereby **the server** receives and logs signal data." Part (c) of Claim 25 then states: "a network for communicating the plurality of sensor appliances with **a central server**."

The term "server" in Claims 26, 28, and 29 was not the result of a typographical error in leaving off the letter "s." E-Watch would not agree that "the server" in Claims 26, 28, and 29 referred to both servers described in Claim 25, pointing out that too much band width would be needed for all data going to all of the initial servers to also go to the central server. Tr. p.83, ll. 3-17. The specification described the initial servers at a school campus being in use during classroom hours but being shut off after hours, when the central server could monitor all areas. ' 183 patent, col. 9, ll. 1-7; see also ' 183 patent; col 18, ll. 21-30.

Likewise, E-Watch [*28] would not agree that "server" in Claims 26, 28, and 29 referred to the "central server," even though it could be argued that the "central server" is the one specifically claimed in Claim 25. Tr. p. 79, ll. 24-25, p. 80, ll. 1-20.

To the extent that E-Watch argues that the failure to include "initial" before "server" was a typographical error in the patent and should be corrected, the court concludes that the proposed correction of "initial server" is subject to reasonable debate. See *Novo Industries, L.P., 350 F.3d at 1357*. In the end, deciding which "server" is described in Claims 26, 27, and 29 is a toss-up. Given the claim language, it is just as likely to be the "initial server" as the "central server." True, with a 50-50 chance one can pick the initial server and argue that it is not insolubly ambiguous, merely debatable. But the only "debate" is how the coin toss comes out. Therefore, the court finds that this term is insolubly ambiguous. The court is constrained to find that Claims 26, 28, and 29 are indefinite.

### III. Claim Terms - The ' 692 patent

David Monroe is the inventor of *United States Patent No. 6,392,692*. The *' 692 patent* describes a wireless [*29] security and surveillance system, which provides communication of data in a port or terminal and port-to-transport and transport-to-transport communication of data. The subject invention is generally related to safety and surveillance equipment for aircraft, ships, and other commercial vehicles. It is specifically directed to a comprehensive multi-media security system while in port or terminal and in the preferred form provides both visual and/or audio information as well as critical data such as location, direction, intrusion, fire/smoke detectors. Any captured data and images are transmitted to a ground based security station for display on a monitor and may be recorded on a "black box" recorder as well as ground based recording system.

### 1. "Monitoring." Used in Claim 1.

The first disputed term is contained in the beginning of claim 1. This section is set out below with the disputed terms in bold and the agreed terms in italics.

> A comprehensive multi-media security and surveillance system for **monitoring** a commercial transport utilizing *IP protocol* and *transmitting secure data to both a ground monitoring station and to the commercial transport in digitized,* [*30] *multi-media format comprising textual, visual and audio information* . . .

E-Watch argues that the term "monitoring" is plain and ordinary on its face and does not need to be construed. In the alternative, E-Watch proposes "watching, observing, recording, or detecting." March Networks suggests "observing and gathering current data which indicates the specific near real time status of the transport's condition or its operational systems."

March Networks argues strenuously that "monitoring" cannot involve the storage of any data for later review. Its position is that a camera which sweeps a room is "monitoring" the room even though it covers only a part of the room at a time. On the other hand, March Networks argues, the "black box" in a plane is not "monitoring" because the F.A.A. doesn't get the box until the plane has crashed. At the hearing, March Networks stated that its proposal of "near real time" would allow for the delay between observations of a guard going around a building or "a system that polls every 20 minutes. Tr. p. 103, ll. 16-25.

March Network's construction is somewhat strained, and does not take into account col. 3, ll. 33-41, which describe monitoring of [*31] water, waste water, etc., so that an aircraft can be re-supplied when it reaches the terminal. There is no need for such data from the sensor appliances to be continuously transmitted, as there might be for other information such as fuel and oil levels or temperature. The data can be accessed when the plane approaches an airport, and the proper arrangements made. See' 692 patent, col. 6, ll. 42-43 ("Any signal which is capable of being captured and stored may be monitored in this manner.").

There is no limitation in the claim language, nor in the specification, that the monitoring must be in or close to "real time." March Networks' examples of "real time" involved delays of up to twenty minutes. If that expan-

sion is accepted, there is no basis in the specification for determining what would be "real time" and what would be "delayed" or "stored." Therefore the court construes this term as follows:

**"Monitoring"** means: "observing characteristics of, or events concerning."

**2. "A unique visual data signal in IP protocol representing a specific visual condition to be monitored."** Used in Claim 1(a).

Claim 1(a), with disputed term in bold, reads:

> [the system [*32] comprising] at least one visual sensor adapted for monitoring a selected visual condition associated with the commercial transport for generating **a unique visual data signal in IP protocol representing a specific visual condition to be monitored**.

E-Watch proposes "an image of a monitored area or object, transmitted in IP protocol together with information for distinctively identifying the image, such as the source and date/time of the image, or together with information for distinctively identifying an object or condition in the image." March Networks suggests "a specific data signal in IP protocol representing an event that is able to be sensed visually, and which indicates the occurrence of the event."

March Network, therefore, argues that the signal being transmitted must be a specific signal such as an alarm in response to an event. That is described at col. 12, ll. 18-21. But the specification also describes the system monitoring an aircraft, with the signal transmitting information such as the tail number and G.P.S. location data, so that the signal identifies a specific aircraft at a specific location and time. *See ' 692 patent*, col. 12, ll. 41-43; *' 692 patent*, [*33] col. 13, ll. 1-8. Just because the signal in one of the embodiments is a specific alarm does not mean that the entire claim should be so limited. The court construes this claim term as follows:

> **"A unique visual data signal in IP protocol representing a specific visual condition to be monitored"** means: "Information:
>
> > a. which is transmitted in a protocol compliant with the internet;
>
> > b. is about a condition, which can be seen, and which has been chosen to be observed; and
>
> > c. which distinctly identifies the condition being observed."

**3. "A unique audio data signal in IP protocol representing a specific audio condition to be monitored."** Used in Claim 1(b).

Claim 1(b), with disputed term in bold, reads:

> [the system comprising] at least one audio sensor adapted for monitoring a selected audio condition associated with the commercial transport for generating **a unique audio data signal in IP protocol representing a specific audio condition to be monitored**.

E-Watch argues this phrase means "an audio signal of a monitored area or object, transmitted in IP protocol together with information for distinctively identifying the [*34] audio signal, such as the source and date/time of the audio signal, or together with information for distinctively identifying a sound." March Networks proposes "a specific data signal in IP protocol representing an event that is able to be sensed audibly, and which indicates the occurrence of the event." The specification's description of the use of an audio signal is similar to the description of the visual signal discussed above. *See ' 692 patent*, col. 14, l. 45 - col. 15, l. 6. Accordingly, the analysis of this claim element is the same as for the previous claim element, and the court will construe it in a similar fashion, as follows:

> **"A unique audio data signal in IP protocol representing a specific visual condition to be monitored"** means: "Information:
>
> > a. which is transmitted in a protocol compliant with the internet;
>
> > b. is about a condition, which can be heard, and which has been chosen to be observed; and

c. which distinctly identifies the condition being observed."

Claims 3 and 31 are dependent on Claim 1. They are set out below with the disputed terms in bold:

3. The system of claim 1, wherein **said sensor is a commercial** [*35] **transport based sensor adapted for monitoring a specific on-board based condition on the commercial transport.**

31. The system of claim 1, wherein **said sensor** comprises an image sensor device for generating an image signal.

**4. "Said sensor."** Used in Claims 3 and 31.

March Networks argues that this phrase is indefinite. E-Watch states in its claim construction chart that in Claim 3 the term means "an additional sensor." In Claim 31, E-Watch argues that the term should be interpreted to mean "said at least one visual sensor."

The problem with both claims is the reference to "said sensor." Claim 1, the independent claim, describes a system comprising: "at least one visual sensor" and "at least one audio sensor." To which sensor do Claims 3 and 31 refer? The court must consider the application of several rules of construction, which, on their face, might appear to conflict.

A court must take a claim as it finds it, and "may not redraft claims, whether to make them operable or to sustain their validity." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). On the other hand, E-Watch asserts that a patent is presumed [*36] to be valid, and "claims should be construed to preserve their validity." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005). However, the Court also stated that such validity preserving construction was not a broadly applied principle. *Id.* A claim should be construed to preserve its validity "where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims." *Id.* (citations omitted). A court can "correct minor typographical and clerical errors in patents," but "only if (1)the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

As might be expected, E-Watch referred the court to a number of cases in which courts made corrections, or applied limiting constructions to preserve validity. March Networks provided an equally impressive list of cases supporting a finding of indefiniteness. In the end, these [*37] patent claims must be construed in the context of this patent's claim language, specification, and prosecution history.

Claim 3

The use of "said sensor" is not merely a typographical error. Claim 1 describes two distinct sensors - one visual, and one audio. There is no hint in the specification as to which is intended for use in the invention described in Claim 3. E-Watch argued in its brief that "said sensor" must mean at least one of the sensors - either the visual sensor, the audio sensor, or both. At the hearing E-Watch withdrew that argument, and was reduced to arguing that in Claim 3 the "said sensor" must mean "an additional sensor." While it may now be convenient to add to the invention a sensor which has been neither disclosed nor described, how does that meet the requirements of *35 U.S.C. § 112* for "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention"? How would a later inventor know that in addition to claiming a system with an audio sensor and a visual sensor, Claim 3 might also teach a system in which an additional audio or video sensor or a completely different sensor [*38] would be on board the commercial transport? Neither the court, nor another inventor should be required to guess what was meant by the language of Claim 3.

The court finds the language of Claim 3 to be insolubly ambiguous and not amenable to construction. Claim 3 is therefore is held to be indefinite. Since Claim 53 is dependent on Claim 3, it is also indefinite.

Claim 31

Claim 31 is subject to the same rules of construction and analysis. However, Claim 31 further describes the "said sensor." The claim states: "the system of claim 1, wherein said sensor comprises an image sensor device for generating an image signal." Clearly "an image sensor" which generates "an image signal" does not apply to the audio sensor described in Claim 1. That leaves only one sensor in Claim 1, to which "said sensor" in Claim 31 could refer - the visual sensor.

March Networks seems to argue that this would "render claims 16-21 not enabled." *See* March Networks' Resp. Br., p. 35. Since claims 16-21 are dependent upon Claim 3, not upon Claim 31, this argument is unavailing. March Networks also asserts that there could be some debate about whether "said sensor" of Claim 31 is the

audio sensor [*39] of Claim 1, because an audio sensor could be hooked up to a camera. *See* March Networks' Resp. Br., p. 36. True, but that mere possibility does not make the term insolubly ambiguous - merely debatable.

Likewise, March Networks argues that references in Claims 32 and 34, which depend from Claim 31, indicate that "said sensor" in Claim 31 can not be a visual sensor. It may be true that Claims 32 or 34 do not comport with Claim 31, upon which they depend. At most, that is an argument that Claims 32 or 34 may be indefinite. Since neither claim is before the court, that issue will be left to another day.

Therefore, the court construes the disputed language of Claim 31 as follows:

> "The system of claim 1, wherein **said sensor** comprises an image sensor device for generating an image signal" means: "The system of claim 1, where the signal produced by the 'visual sensor' is an image."

**5. "Commercial transport based sensor for monitoring a specific on-board condition on the commercial transport."** Used in Claim 3.

Since the court has determined that Claim 3 is indefinite, this term will not be construed.

**6. "Means for accessing and controlling system on [*40] board the commercial transport from the ground based monitoring station."** Used in Claim 53.

Since the court has determined that Claim 3 is indefinite, and Claim 53 depends from Claim 3, this term will not be construed.

### IV. Conclusion

The jury shall be instructed in accordance with the court's interpretation of the disputed claim terms in the '*183* and '*692 patents*.

So **ORDERED and SIGNED** this 4 day of **August, 2006**.

Ron Clark, United States District Judge