UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERVET, INC.,

     Plaintiff,

v.

MERIAL LIMITED AND MERIAL SAS

     Defendants.

Civil Action No. 1:06-cv-00658 (HHK-JMF)

**DECLARATION OF CHRISTOPHER CIVILIAN LOUIS CHASE, D.V.M., PH.D.**

**INTRODUCTION**

**I.    MY BACKGROUND**

1. I am a Professor in the Department of Veterinary Science and the Animal Disease Research and Diagnostic Laboratory in the College of Agriculture and Biological Sciences at South Dakota State University in Brookings SD. I hold an adjunct Professor position in the Department of Biology/Microbiology at South Dakota State University.  I am also an associate/consulting veterinarian at the Flandreau Veterinary Clinic.

2. I am the President of Rural Technologies, Inc. ("RTI"), a contact research organization. RTI does contract research with a number of animal health companies including Boehringer Ingelheim Vetmedica, Fort Dodge Animal Health, Schering Plough Animal Health, Novartis Animal Health, Merial and Intervet.  Under my direction, RTI has isolated porcine circovirus type 2 ("PCV2") for the development of a PCV2 disease model for vaccine testing.

3. I also have a consulting business whose clients include Boehringer Ingelheim Vetmedica, Fort Dodge Animal Health, Schering Plough Animal Health, Novartis

Animal Health, Merial and Intervet.  I have 22 years of experience in virology and immunology research and 27 years of experience in swine clinical veterinary medicine.

4.  My clinical experience has included swine herd health and working with herds with porcine circovirus.

5.  I am a member of the American Association of Swine Veterinarians and have been a member of the program committee for the Annual Meeting a number of times.

6.  I received my Doctor of Veterinary Medicine from Iowa State University in 1980. I received my Master of Science in Veterinary Science with specialization in virology in 1987 from the University of Wisconsin-Madison. I received my Ph.D. in Veterinary Science with specialization in virology/immunology in 1990 from the University of Wisconsin-Madison.  My doctorial work included studies of animal viruses using molecular biology techniques.  I also did a one month sabbatical in molecular virology at Duke Medical Center in Dr. Wolfgang "Bill" Joklik's laboratory in 1991.

7.  Prior to my present professorship at South Dakota State University, I was an associate in a swine and mixed animal practice (both companion animal and production animal practice) in Viborg, SD from 1980-1985. I was also a Veterinary Medical Officer at the Arthropod-borne Animal Disease Laboratory at USDA-ARS in Laramie WY from 1990-1992.  I was also an adjunct assistant professor in the Department of Molecular Biology at the University of Wyoming in Laramie from 1990-1992.

8. A copy of my *Curriculum Vitae* is attached hereto as Exhibit A.

## II. EXPERT CONSULTANCY

9. I have been engaged by Merial Limited to act as a consultant in this matter. I am being compensated at the rate of \$250/hr plus reasonable expenses. My compensation is not based on the opinions formed or the outcome of this litigation.

10. A list of publications authored by me within the preceding 10 years is shown in my *Curriculum Vitae*, which is attached hereto as Exhibit A.

11. I have not testified as an expert witness at trial or by deposition in any other litigation within the proceeding four years.

12. My opinions set forth in this declaration are based on my knowledge, education, and experience and the information in the documents cited in the paragraphs below and attached to this declaration and the following:

- U.S. Patent No. 6,368,601 ("the '601 patent");

- The prosecution file history of the '601 patent;

- Declaration of Raymond R. R. Rowland, Ph.D., dated May 2, 2007, and the attached exhibits;

- Merial's Principal Brief Concerning Claim Construction, dated May 2, 2007; and

- Declaration of Vicki Franks in Support of Merial Merial's Principal Brief Concerning Claim Construction, dated May 2, 2007, and the attached exhibits.

### III.    SUMMARY OF EXPECTED TESTIMONY

13. I am herein providing and if called to testify would expect to provide my opinions on certain terms and phrases in certain claims of the '601 patent and on the May 2, 2007 Declaration of Raymond R. R. Rowland, Ph.D. in this matter.

### IV.    BACKGROUND ON THE SCIENCE / TECHNOLOGY

14. I have read MERIAL'S PRINCIPAL BRIEF CONCERNING CLAIM CONSTRUCTION, including the sections entitled, "GLOSSARY OF TERMS AND ABBREVIATIONS" and "Scientific Background." In my opinion, the definitions and descriptions set forth in those sections for the various scientific terms and phrases are consistent with my understanding of how those terms and phrases are used in the scientific community.

### V.    OPINIONS AND BASES THEREFOR

#### A.    Vector

15. I have read and agree with Merial's proposed construction of the term "vector" as used in claims 9, 16, 33, and 35 of the '601 patent as being "an agent (virus or plasmid) used to transmit foreign genetic material to a cell or organism; used for the in vitro or in vivo expression of polypeptides."

16. This construction is consistent with how the term "vector" is used in the '601 patent. See, for example, '601 patent, Column 4, lines 11-13, 22-31, 31-34, 40-63; Column 5, lines 24-27.

17. I disagree with Dr. Rowland's proposed construction of the term "vector" as set forth on page 7 of his declaration. Dr. Rowland's proposed construction is too narrowly focused because it fails to recognize the breadth of the use of the term "vector" in the '601 patent and in the scientific community.

4

18. For example, Dr. Rowland asserts that the term "vector" must be limited to a "live" virus or plasmid. The term "vector" as it is used in the scientific community is not limited to "live" viruses or plasmids. In fact, I am not aware of any "live" plasmids. The term "vector" as used in the scientific community includes both living and non-living viruses.

19. Likewise, the '601 patent does not limit vectors to "live" viruses or plasmids. With respect to the use of viruses as vectors, I do not see any express requirement in the '601 patent that any virus vector be "live". The '601 patent uses the word "live" in the context of vaccines, where the virus replicates or multiplies in the target host. For example, Column 4, lines 44-45 refers to live viruses capable of multiplying in pigs. In addition to providing examples of live viruses, the '601 patent provides examples of non-living viruses as appropriate vectors. For example, column 4, lines 45-46, provides that appropriate vectors can be viruses that are "non-pathogenic for pigs (naturally nonpathogenic or rendered as such)." Viruses that are non-pathogenic include viruses that are not living (inactivated). In fact, the '601 patent provides specific examples of viruses that are incapable of replicating in pigs, such as avipox and canarypox virus, and that, therefore, would be considered non-living in pigs. Thus the '601 patent does not limit the use of the claim term "vector" to "living" viruses or plasmids.

**B.     Porcine Circovirus Type 1 (Porcine Circovirus Type I, PCV-1, or PCV1)**

20. I have read and agree with Merial's proposed construction of the term "PCV-1" as used in claims 32, 33, and 35 of the '601 patent as being "a non-pathogenic porcine circovirus that can be derived from PK/15 cells".

21. This construction is consistent with how the term "PCV-1" is used in the '601 patent. See, for example, '601 patent, Column 1, lines 10-27 and 59-62; Column 13, lines 12-14.

22. I disagree with Dr. Rowland's proposed construction of the term "PCV-1" as set forth on page 9 of his declaration. Dr. Rowland's proposed construction is too narrow as it proposes just two isolates to define "PCV-1." Dr. Rowland appears to focus only on two lines of the patent, Column 12, lines 26-27, to arrive at his definition. Dr. Rowland's definition seems to ignore the other sections of the patent that state that PK/15 is "representing" PCV-1. See, for example, Column 13, lines 12-14.

23. Dr. Rowland's assertion that the term "PCV-1", which he admits is synonymous with "porcine circovirus type I," did not exist and thus did not have an ordinary meaning at the time the application for the '601 patent was filed is not accurate. Allan et al., "Novel porcine circoviruses from pigs with wasting disease syndromes," The Veterinary Record, pp 467-468, was published April 25, 1998 – before the May 21, 1998 filing date of the U.S. application for the '601 patent – states that the "original PCV contaminant of continuous pig kidney cell cultures and the isolates … should be designated Type I porcine circovirus" and that the novel PCVs isolated and characterized from pigs with wasting diseases syndromes "should be designated Type II porcine circoviruses." A copy of Allan et al. is attached as Exhibit B. Thus, the term porcine circovirus type I, i.e., PCV-1, as well as the term porcine circovirus type II, i.e., PCV-2, was known in the field before the filing date of the U.S. application for the '601 patent.

24. Furthermore, the '601 patent at Column 1, lines 10-11 states that "PCV was originally detected as a noncytopathogenic contaminant in pig kidney cell lines" and that the '601 patent involves a new type of porcine circovirus. Clearly, the type of PCV that is the contaminant in the pig kidney cells was the first PCV (as it was "originally detected"), i.e., PCV-1 and the new type of porcine circovirus described in the '601 patent that came next was the second type of PCV, i.e., PCV-2.

25. Prior to the inventors' disclosure of the new type of PCV, i.e., PCV2, the only known PCV was the non-pathogenic porcine circoviruses, which were previously referred to simply as PCV. Those in the scientific community understood that this PCV – which is the same as PCV1 - was not limited to just the two isolates set forth in column 12, lines 26-27 of the '601 patent; but rather, that these isolates were representative of the original non-pathogenic circoviruses.

**C.     Porcine Circovirus Type 2 (Porcine Circovirus Type II, PCV-2, or PCV2)**

26. I have read and agree with Merial's proposed construction of the term "Porcine Circovirus 2; PCV-II" as used in claims 9, 16, 32, 33, and 35 of the '601 patent as being "a porcine circovirus of type II that is pathogenic to pigs and a causative agent of Post Weaning Multisystemic Wasting Syndrome [PMWS]".

27. This construction is consistent with how the terms "porcine circovirus type II " and "type II circovirus" are used in the '601 patent, as well as how the '601 patent discusses the new porcine circoviruses of the invention. See, for example, '601 patent, Column 1, lines 4-9, Column 1, lines 48-65, Column 13, lines 8-17.

28. I disagree with Dr. Rowland's proposed construction of the term "porcine circovirus type II" or "PCV-2" as set forth on pages 7-9 of his declaration. Dr. Rowland's proposed construction that PCV-2 means only the "five new PCV strains" is too restrictive; it seems to ignore the text in the '601 patent and is inaccurate with respect to the term "PCV-2".

29. As discussed above with regard to PCV-1, the Allan et al. article (Exhibit B) that was published in April 1998 – before the May 1998 filing date of the U.S. application that resulted in the '601 patent - shows that Dr. Rowland was not accurate when he states that the term PCV-2: "did not exist and did not have an ordinary meaning … at the time that Merial filed its patent applications leading to the '601 patent" and "comes from the '601 patent itself."

30. Moreover, the '601 patent at Column 1, lines 59-62, clearly identifies the five strains as "being representative of a new type of porcine circovirus, called here type II, type I being represented by PK/15". At page 8 of his Declaration, Dr. Rowland quotes this text; but, for some reason ignores it.

31. In footnote 2 of paragraph 24 of his declaration, Dr. Rowland asserts that "the applicants [for the '601 patent] never demonstrated that PCV-2 as defined in the '601 patent caused PMWS." As an initial matter, this assertion by Dr. Rowland is not particularly significant since the '601 patent states that the new porcine circovirus strains that are the subject of the '601 patent, i.e., PCV-2, are "responsible for the PMWS syndrome". See Column 1, lines 4-8. The '601 patent also distinguishes the new PCV-2 from the previously known non-pathogenic porcine circovirus, i.e., PCV-1. See Column 1, lines 25-27, 59-62.

Importantly, it is commonly accepted that PCV-2 is a causative agent of PMWS as stated in the '601 patent. In fact, a 2007 paper on which Dr. Rowland is listed as a co-author states:

> Two genotypes of PCV have been identified. PCV type 1 (PCV1) is nonpathogenic, while PCV type 2 (PCV2) has been implicated as the etiological agent of postweaning multisystemic wasting syndrome (PMWS) in swine.

This 2007 paper co-authored by Dr. Rowland, which is entitled "*Brief Report*: Detection of two porcine circovirus type 2 genotypic groups in United States swine herds," is attached hereto as Exhibit C. See page 1036.

32. In support of his unduly narrow construction for PCV-2, at pages 8-9 of his Declaration, Dr. Rowland relies on a published letter by Nayar et al. Dr. Rowland's reliance on this letter by Nayar is misplaced. The Nayar letter was not a peer-reviewed article. The Nayar letter does not fully describe the methods or procedures that may have been performed to allow another to reproduce those methods or procedures; or, to allow another to verify the conclusions in the Nayar letter. For example, the Nayar letter does not describe the sequence of the DNA primers for the PCR (polymerase chain reaction) assay, or the restriction enzymes (RE) that may have been used for the RE mapping.

33. In fact, contrary to normal practice, the Nayar letter fails to set forth any experimental controls. (Experimental controls are tests done to ensure that the results are valid; for example, in the Nayar letter, an important control would have been conducting the assays using pigs that were known to not have clinical signs of PMWS, and that had no exposure to pigs that had clinical signs of PMWS.)

Nowhere does the Nayar letter state whether such a control was performed or, if so, what the results of the control experiment were.

34. Nor are the results in the Nayar letter described with sufficient detail to allow another scientist to know if the conclusions reached are valid. For example, the Nayar letter fails to provide the size of the PCR product and the number and size of the RE fragments.

35. More significantly, the Nayar letter does not provide nucleotide sequence information. Without this information and with the bare information provided by the Nayar letter it is impossible to conclude that Nayar et al. in fact detected any new type of porcine circovirus. Based on the information provided in the Nayar letter, it is equally plausible that Nayar et al. detected in their assays a variant of PCV1, as opposed to detecting a new type of porcine circovirus. Furthermore, in view of the absence of controls in the Nayar letter, it is also plausible that Nayar et al.'s findings were the result of experimental error, such as contamination.

36. Furthermore, Rowland's assertion that "the only additional information provided in the '601 patent is the actual nucleotide sequence information of the specific strains isolated and identified in the patent" is simply wrong. While it is in fact, true that the Nayar letter does not teach nucleotide information, the Nayar letter also fails to provide, for example, information on: procedures for culturing and isolating PCV-2; techniques for detection of PCV-2; extraction of PCV-2 genomic DNA; restriction mapping of the genome of PCV-2; cloning of the PCV-2 genome; comparative analyses of the PCV-2 and PCV-1 DNA and amino acid sequences; amino acid sequences of PCV-2 peptides, polypeptides and proteins;

PCV-2 ORFs; production of PCV-2 antigens; vaccine preparation; and methods for determination of PCV-2 epitopes – all of which is in the '601 patent.

37. Therefore, Rowland's reliance on the Nayar letter as a justification for his unduly narrow construction of PCV-2 is unfounded.

**D.    ORFs 1-13**

38. I have read and agree with Merial's proposed construction of the term "ORFs 1-13" as used in claims 9 and 16 of the '601 patent as being "a length of DNA sequence (or corresponding RNA sequence) from the genome of a PCV-2 circovirus between an ATG (or AUG) translation start signal (initiation codon) and a termination codon which can be potentially translated into a polypeptide sequence."

39. This construction is consistent with how the term "ORFs 1-13" is used in the '601 patent. See, for example, '601 patent, Column 3, line 65 to Column 4, line 10, Column 4, lines 14-21, Column 13, lines 21-60, and Column 14, lines 59-65.

40. While Dr. Rowland is correct that an ORF is an open reading frame which is a length of DNA that could potentially encode a polypeptide or protein, i.e., a sequence of amino acids, I disagree with Dr. Rowland's proposed construction of the term "ORFs 1-13" (as set forth on pages 9-10 of his declaration) to mean only those specific subsections of the DNA sequences defined as 1-13 in Example 13 of the '601 patent. This definition is unduly narrow in light all of the information in the '601 patent. The '601 patent particularly provides that the sequences identified in Example 13 are only representative examples; see, for example, Column 13, lines 21-60, and Column 14, lines 59-65. Also, claims 9 and 16 of

the '601 patent do not include any language specifically limiting them to particular sequences by reference to any SEQ ID NOs.

41. Dr. Rowland asserts that the "decision by the inventors to select a parameter of 20 amino acids as the smallest number of amino acids defined by a putative ORF is not standard practice and ... indicates the intention of the inventors to limit their ORFs to the exact ORFs delineated in Example 13." This assertion is unsupported. As an initial matter, I am unaware of any standard practice with respect to a particular number as the minimum amino acids defined by a putative ORF. Even if there was a standard minimum number of amino acids that defined a putative ORF, the selection of such a number or the parameter of 20 amino acids says nothing about whether the ORFs are limited to particular sequences or are representative.

42. Thus, Dr. Rowland's attempt to limit the term ORFs 1-13 to the specific DNA sequences defined in ORFs 1-13 in Example 13 is not consistent with the description and claims in the '601 patent.

**E.    Epitope**

43. I have read and agree with Merial's proposed construction of the term "epitope" as used in claims 32, 33, and 35 of the '601 patent as being "an immunodominant region of a protein." An epitope is a portion of a molecule that may be recognized by the immune system, such as antibodies, B cells or T cells, which is consistent with Merial's proposed construction.

44. Merial's construction is consistent with how the term "epitope" is used in the '601 patent. See, for example, '601 patent, Column 6, lines 36-57.

45. I disagree with Dr. Rowland's proposed construction of the term "epitope as set forth on pages 10-11 of his declaration. In particular, I disagree with Dr. Rowland's assertion that the term "epitope" is limited to "immunodominant regions having at least 8-9 amino acids." The term "epitope" as used in the field is not limited to a particular number of amino acids and I do not understand the '601 patent to be using the term "epitope" in a manner that is contrary to the way the term is ordinarily used. I read the text at Column 6, lines 51-53 of the '601 patent as merely providing examples of sizes for epitopes; not as limiting the size of an epitope.

46. I also disagree with Dr. Rowland's assertion that the claims of the '601 patent use the term "epitope" solely in the context of a diagnostic tool or a vector comprising a diagnostic tool. In direct contrast to Dr. Rowland's assertion, Column 6, lines 36-39 of the '601 patent specifically state that "epitopes of interest" are of both "vaccinal interest or epitopes of interest in diagnosis." Column 14, lines 58-64 of the '601 patent provide that any ORF can represent all or part of an antigenic protein encoded by the type II porcine circovirus and is therefore potentially used for diagnosis and/or for vaccination. Since an antigen or immunogenic portion thereof may be an epitope, I also read Column 14, lines 58-64 of the '601 patent as showing that the term "epitope" is not limited to a diagnostic tool or a vector comprising a diagnostic tool. My understanding is consistent with other portions of the '601 patent which involve immunogenic active ingredients and vaccines. See, for example, '601 patent Column 1, lines 1-9 and Column 2, lines 52-54.

13

47. It is thus my view that Dr. Rowland has taken the term "epitope" out of the context of the entire '601 patent, and particularly ignores those statements in the '601 patent that refer to "vaccinal" and "vaccine" uses of epitopes.

**F.    A Nucleotide Sequence Encoding an Epitope Which is Specific to PCV-2 and Not Specific to PCV-1**

48. I have read and agree with Merial's proposed construction of the term "a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1" as used in claims 32, 33, and 35 of the '601 patent as being "a DNA sequence which codes for an immunodominant region of a protein, wherein the sequence is from the genome of PCV-2 circovirus and not from the genome of a PCV-1 circovirus".

49. This construction is consistent with the '601 patent. See, for example, '601 patent, Column 2, lines 20-26, Column 5, lines 14-17 and Column 6, lines 36-39, and Column 5, lines 18-19 and Figures 5 and 7.

50. I disagree with Dr. Rowland's proposed construction of the term "an isolated DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1" as set forth on pages 11-14 of his declaration.

51. Dr. Roland wrongly asserts that "no guidance is provided in the patent as to how one of ordinary skill in the art would make the determination that a particular DNA sequence encoded epitopes specific for PCV-2 by none [sic: not] for PCV-1." From the DNA sequence of a genome of a virus, it is possible to determine epitopes using known techniques, such as through the use of computer program analyses, PEPSCAN, which is a technique for epitope mapping. The '601 patent

makes this point in column 6, lines 39-43. Also, the '601 patent explains that

DNA sequences that are in PCV-2 and not in PCV-1 are used for ascertaining

PCV-2 epitopes for vaccinal or diagnostic purposes:

> Knowledge of the sequences of the different circoviruses makes it possible to define common sequences which make it possible to produce reagents capable of recognizing all the porcine circoviruses known.

> Persons skilled in the art will also be able to select fragments of the sequences corresponding to regions exhibiting little or no homology with the corresponding PK/15 circovirus sequence in order to carry out a specific diagnosis.

> Sequence alignments make it possible for persons skilled in the art to select a reagent in accordance with their wishes.

> . . .

> The present invention also makes it possible to determine epitopes of interest especially on the basis of the DNA sequences described here, whether epitopes of vaccinal interest or epitopes of interest in diagnosis. From the DNA sequence of the genome of the circovirus according to the invention, persons skilled in the art are in a position to determine epitopes according to known methods, for example an appropriate computer program or PEPSCAN.

'601 patent, Column 5, lines 10-19; Column 6, lines 36-43. Such sequence

alignments are provided in the '601 patent in Figures 5 and 7.

52. Given the information in the '601 patent, I disagree with Dr. Rowland's statement

that "a great deal of time, effort, and money would be required to design and

develop any experiment ... [to] identify an example of a DNA sequence that

encodes [sic: codes] for a particular epitope or immunodominant region that

would be 'specific to PCV-2 and not specific to PCV-1.'" Using the information

provided in the '601 patent, and techniques known in the field at the time that the

original French application to which the '601 patent claims priority was filed

(October 3, 1997), no undue experimentation was required to identify nucleotide sequences encoding an epitope which is specific to PCV-2 and not specific to PCV-1. In this regard, I particularly note the portions of the '601 patent cited in the paragraph above, as well as the techniques mentioned therein.

53. In addition, for the reasons set forth above whereby I refute reading "diagnostic" into the term "epitope", I also disagree with Dr. Rowland's assertion that the word "specific" in claim 32 indicates that the claim relates solely to diagnostics, or that such an assertion provides support for his erroneous construction of claim 32. Further, I see nothing in claim 32 that restricts the claim to a diagnostic tool or test.

54. I do not understand claim 32 as requiring that only DNA sequences unique to PCV-2 can be present in the isolated DNA molecule. While I understand claim 32 as requiring an isolated DNA molecule having at least one nucleotide sequence encoding an epitope unique to PCV-2 (and hence not present in PCV-1), I do not understand claim 32 to prevent the isolated DNA molecule from also including other nucleotide sequences, encoding epitopes found on PCV-1. That is, I do not understand claim 32 to exclude from the isolated DNA molecule nucleotide sequences encoding epitopes found on PCV-1, so long as the DNA molecule includes at least one nucleotide sequence encoding an epitope that is unique to PCV-2.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 21, 2007

_____

Christopher Civilian Louis Chase, D.V.M., Ph.D.

16